```
                    UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                        .
IN RE:                                  .  Case No. 24-90004
                                        .  Chapter 11
AUDACY, INC.                            .
                                        .  515 Rusk Street
               Debtor.                  .  Houston, TX 77002
                                        .
                                        .  Monday, January 8, 2024
. . . . . . . . . . . . . . . .  .  2:00 p.m.


               TRANSCRIPT OF FIRST-DAY MOTIONS HEARING
            BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
               UNITED STATES BANKRUPTCY COURT JUDGE
```

APPEARANCES:

For the Debtors:

Latham & Watkins LLP
By:  CAROLINE A. RECKLER, ESQ.
     HEATHER A. WALLER, ESQ.
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

Latham & Watkins LLP
By:  THOMAS FAFARA, ESQ.
     REBEKAH ANNE PRESLEY, ESQ.
     ATA E. NALBANTOGLU, ESQ.
     CHRISTOPHER HARRIS, ESQ.
     ELIZABETH A. MORRIS, ESQ.
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

APPEARANCES CONTINUED.

Audio Operator:          Courtroom ECRO Personnel

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):


For the Debtors:

Porter Hedges LLP
By:  JOHN HIGGINS, ESQ.
     M. SHANE JOHNSON, ESQ.
     MEGAN YOUNG-JOHN, ESQ.
1000 Main Street, Suite 3600
Houston, TX 77002-6336
(713) 226-6648

Dechert LLP
By:  SHMUEL VASSER, ESQ.
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
(212) 698-3500

Latham & Watkins LLP
By:  DENIZ A. IRGI, ESQ.
     JEFFREY T. MISPAGEL, ESQ.
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
(213) 485-1234

Latham & Watkins LLP
By:  LUCA CREDENTINO, ESQ.
99 Bishopsgate
London, EC2M 3XF
United Kingdom
+44.20.7710.1000

For the Ad Hoc First
Lien Lender Group:

Gibson Dunn & Crutcher LLP
By:  MATTHEW WILLIAMS, ESQ.
200 Park Avenue
New York, NY 10166-0193
(212) 351-2322

Gibson Dunn & Crutcher LLP
By:  ANNELYSE S. GAINS, ESQ.
1050 Connecticut Avenue Northwest
Washington, DC 20036-5306
(202) 955-8606

Howley Law PLLC
By:  TOM HOWLEY, ESQ.
Pennzoil Place, South Tower
711 Louisiana Street, Suite 1850
Houston, TX 77002
(713) 333-9125

APPEARANCES (Continued):

For the Ad Hoc Second        Akin Gump Strauss Hauer & Feld LLP
Lien Group:                  By:  MIKE STAMER, ESQ.
                                  JASON P. RUBIN, ESQ.
                                  MELANIE A. MILLER, ESQ.
                             One Bryant Park
                             Bank of America Tower
                             New York, NY 10036-6745
                             (212) 872-1000

For Wilmington Savings       ArentFox Schiff LLP
Fund Society, FSB, as        By:  JEFFREY GLEIT, ESQ.
DIP Agent and                1301 Avenue of the Americas
Prepetition First Lien       42nd Floor
Agent:                       New York, NY 10019
                             (212) 484-3900

For the U.S. Trustee:        Office of the U.S. Trustee
                             By:  HA MINH NGUYEN, ESQ.
                             515 Rusk Street, Suite 3516
                             Houston, TX 77002
                             (202) 590-7962

For DZ Bank:                 Mayer Brown LLP
                             By:  JAMES DANFORD, ESQ.
                                  BRIAN TRUST, ESQ.
                                  DABIN CHUNG, ESQ.
                             700 Louisiana Street, Suite 3400
                             Houston, TX 77002-2730
                             (713) 238-3000

Also Present:                SCOTT FEDERICI
                             Sessa Capital

                             MARK CONLAN, ESQ.
                             Gibbons P.C.

1          (Proceedings commence at 2:00 p.m.)

2              THE COURT:  Good afternoon, everyone.  This is Judge

3    Lopez.  Today is January 8th.  I'm going to call the

4    two o'clock case, 24-9004, the jointly administered cases of

5    Audacy, Inc.  And before I take appearances, I think I can

6    still tell everyone happy New Year, still early enough in the

7    year.  I hope everyone had a great holiday season and a happy

8    New Year.

9              It is my understanding that debtors' counsel, their

10   lines have been unmuted, and in a moment, I will unmute other

11   lines.  If you know you wish to make an appearance, why don't

12   you hit "five star"?  There's about 90 people on the line now

13   and probably growing.  So I've muted the entire line.  Once I

14   unmute your line, your line will be completely unmuted.  For

15   those who have made requests to appear, pro hac vice, we're

16   getting to them.  But to the extent we didn't get to yours

17   specifically, you're more than welcome to appear today at this

18   first day hearing.

19             Finally, I would note if you don't need to speak

20   today, but you wish to make an appearance, if you just jump on

21   the Southern District of Texas website, find my home page,

22   you'll find a place to make electronic appearances and you'll

23   find a link to the specific case.  I'd ask that you make an

24   electronic appearance for purposes of today.

25             With that said, who should I turn this over to to

1   make an appearance on behalf of the debtors?

2            MS. RECKLER:  Good afternoon, Your Honor, and happy

3   New Year to you as well.  Caroline Reckler of Latham & Watkins

4   as proposed counsel for the debtors, Audacy, Inc. and its

5   affiliates.

6            THE COURT:  Okay.  Good afternoon.

7            Is there anyone else whose line I've unmuted who

8   wishes to make an appearance before I start to unmute other

9   lines?  Alrighty.  I'm going to just unmute as I go in the

10  order.  Here's a 212 number.

11           MR. STAMER:  Your Honor, can you hear me?

12           THE COURT:  Just fine.

13           MR. STAMER:  Good afternoon, and again, happy New

14  Year, Your Honor.  Mike Stamer from Akin Gump on behalf of the

15  Ad Hoc Second Lien Group.

16           THE COURT:  Good afternoon, Mr. Stamer.

17           Okay.  Here's another 212 number.

18           MR. WILLIAMS:  Good afternoon, Your Honor.  Can you

19  hear me okay?

20           THE COURT:  Just fine.

21           MR. WILLIAMS:  Okay, great.  It's Matthew Williams of

22  Gibson, Dunn & Crutcher, counsel to the 1L Ad Hoc Group.

23           THE COURT:  Good afternoon.

24           MR. WILLIAMS:  Good afternoon.

25           THE COURT:  Here's a 202 number.

1          MR. NGUYEN:  Good afternoon, Your Honor.  Ha Nguyen

2   for the U.S. Trustee.

3          THE COURT:  Okay.  Good afternoon, Mr. Nguyen.

4          Anyone else wish to make an appearance?  Please hit

5   "five star."  One more.  Here's a 212 number.

6          MR. TRUST:  Good afternoon, Your Honor.  This is

7   Brian Trust at , Mayer Brown.  Good afternoon.  And again, to

8   reiterate, happy New Year to everybody.  We are serving as

9   counsel to DZ Bank, the agent under the securitization program,

10  as well as the agent under the proposed continued

11  securitization program as well.  Thank you.

12         THE COURT:  Good afternoon.

13         All right.  One more, and it's a 713 number.

14         MR. DANFORD:  Good afternoon, Your Honor.  James

15  Danford.  Brian Trust beat me to the punch here with Mayer

16  Brown, but his pro hac was signed just now at Docket 62, and

17  then Dabin Chung from our office is also part of the group, and

18  her pro hac was signed at Docket 63.  So I will leave it in the

19  capable hands of Brian and Dabin, but just wanted to make my

20  appearance as well.

21         THE COURT:  Okay.  I think that covers all the --

22  everyone who has requested to make an appearance.  I'll check

23  it periodically, but with that being said, I'll turn things

24  over to the debtors.

25         MS. RECKLER:  Thank you, Your Honor.  First off, for

1  the record, again, it's Caroline Reckler of Latham and Watkins,

2  the proposed debtors' counsel.

3       I want to thank Your Honor and your chambers for

4  accommodating us today.  I know that we've been reserving time

5  on your calendar for quite a few months, but we've used that

6  time to work with our key stakeholders very efficiently.  In

7  fact, I believe that we are likely to have a largely

8  uncontested first day hearing today, and hopefully a smooth

9  prepackaged case, thanks in large part to the broad consensus

10  that we have been able to reach with both groups of the

11  debtors' lenders.

12       As Your Honor will hear shortly, we've begun

13  solicitation of a plan of reorganization that is supported by

14  82 percent of our first lien debt holders and 73 percent of our

15  second lien debt holders.  And we do not plan to impair general

16  unsecured creditors.  I'll provide more detail on the proposed

17  plan shortly.

18       I would also like to thank Mr. Nguyen of the Office

19  of the United States Trustee for working constructively with us

20  on the orders that we will be asking Your Honor to approve

21  today.  I am pleased to report that we've been able to work

22  through all of the U.S. Trustee's comments cooperatively, and I

23  hope that will be indicative of a smooth hearing today.  Since

24  this morning, we've received a few comments to the first day

25  orders.  I believe we resolved a comment to the DIP order, and

1  we were working through one comment on the cash management

2  motion that we hope to address during the hearing.

3          I'd also like to thank the teams at Gibson, Dunn and

4  Akin, led by Mr. Williams, Ms. Gains, and Mr. Scheffer,

5  Mr. Stamer, Ms. Rubin *[sic]*, and Ms. Miller, respectively.

6  They have worked incredibly hard and constructively with us

7  over many months.  We appreciate their professionalism and

8  collaboration, even when we disagree.

9          I am joined here virtually today with certain of the

10  members of the debtors' management team, including their chief

11  executive officer, Mr. David Field, their chief financial

12  officer, Richard Schmaeling, their general counsel and

13  executive vice president, Andrew Suter.  And I believe the

14  management team is on the video with us today.

15          Also with me are our co-counsel, John Higgins, Shane

16  Johnson, and Megan Young-John, and my colleagues from Latham &

17  Watkins, including a number of my more junior colleagues that

18  you will be hearing from, some of whom, I think three actually,

19  are presenting in court for the first time today.

20          We also have Mr. Gray of FTI Consulting, our first

21  day declarant, and also one of the DIP declarants and his

22  colleagues at FTI Consulting, who have been acting as the

23  debtors financial advisors.  We have Mr. William Evarts, our

24  other DIP declarant and his colleagues at PJT Partners, who are

25  advising the debtors as investment banker.

1          Before presenting first day motions, I wanted to give

2     the Court a brief overview of the debtors, including how we got

3     here, who we are, and where we are going.  If you could give my

4     colleague, Ms. Chapman (phonetic), permission to share her

5     screen, it will be helpful to have a brief presentation pulled

6     up now.

7          THE COURT:  You got it.  Ms. Chapman, you're going to

8     have to help me.  There's a number of parties that are here.

9     If I could just have you wave, just turn your camera on for a

10    second and wave.  I got you.  Thank you.  There we go.

11         MS. RECKLER:  Thank you, Your Honor.

12         A lot of what I will be talking about is covered in

13    the first day declaration of Mr. Gray, who has been deeply

14    involved with the debtors planning and operations in the months

15    leading up to today in his role as senior managing director at

16    FTI.  His declaration, and I'll turn to the declaration

17    shortly, but his declaration appears at Docket Number 26.

18         Your Honor, starting with three main questions, who

19    are the debtors?  How did we get here?  And where are we going?

20    Audacy is the second largest radio broadcaster in the United

21    States.  We have over 220 stations in 45 markets nationwide.

22    And as you can see from the map on the next slide, we are

23    heavily weighted to the largest U.S. markets.  The company was

24    founded in 1968 at the dawn of the FM radio industry.  The

25    company went public in 1999.  At that time, it was known as

1   Intercom and in 2017 acquired CBS radio.

2          Here in Houston, Your Honor may have heard of Mix

3   96.5 or 95.7 The Spot, if Your Honor is a fan of pop music,

4   100.3 The Bull, for some Texas country, SportsRadio 610,

5   whether you're an Astros fan, Texans fan, Rockets fan, or

6   anything in between.  In fact, Audacy is the flagship station

7   for the Texans, and I know they enjoyed a big victory on

8   Saturday.

9          All that is to say, Audacy is big in Houston, but to

10  give Your Honor a sense of scale, this is a national company as

11  well.  Audacy's markets provide coverage of 60 percent of the

12  United States population ages 12 and up.  I grew up in New York

13  City and got my news from 1010 WINS and sports updates from

14  WFAN.

15         Audacy has three of the top six most listened to

16  music stations in America.  It has 118 million monthly music

17  listeners, and in 2022, it represented 48 percent of listening

18  in the all sports radio format, according to Nielsen's rating

19  of top 10 radio groups.

20         In news, Audacy had 81 percent of listening in the

21  all-news radio format in 2022.  Its next closest competitor

22  only had 10 percent by way of comparison.

23         But Audacy is not just a radio company.  While the

24  company got its start in radio, it has spent the last several

25  years investing heavily in digital media, podcasts, streaming,

1  and sports analytics.  Your Honor may have heard of We Can Do

2  Hard Things with Glennon Doyle, or Rotten Mango podcast, or the

3  CBS Sports Podcast Network.  The idea here is to capitalize off

4  of the trend in consumer audio listening habits.

5         While Americans listen to more live and recorded

6  audio each day than ever, up 15 percent in 2022 as compared to

7  the pre-pandemic, a growing percentage of that is digital

8  listening.  Audacy has an advantage in this space.  It can

9  leverage its existing radio stations, which are already

10  producing popular content, and deliver them to listeners

11  digitally.  And it has aggressively built its podcasting

12  capabilities.  Today, Audacy is the second largest radio player

13  in the podcasting market, and its podcasts have approximately

14  185 million monthly downloads.

15         So you might be asking yourself, based on everything

16  I've just said, why are we here?  If there's one chart that

17  answers that question, it's this one.  Between 2019 and 2020,

18  radio advertising markets where Audacy competes lost 1.5

19  billion in advertising revenue.  As Your Honor likely

20  remembers, there was almost no daily commuting to the office in

21  2020 when folks were locked down due to COVID-19.  For radio

22  broadcasters, that meant the prime time audience disappeared

23  virtually overnight.

24         Let me show you on the next slide how that translated

25  to Audacy, 67 percent reduction in adjusted EBITDA between 2019

1  and 2020.  And while many of us are back in the office, radio

2  advertising has not yet returned with the same strengths as

3  before.  If you look at 2021 and 2022 of this chart, the amount

4  of advertising revenue is still lower than 2019, and Audacy is

5  still down almost 60 percent compared to 2019.

6           But part of that is COVID.  Large markets where

7  Audacy is concentrated have lower office attendance on average.

8  But part of it is a shift in advertising dollars to new forms

9  of digital media.  As I mentioned earlier, Audacy is well-

10  positioned to take advantage of that shift.  It's heavily

11  invested in digital media over the past few years.

12           But those investments are taking longer to play out

13  than can be sustained under the company's current capital

14  structure.  What does that capital structure look like?  Audacy

15  has $1.9 billion of pre-positioned funded debt.  853 million of

16  that is owed to the first lien lenders, and that's made up of a

17  $220 million revolver and a $632 million term loan.  One

18  billion of that is owed under two tranches of debt.  The first

19  lien debt and the second lien debt share collateral, and

20  there's an inter-creditor agreement governing that

21  relationship.  And on top of that, Audacy has a $75 million

22  receivable financing facility.

23           Overall, Audacy's funded debt required $103 million

24  of interest payments in 2022 and would have required $120.6

25  million of interest payments in 2023, but for lender

1   forbearances.

2          As I'll cover in a moment, we are entering Chapter 11

3   with a deal with both the first lien and second lien lenders,

4   and we have an agreement with the agent on the receivables

5   facility to continue and ultimately upsize that facility.

6          So we have consensus with the lenders holding a

7   supermajority of all of the funded debt instruments that you

8   see on this slide.  But that consensus did not come out of

9   nowhere.  We have been in negotiations with the first lien and

10  the second lien lenders for over six months, starting in the

11  late spring of 2023.  Those negotiations at time were heated in

12  part because of disputes over the scope of liens that secured

13  the first and second lien collateral and the value of any

14  unencumbered assets.

15         By way of example, the first lien and second lien

16  debt documents do not provide for liens on real estate owned by

17  Audacy, the equity value of the receivable facility

18  securitization entity, or certain podcasting assets.  And in

19  negotiations, we needed to work out how reorganized Audacy's

20  equity would be allocated among the first lien and second lien

21  holders.  Fortunately, we were able to bridge the gap on those

22  issues, and we now have a plan that enjoys broad consensus from

23  both groups.

24         But I wanted to share with Your Honor a bit of the

25  background regarding the issues that needed to be resolved

1  before we could be here with consensus.  On the next slide,

2  Your Honor, you will see a simplified version of Audacy's

3  corporate structure.  Of the entities that you see on this

4  chart, only one, Audacy Receivables LLC, in the bottom row on

5  the left, is not a debtor.  That is because Audacy Receivables

6  LLC is a SPV designed to facilitate the AR securitization

7  financing that has been a longstanding source of liquidity for

8  the debtors.  But other than that, all Audacy entities are in

9  Chapter 11.  Audacy Inc. is the public parent.  Audacy Capital

10 Corp. is the issuer or borrower under the outstanding funded

11 debt.

12          As Your Honor can see, virtually all of Audacy

13 entities are liable on the $1.9 billion secured debt in some

14 way, or will be asked to pledge their assets to support the DIP

15 financing that the debtors require.

16          Turning now, Your Honor, to the key parties that you

17 will be hearing from in this restructuring, Audacy has been

18 represented by Latham & Watkins for many years, and we've spent

19 the better part of the last year preparing for these Chapter 11

20 cases and working on our strategy.  And we are proposed counsel

21 to the debtors, along with Porter Hedges.

22          FTI Consulting and PJT Partners have also been

23 representing Audacy as financial advisor and investment banker,

24 respectively.  As I mentioned, Audacy has engaged with

25 representatives of its 1L and 2L lenders.  An ad hoc group of

1   first lien lenders is represented by Mr. Stamer -- excuse me,

2   by Mr. Williams and his team and Greenhill, and they enjoy

3   support of 82 percent of their group.

4           An ad hoc group of second lien lenders is represented

5   by Akin and Evercore.  An estimated 73 percent of the second

6   lien notes are in that group.  And the DZ facility is

7   represented by Mayer Brown.

8           The negotiations with the lender groups were hard

9   fought by all involved, and that competitive tension between

10  Audacy's lenders led to deal terms that were favorable to the

11  company.  Those negotiations resolved the collateral issues

12  that I referred to earlier.  The restructuring support

13  agreement reflects that agreement, and it was signed by the

14  debtors on January 4th.

15          The restructuring support agreement provides for an

16  approximately $1.6 billion reduction in Audacy's total debt.

17  Audacy's balance sheet will go from approximately $1.9 billion

18  of funded debt prepetition to approximately $350 million upon

19  exit.  The restructuring support agreement also provides for

20  the equitization of all but $225 million of first lien loans

21  and full equitization of a billion dollars of second lien

22  notes.  Funding for operations and Chapter 11 costs will be

23  provided through a $32 million DIP loan and a $25 million

24  upsize of the AR facility.

25          Equity of reorganized Audacy will be allocated 85

1  percent to holders of first lien loans and 15 percent to

2  holders of second lien notes.  Very significantly and very

3  important to the company, the management team, and the board is

4  the fact that unsecured creditors will be unimpaired.

5          Solicitation on the plan began on January 5th, and

6  we're proposing a voting deadline of February 12th.  We

7  appreciate that your chambers gave us a February 20th

8  confirmation hearing date, and if confirmed, the plan would be

9  consummated as soon as FCC regulatory is received, and we

10  recognize that that may take a few months post-confirmation.

11          The restructuring support agreement also contemplates

12  DIP financing.  We will cover the DIP in greater detail, but to

13  give Your Honor a preview, we will be seeking a $32 million

14  DIP, all of which is new money.  There is no rollup feature.

15  All first lien lenders are eligible to participate in the DIP.

16  Certain members of the first lien ad hoc group have agreed to

17  backstop the DIP and exit facility for a 3 percent fee.

18          As I mentioned, the AR facility will be upsized to

19  $25 million, and we're asking Your Honor to approve the DIP and

20  the upsize in the AR facility today.  But with that financing,

21  the debtors expect to have sufficient liquidity to operate

22  their business and to fund these Chapter 11 cases.

23          Your Honor, the exit financing is also contemplated

24  by the restructuring support agreement, and we enjoy the fact

25  that we know we have that exit financing in hand now and don't

1    have to go out to the market to secure it.  Upon exit, an

2    estimated $25 million of DIP loans will be rolled into an exit

3    facility with a five-year maturity.  Again, certain members of

4    the first lien ad hoc group have agreed to backstop the exit as

5    DIP lenders, but not required to roll their DIP claims into the

6    exit facility claims.  An additional $225 million of exit

7    facility will be comprised of first lien loan take-back debt.

8    The amount of the exit facility will scale to ensure that the

9    debtors have $50 million of cash on their balance sheet upon

10   emergence, which we view as essential to the long-term

11   business.

12          So where are we going from here?  As I mentioned, the

13   company signed the RSA on January 4th and started solicitation

14   on January 5th.  The RSA contemplated a prepackaged Chapter 11

15   plan, and we are well on our way.  We hope that we will move to

16   a consensual and efficient trip through Chapter 11.

17          Audacy filed our petitions yesterday, and we hope

18   that Your Honor will approve the emergency release today,

19   January 8th, on various motions so the company continue to

20   operate as smoothly as possible, including by funding payroll

21   for employees and approving DIP financing that is needed to

22   continue operations.  We also are seeking conditional approval

23   of our disclosure statement today and approval of our

24   solicitation procedures.

25          Under the RSA, the DIP financing needs to be in place

1    by January 10th, so we are hopeful we will convince Your Honor

2    to approve it.  The formal voting deadline to participate --

3    excuse me, the formal voting deadline is February 12th under

4    the debtors solicitation procedures.  The RSA then requires

5    that we have planned confirmation no later than February 21st.

6    While we have started the process to obtain FCC approval, that

7    process may take a few months post-confirmation, and we have

8    180 days to obtain this regulatory approval.

9           Your Honor, that concludes my remarks.  I don't know

10   if others want to make a statement on the record, but if Your

11   Honor wants to take a break and turn to others, after that, I

12   would like to turn to the evidence and the declarations that

13   we'd like to submit into evidence for purposes of this hearing

14   today.

15          THE COURT:  Okay, let me just open it up.  Does

16   anyone else wish to make any form of brief opening before we

17   get into the evidence?

18          MR. STAMER:  Your Honor, can you hear me?

19          THE COURT:  Just fine.

20          MR. STAMER:  Okay.  Again, it's Mike Stamer from Akin

21   Gump on behalf of the Ad Hoc Second Lien Group.  I am joined by

22   my colleagues, virtually, Jason Rubin and Melanie Miller.

23          I rise to make a very efficient presentation.  Rather

24   than stand up after each of the material motions, if it's okay

25   with Your Honor, I'll just quickly put our support on the

1   record.

2             THE COURT:  Okay.

3             MR. STAMER:  Your Honor, and I'll do my best to

4   either not repeat what debtor's counsel said, or at least limit

5   my repeating as much as possible.

6             Your Honor, we do represent an Ad Hoc Second Lien

7   Group.  The members of the Second Lien Group hold in excess of

8   70 percent of the principal amount of the second lien loans.

9   And we are a party -- the members of the Ad Hoc Second Lien

10  Group are a party to the restructuring support agreement.

11            Your Honor, the negotiations that led to the signing

12  of the RSA and the filing of Audacy's prepackaged consensual

13  Chapter 11 cases were, as Ms. Reckler said, they were lengthy,

14  they were at times spirited, but at all times they were

15  conducted at arm's length and in good faith.

16            Your Honor, we have had the opportunity to review and

17  comment on each of the first day motions currently before the

18  Court.  And the Ad Hoc Second Lien Group supports the relief

19  requested and the entry of the proposed forms of order.

20            Your Honor, I'm happy to answer any questions or

21  elaborate further.  I leave it to Your Honor.

22            THE COURT:  Yep.  Thank you very much, Mr. Stamer.

23            MR. STAMER:  Thank you.

24            THE COURT:  Anyone else wish to make any statements?

25            MR. WILLIAMS:  Yes, Your Honor.  Can you hear me?

```
1            THE COURT:  Just fine.
2            MR. WILLIAMS:  Great.  Hi, it's Matthew Williams
3   again at Gibson, Dunn & Crutcher.  With me are my colleagues,
4   AnnElyse Gains and Tommy Scheffer.
5            As you heard earlier, we represent the Ad Hoc First
6   Lien Lender Group.  Again, Your Honor, I'll be very brief as
7   well.
8            You know, our group holds over $700 million or over
9   82 percent of the first lien loans.  Our 2019 statement was
10  filed earlier today.  I think it's Docket Number 47.  Your
11  Honor, as you heard from the debtors and from the 2L lenders as
12  well, over the summer of last year, the 1L lender group, the 2L
13  lenders, and the company all got -- or the lenders got
14  restricted and we began discussions with the debtors.  The
15  mutual goal of those discussions was to holistically address
16  the company's burdensome capital structure and its inability to
17  make its upcoming interest payments.  After extensive good
18  faith and sometimes contentious negotiations with the
19  representatives for the company, as well as for the second lien
20  lenders, all the parties were able to reach the global
21  consensus that I think you've got that debtor is currently
22  soliciting in its prepackaged plan.
23           As the debtors noted, Your Honor, as part of that
24  plan, right, if confirmed the 1Ls would convert their 1L debt
25  into a combination of takeback debt and reorg equity.  The 2Ls
```

1  would convert their 2L debt into a combination of reorg equity

2  and warrants, and unsecured creditors are importantly less

3  unimpaired.  In addition, Your Honor, as Ms. Reckler noted, as

4  part of the restructuring, my clients have agreed to provide a

5  $32 million new money DIP, and upon exit from Chapter 11, roll

6  the vast majority of that DIP into first out exit financing.

7  And so therefore, the company will know that it's got money

8  both during and after the case to run the company.

9        Your Honor, we put in a lot of hard work to get where

10  we are today.  The vast majority of our clients were restricted

11  for an extended period of time while we negotiated this

12  restructuring.  Over the last eight months, we've had to

13  resolve dozens and dozens of complex business and legal issues.

14  But, you know, we're happy and it's a testament really to the

15  debtor's hard work here that we got to where we are today.  The

16  company, its management, its professionals were always helpful

17  and always urging us to get to a deal and urging the 2Ls to get

18  to a deal.  And we think that through those efforts, we've

19  gotten there and it's going to then work in the benefit of the

20  go forward business, its employees and all of its stakeholders.

21        And still, while there's a lot of work to do to get

22  the confirmation, we look forward to continuing to work with

23  the 2Ls and the debtors to get there.  And we think the

24  debtor's prepackaged plan will get us there in due course.

25  That's really all I had to say, Your Honor.  I'm happy to

1  answer any questions.

2            THE COURT:  Thank you very much.

3            Anyone else?

4            MR. WILLIAMS:  Sure.

5            THE COURT:  Okay, Ms. Reckler, I'll turn it back over

6  to you.

7            MS. RECKLER:  Thank you, Your Honor.  And it's

8  Caroline Reckler again for the record.  As a housekeeping

9  matter, Your Honor, I'd like to offer four declarations into

10 evidence.  The first declaration is that of Heath Gray, senior

11 managing director at FTI Consulting, the debtors financial

12 advisor.  That declaration can be found at Docket Number 26.

13 Your Honor, would you like to take these one at a time or

14 should I go through the remaining three?

15           THE COURT:  Let's go through the remaining three.

16           MS. RECKLER:  Your Honor, the second is also a

17 declaration of Mr. Heath Gray in support of the debtor's DIP

18 financing motion and securitization program motion.  This

19 declaration is at Docket Number 19.  The third is a declaration

20 of William Evarts, a managing director at PJP Partners, the

21 debtors proposed investment banker, also in support of the

22 debtor's DIP financing motion and securitization program

23 motion.  That declaration is a Docket Number 20.  And the

24 fourth is the declaration from Alex Warso of Epiq, our

25 solicitation and noticing agent.  And that declaration can be

1    found at Docket Number 5-2.

2                THE COURT:  Any objection --

3                MS. RECKLER:  All three witnesses are available on

4    video for cross-examination, if necessary.

5                THE COURT:  Does anyone have any objections to the

6    admission of the aforementioned declarations for purposes of

7    today's hearing?  Just checking.  Okay.  They are admitted.

8                MS. RECKLER:  Thank you, Your Honor.  And Your Honor,

9    before we turn to the first day motions, I'd just like to

10   address two brief housekeeping items with the Court.  The

11   first, Your Honor, certain of the motions only seek interim

12   release today and will require us to come back to Your Honor

13   for final approval.  I believe these include tax management and

14   our all trade motion, the NOL motion, the interim DIP motion,

15   the dip order, and the securitization program order.

16                As a result, Your Honor, we were hoping to find time

17   with the Court for a second day hearing.  If you have any time

18   available on the 5th or the 6th, or we can work with your

19   chambers to find a hearing date and time, whatever is easiest

20   for you.

21                THE COURT:  Let's find a time.  Why don't we do it on

22   the 5th?

23                MS. RECKLER:  Okay.

24                THE COURT:  Let's figure this out.  Let's see.  I'm

25   sorry.  If you're there, let me know if this time works.  I

1    will make the time.  Why don't we go with February 5th at 1

2    p.m.?

3             MS. RECKLER:  Thank you, Your Honor.

4             THE COURT:  Okay.

5             MS. RECKLER:  And lastly, Your Honor, we appreciate

6    the short turnaround between when we filed all of our papers

7    yesterday and today's hearing.  So I thought it might be

8    helpful to provide an overview up front of the service and

9    noticing plan that we implemented yesterday.

10            As a threshold matter, the debtors work with their

11   solicitation agent Epiq to discuss the broadest and most robust

12   notice that we could provide to our stakeholders under the

13   circumstances.  The debtors served by email all of the first

14   day motions to the core notice parties, and those include the

15   holders of our largest 30 unsecured claims, the first lien

16   agent and its counsel, the indenture trustee and its counsel,

17   the agent for the post-petition securitization program and its

18   counsel, the agent for the DIP facility and its counsel,

19   counsel for the first and second lien ad hoc group, as well as

20   a host of governmental regulatory authorities, including the

21   United States Trustee, the U.S. Attorney's Office for the

22   Southern District of Texas, the IRS, the SEC, state attorney

23   generals for the states in which the debtors operate, and the

24   FCC.  Importantly, we had email addresses for over 90 percent

25   of these notice parties, and we're able to provide notice of

1   all the first day motions in addition to any motion specific

2   notice parties.

3          In addition, Your Honor, we recognize that the debtor

4   stakeholders include beneficial owners of second lien notes and

5   holders of Audacy Inc.'s common stock.  In an effort to reach

6   such holders, we emailed notice of the first day hearing to the

7   nominees holding positions in DTC for the beneficial owners of

8   the debtor's second lien notes and equity.  All nominees were

9   requested where possible to provide notice of the hearing to

10  the beneficial owners of the debtor's debt and equity

11  securities.

12      In addition, to supplement the email notice to nominees or

13  the second lien notes and equity, the debtors also posted

14  notice of today's hearing on LENS, which is DTC legal notice

15  system, which is immediately available to the nominees with

16  positions held through DTC.

17         And finally, Your Honor, before the market opened

18  this morning, the debtors also filed an 8-K detailing the

19  Chapter 11 filing, which included among other things, an

20  overview of the RSA, as well as copies of key documents,

21  including the DIP order and the credit agreement and the

22  amended securitization program documents among others.  The 8-K

23  also provided notice of today's hearing and a link to Epiq's

24  case website for the debtors.

25         Taken together, Your Honor, we believe the debtors

1  have provided the most robust notice possible under the

2  circumstances.  And we have an affidavit of service on file at

3  Docket Number 50.

4           So Your Honor, unless you have any questions for me,

5  I'd like to pass the virtual lectern to my colleague, Thomas

6  Farfara, for presentation of a consolidated Creditor Matrix

7  motion.  And he's one of my colleagues who will be presenting

8  for the first time in court today.

9           THE COURT:  No pressure.  Yeah.  I will turn it over.

10 No questions.  Thank you.

11          MS. RECKLER:  Thank you, Your Honor.

12          MR. FARFARA:  Good afternoon, Your Honor.

13          THE COURT:  Good afternoon.

14          MR. FARFARA:  For the record, Thomas -- thank you.

15 For the record, Thomas Farfara of Latham & Watkins, proposed

16 counsel for the debtors.

17          The first item on the agenda is joint administration.

18 Thank you for entering that order, Your Honor.

19          The next item on the agenda is the debtors' motion to

20 file a consolidated Creditor Matrix.  It is at Docket Number 4.

21 This motion seeks an order first authorizing a consolidated

22 Creditor Matrix and lists of the top 30 unsecured creditors.

23 Second, modifying the requirement to file a list of equity

24 security holders.  And third, authorizing the debtors to redact

25 personally identifiable information from natural persons,

1   specifically their names and home and email addresses.  We

2   understand that the U.S. Trustee does have some views on this

3   point.

4          First, Your Honor, we believe that filing

5   consolidated lists will help alleviate administrative burdens

6   and costs, as well as eliminate the possibility of duplicative

7   filings and service.  Second, Your Honor, by this motion, we're

8   also seeking to modify the requirement that the debtors file a

9   list of and provide notice to all equity holders.

10          Audacy is a large publicly held company and does not

11   maintain a complete list of the beneficial holders of its

12   equity.  Filing a list of all shareholders would be burdensome

13   for the company.  Instead, the debtors proposed to file a list

14   of the registered equity holders within 14 days, and to only

15   serve those holders.

16      Again, as my colleague, Ms. Reckler just mentioned, we

17   also plan to promptly file an AK.  By this motion, finally,

18   Your Honor, we're seeking authority to seal certain personally

19   identifiable information of the debtors, individual creditors,

20   interest holders, employees, and other parties and interests to

21   the extent that they are natural persons.  Specifically, we are

22   seeking to redact their names and home and email addresses.

23          While this may raise concerns, the debtors are

24   prepared as noted in the motion and the proposed order, to

25   provide an unredacted version of all filings upon request by

1   email.  We believe that this relief is critical to protecting

2   individual creditors and other natural persons from the risk of

3   identity theft, harassment, and other injuries as has been

4   publicly known recently.  We believe that this relief has

5   become routine in this jurisdiction and it's appropriate given

6   the risk to individuals of publishing their addresses in a

7   public forum.

8          Unless Your Honor or anyone else has any questions,

9   we would respectfully request that you enter the proposed

10  order.

11         THE COURT:  Anyone wish to be heard?

12         Okay.  Before the Court is a request, what I would

13  call the consolidated Creditor Matrix motion filed at Docket

14  Number 4.  I'm going to find that there's been proper notice

15  and service for purposes of today's hearing.  I'm also going to

16  grant emergency consideration of this motion and I'll say I'm

17  going to grant emergency consideration for every other motion

18  that is before the Court today.  I believe it's appropriate

19  under the circumstances, and I believe each of the motions that

20  will be requested today on the agenda are appropriate for

21  emergency consideration for the Court.  So that statement will

22  carry for every motion.

23         The relief requested I think is important with

24  respect to the redaction of certain personally identifiable

25  information.  I think making -- providing potential

1    opportunities for others to see it when appropriate is

2    appropriate under the circumstances.  And I also find that the

3    proposed noticing procedures with respect to equity, it's just

4    appropriate.  It's right under the law and it is practical.  It

5    is made to achieve and provide the greatest amount of notice as

6    fast as possible to every holder of equity.

7              So I -- you look at the multiple forms in which the

8    debtor is proposing to reach out to holders of equity.  Under

9    the circumstances, I don't think one could ask for more under

10   the circumstances.  So I'm going to grant the relief requested.

11   Is the order at Docket Number 4 still the same one that you

12   want me to sign?

13             MR. FARFARA:  Yes, please, Your Honor.

14             THE COURT:  Okay.  Thank you.  It's signed and it's

15   off the docketing.

16             MR. FARFARA:  Thank you, Your Honor.  I will now pass

17   our microphone over to my colleague, Rebekah Presley.

18             THE COURT:  Thank you.  Great job.

19             MS. PRESLEY:  Good afternoon, Your Honor.  For the

20   record, Rebekah Presley from Latham & Watkins, proposed counsel

21   for the debtor.

22             THE COURT:  Good afternoon.

23             MS. PRESLEY:  You're -- good afternoon.

24             Your Honor, the fourth item on the agenda was the

25   claims agent retention application, which we saw Your Honor

1 entered this morning.  Thank you.  And with that, I will move

2 to agenda item 5, the customer programs motion, which is

3 located at Docket Number 6.

4          THE COURT:  Okay.

5          MS. PRESLEY:  By this motion, the debtors seek

6 authorization to maintain their customer programs and to pay

7 any prepetition obligations related thereto in an amount not to

8 exceed approximately 54.9 million.  This amount consists of

9 approximately 46 million in non-cash performance obligations

10 and approximately 9 million in cash customer obligations.

11          Your Honor, the customer programs are essential to

12 the continued growth and satisfaction of the debtor's customer

13 base.  And the debtor submits that maintaining their customer

14 programs and paying any prepetition amounts they're under is in

15 the best interest of the debtors estates and the maximized

16 value for all parties.

17          The U.S. Trustee has received this motion and we

18 believe the proposed order is acceptable to the U.S. Trustee.

19 No constituent has raised any other issues with respect to the

20 relief we are seeking in this motion.

21          The debtors believe that the requested relief is

22 consistent with relief previously granted in this district.

23 And unless Your Honor has any questions, the debtors would

24 request that the Court enter the proposed order.

25          THE COURT:  Can you give me a couple of examples of

1  the types of customer programs that the debtor seeks to pay --

2  continue?

3          MS. PRESLEY:  Sure.  Your Honor, the customer

4  programs include prepaid advertisement sales, an agency of

5  record program, incentive deals, and prepaid events.  In our

6  understanding, these are all very typical for large radio

7  scale -- large radio companies like Audacy.

8          THE COURT:  Well, the purpose is to continue to

9  operate in the ordinary course and to allow the programs that

10  companies would -- that people would expect to be provided by

11  Audacy to allow to continue the goodwill.  Do I get that right?

12          MS. PRESLEY:  Yes, Your Honor.

13          THE COURT:  Okay.  Yeah.  Anyone wish to be heard?

14          Okay.  I'm going to consider the motion file, the

15  Docket Number 6, which I'll call the customer programs motion.

16  Proper notice and service has been provided.  Relief requested

17  is appropriate under the circumstances and every case is

18  different, right?  And so you got to look at every case and

19  consider what the customer programs and also the kind of the

20  type of case that you have, whether you have a free fall or a

21  prepack or a pre-negotiated or even a straddle.  Every case is

22  different.  And so the customer program motion in every case

23  has to be considered separately.

24          And I do find that under the circumstances that the

25  relief requested is a sound exercise of the debtor's business

1   judgment.  And I'm going to find that the relief requested

2   today is appropriate.  Take note of the support by the 1L and

3   the 2L groups that have spoken today and I will grant the

4   relief requested.

5          Is the order that you still want me to sign at Docket

6   6?

7          MS. PRESLEY:  Yes, Your Honor.

8          THE COURT:  Okay.  Thank you.

9          MS. PRESLEY:  Thank you, Your Honor.  With that, I

10   will pass the virtual podium to my colleague, Ata Nalbantoglu.

11          THE COURT:  Okay.

12          MR. NALBANTOGLU:  Thanks, Your Honor.  This is Ata

13   Nalbantoglu, for the record, of Latham & Watkins, proposed

14   counsel for the debtors.

15          THE COURT:  Good afternoon.

16          MR. NALBANTOGLU:  Good afternoon.

17          Your Honor, the next item on the agenda is a tax

18   motion, which can be found at Docket Number 12.  By the tax

19   motion, debtors seek authority to pay their prepetition tax and

20   fees in the ordinary course, as well as any tax and fees that

21   accrue during these Chapter 11 proceedings.  Debtors also seek

22   authority to amend the list of taxing authorities as may be

23   necessary and pay the service fees that have accrued

24   prepetition the debtors, third party payment processing

25   provider, global tax management, or GTM.

1          Your Honor, the debtors believe that they are

2   substantially current in a payment of assessed and undisputed

3   tax and fees.  However, certain of these taxes and fees that

4   are attributable to this prepetition period have not yet come

5   due.  The debtors estimate that this amount is approximately

6   $1,330,000 that have accrued and remain unpaid as of the

7   petition date.

8       Your Honor, as mentioned before, to facilitate the timely

9   payment of these tax and fees, the debtors work with GTM.  GTM

10  tracks, processes, and pays certain of these taxes and fees.

11  And we estimate that approximately $90,000 in service fees have

12  accrued and remained unpaid as of the petition date.

13         Your Honor, it goes without saying that the payment

14  of these taxes and fees are in the best interest of the debtors

15  and their estates, and as well as the service fees, which

16  facilitate the payment of these tax and fees.  If these -- if

17  we're delinquent on any of these payments, it could result in

18  fines, accrual of interest, or penalties, which we'd like to

19  avoid.

20         Your Honor, we have received no objections to this

21  motion on the docket and the United States Trustee's office

22  indicated that they had no comments to either the motion or the

23  proposed form of order.  I'm happy to go into more detail or

24  answer any questions you may have, but otherwise we would

25  respectfully ask the Court to enter the proposed order.

1           THE COURT:  Anyone wish to be heard in connection

2    with the taxes motion?

3           Okay.  I'm going to grant the relief request.  It's

4    taxes, you got to pay them.  Things get expensive when you

5    don't, and the IRS and other state authorities will continue

6    and they'll show up a lot.  So it's better to just pay them and

7    you got to pay them anyway.  Especially when you're going to

8    have a case where you're going to unimpaired the trade.  So it

9    makes a lot of sense.  Great job.  Thank you.

10          MR. NALBANTOGLU:  Thank you very much, Your Honor.

11   We will be moving now onto the insurance motion, which is

12   located at Docket Number 13.

13          THE COURT:  Thank you.

14          MR. NALBANTOGLU:  Absolutely.  By the insurance

15   motion, debtors seek authority to maintain their insurance

16   program in the ordinary course of business and to honor their

17   pre and post-petition insurance obligations.  Additionally,

18   Your Honor, debtors believe that the renewal of or entry into

19   new insurance policies and the payment of any related premiums

20   there too, would be in the ordinary course of business.

21   However, that is request such approval and authority out of an

22   abundance of caution.

23          Your Honor, as listed in Exhibit A to the motion, the

24   debtors maintain a variety of insurance policies, and we

25   believe this -- the amounts and the coverage there is typical

1    of businesses in the debtors field.  The debtor's insurance

2    obligations consist primarily of insurance premium payments,

3    deductibles, and broker fees.  Taking each in turn with respect

4    to premiums, Your Honor, debtors renewed their insurance

5    policies on November 17th, 2023 for this upcoming year.  And

6    the debtors have fully prepaid the insurance premiums under

7    these policies at the amount of approximately $10 million.

8            Moving to deductibles, Your Honor, debtors estimate

9    that approximately $410,000 in deductibles, relating to claims

10   that are outstanding, may come due during these Chapter 11

11   cases as of the petition date.

12           And lastly, turning to broker fees, as of the

13   petition date, the debtors do not believe that there are any

14   accrued and outstanding broker fees.

15           Your Honor, the maintenance of insurance coverage is

16   essential not only to the debtors continued operation, but to

17   their Chapter 11 objectives.  It is thus critical that the

18   debtors have the authority to pay these insurance obligations

19   as they come due and make sure to administer the insurance

20   coverage as necessary.  Again, we received no objections to the

21   motion on the record -- on the docket.  I apologize.  And we

22   have not received any comments to it from the United States

23   Trustee's office.

24           So I'm happy to, again, go into detail and answer any

25   questions.  Otherwise we kindly ask the Court to agree to the

1    order, proposed order.

2            THE COURT:  Anyone who wish to be heard?

3            Okay.  Before the Court is consideration of the

4    insurance motion.  It's important to maintain insurance.  It

5    benefits the estate.  The ability to continue your insurance

6    programs, especially during a Chapter 11 case is, quite

7    frankly, one of the U.S. Trustee guidelines.  So it's important

8    to maintain insurance.  It preserves value for the estate, the

9    sound exercise of the debtor's business judgment.

10           And I will grant the motion.  And I will sign the

11   order at Docket Number 6 -- Docket Number -- excuse me, 13,

12   that's the one you still want me to sign?

13           MR. NALBANTOGLU:  Your Honor, a quick amendment to

14   that point.  We've filed a proposed form of order at Docket

15   Number 48.  It also has an accompanying redline I think at

16   Docket Number 52.  If you would kindly put that order forward,

17   that would be much appreciated.

18           THE COURT:  I did that on purpose to make you see

19   what you were going to do there.  It's good to point out that

20   there's an amended one before the judge gets out there and

21   signs it.  So -- but great job.  So now point me where you want

22   me to go.  Where am I looking?

23           MR. NALBANTOGLU:  Your Honor, I'll turn the virtual

24   podium over to my colleague, Deniz Irgi.

25           THE COURT:  No, no.  Tell me where the order is.

1  Tell me where the order is.  The amended order is where?

2          MR. NALBANTOGLU:  Oh.  Your Honor, the amended order

3  should be Docket Number 48.

4          THE COURT:  All right.  Let's see if you're right.

5  You are right.  Okay.  There is a proposed order at 48 for me

6  to sign and there was a redline that is at Docket Number 52.

7  And I see that.

8          MR. NALBANTOGLU:  Mm-hmm.

9          THE COURT:  Okay.  And it does look good to me.  I

10  will sign the order at 48.  Great job.

11          MR. NALBANTOGLU:  Thank you very much, Your Honor.

12  With that, I will turn the virtual podium over to my colleague,

13  Deniz Irgi.  Thank you.

14          THE COURT:  Alrighty.

15          MR. IRGI:  Good afternoon, Your Honor.  Deniz Irgi,

16  Latham & Watkins, on behalf of the debtor.  My presentation

17  will cover agenda items number 8 and 9, the debtors cash

18  management and all trade motions.

19          THE COURT:  Okay.

20          MR. IRGI:  Starting with cash management, that can be

21  found at Docket Number 8, Your Honor.  By this motion, the

22  debtors seek authorization to maintain their existing cash

23  management system, continue engaging in certain intercompany

24  transactions in the ordinary course.

25          The debtors cash management system consists of 25

1    bank accounts, which are maintained at five different financial

2    institutions, all of which are FDIC insured and authorized

3    depositories in the Southern District of Texas.  A list of

4    these bank accounts and the account balances as of the petition

5    date is in Schedule 2 to the motion that we filed.

6            As a general overview, the debtors maintain a

7    centralized cash management system, which revolves around a

8    main concentration account held by Debtor Audacy Capital

9    Corporation at KeyBank.  Ultimately, all of the debtors

10   revenues generated from their regional operations, including

11   those cash receipts realized from the sale of accounts

12   receivable under the debtors receivable financing facility, are

13   deposited into this main concentration account.  This is also

14   the same account that is used to fund disbursements on behalf

15   of the debtors through the several disbursement accounts at

16   KeyBank.

17           This centralized system is important for the debtors

18   because it allows them to track and maintain control over the

19   movement of cash in real time and efficiently manage receipts

20   and disbursements for their entire regional operations.  We've

21   included a schematic showing the flow of funds in Schedule 1 to

22   the motion.

23           Further, Your Honor, I'll briefly note that we're

24   also seeking relief to continue certain intercompany

25   transactions among the debtors in the ordinary course.  As

1    summarized in the motion, these transactions relate to the

2    centralized payment of business expenses, as well as certain

3    shared services arrangements, including those relating to

4    employee services.  Continued access to these intercompany

5    services, as well as the debtors existing cash management

6    system, is critical to their day-to-day business functions and

7    ability to operate in the ordinary course during these cases.

8         Turning to the order, Your Honor, we did share with

9    the United States Trustee.  We did receive some comments, which

10   have been incorporated in the version that was filed on the

11   docket.  However, as Ms. Reckler previewed, we did receive some

12   additional comments from our lender group shortly before the

13   hearing, mostly related to consent and consultation rights.

14   And if it would be acceptable to Your Honor, we would propose

15   to resolve those in a file of revised form of order and redline

16   on the docket as soon as possible.

17        And subject to those changes, unless Your Honor has

18   any questions on the motion, we would respect that the Court

19   enter the cash management order when it's uploaded.

20        THE COURT:  Let me just ask if anyone wishes to be

21   heard with respect to the cash management motion.

22        So let me just note then for the record, the Court

23   will consider the cash management motion.  I did review the

24   motion.  And the purpose of the cash management motion is to

25   allow the debtor to transition smoothly into the Chapter 11

1   process.  If you start opening and closing too many bank

2   accounts on day 1, it's just going to wreak havoc and, you

3   know, money coming in, receivables and payables and employees

4   need to get paid.  It's really to allow a smooth entry into the

5   Chapter 11 process while still observing U.S. Trustee

6   guidelines and the like.

7            So I've reviewed the proposed form of order.  I think

8   I'm going to grant the motion.  What I would ask is that before

9   you upload it, to the extent possible, that you share it with

10  Mr. Nguyen just so he gets a good look at it before it gets

11  uploaded.  And then once it hits the docket, if you would just

12  email my case manager, Ms. Saldana, and we'll know that it's

13  there.

14           But I want to note that I am granting the motion

15  subject to final review of this.  So I think any assurances

16  that the banks may need, you can certainly represent that I

17  have granted the motion.  But I will make sure that I sign that

18  order today.

19           So if you need to kind of work on it, I don't care

20  what time you finish.  If you can get it done today, let us

21  know and I'll sign it tonight if possible.  Okay?

22           MR. IRGI:  Thank you, Your Honor.  And yes, we will

23  share it with the U.S. Trustee before uploading anything.

24           THE COURT:  Okay.  Thank you.

25           MR. IRGI:  Thank you.

1          Next is the debtor's all trade motion, which can be
2    found at Docket Number 9.  Under this motion, the debtors seek
3    authority to pay certain prepetition trade claims in the
4    ordinary course on the condition that such parties continue to
5    business with the debtors on customary terms.
6          The prepetition trade claims include various vendors
7    and service providers utilized by the debtors in their day-to-
8    day business.  Notably, these include various programming
9    providers, including on-air talent, which are featured on the
10   debtors radio stations and other platforms.
11         The prepetition trade claims also include copyright
12   owners so that the debtors can lawfully broadcast musical
13   compositions and sound recording on their network.  And there
14   are various other business side vendors that provide essential
15   services to the debtors, including marketing, sales, billing,
16   as well as various back end and IT support functions, all of
17   which are critical to the debtors operation.
18         As a general point, Your Honor, the debtors operate
19   in a highly competitive industry, and given the nature of their
20   business, any interruption, however temporary it may be, could
21   have a real impact on their operations and ability to attract
22   listeners and advertising revenues in the future.  For that
23   reason, and with respect to today's relief, the debtors worked
24   with their advisors to tailor the relief on an interim basis to
25   what the debtors believe is necessary to preserve the status

1    quo and maintain a business as usual atmosphere until a final

2    hearing.

3           During the interim period, the debtors are only

4    seeking to pay trade claims as they come due in the ordinary

5    course.  And importantly, the relief does not include any past

6    due amounts that have accrued prior to the petition date.

7           I would also just note, Your Honor, in the context of

8    this case, the relief we are seeking today should only affect

9    the timing of payments since the debtors proposed plan does

10   contemplate that all allowed general unsecured claims will be

11   paid in full.  Our goal with this motion is just to bridge the

12   gap from now to a final hearing and ultimately through

13   emergence for those vendors that are critical to the business.

14          With respect to the form of order, we did receive

15   some comments from the U.S. Trustee, which we have incorporated

16   to the version that was uploaded at Docket Number 9.  I would

17   note, Your Honor, that in the order, there are prepetition caps

18   for the various prepetition trade creditors that we are seeking

19   to pay.  And if the debtors expect to exceed those caps for any

20   reason, we would be required to file a notice on the docket

21   with three advanced business days' notice to all parties.

22          With that, Your Honor, unless you have questions

23   about the order, we would respectfully request the Court grant

24   the all trade motion.

25          THE COURT:  So where is the order that you want me to

1   review and consider?

2            MR. IRGI:  That will be the order that we filed on --

3   at Docket Number 9.  That is the original motion we filed.  And

4   the order is attached to that.

5            THE COURT:  Docket Number 9?  You mean 15?

6            MR. IRGI:  My apologies.  If that's -- it should

7   be -- Let me pull it up.  Yes, you're right, Your Honor.  It's

8   Docket Number 15.

9            THE COURT:  Okay.

10            MR. IRGI:  I confused it with the agenda.

11            THE COURT:  No, no.  All good.  I do it all the time.

12   I just want to make sure.  And I have -- so I'm going to grant

13   the relief requested.  Again, it just affects the timing.  It's

14   really just going to continue.  It's a really, I guess, very

15   friendly all trade motion compared to some that we see.  So I

16   think the relief requested is appropriate, an exercise of the

17   debtor's business judgment here.

18            Well, I'm going to grant the relief requested.  I do

19   understand and I appreciate that there are some caps here, and

20   I do appreciate that there'll be some notice if anyone exceeds

21   the cap.  Although I will tell you, I may, if you fall a little

22   bit over the cap, I probably won't say much.  If you know

23   you're going to, like, really run over the cap, it's just a lot

24   easier to file a quick motion and get me on 24 hours' notice,

25   or 48 hours' notice on something if you think it's going to,

1  like, really exceed the cap.  But I'm not interested in

2  rounding errors.  But I do want to make sure that -- and you'll

3  know, your gut will tell you.  This is probably one we can get

4  in front of Lopez on short notice.  But I will sign the order.

5          I'm going to set the final hearing on February 5th at

6  1 p.m. Central Time, and the objection deadline I'm going to

7  set for one week before, which is January 29th at 4 p.m.

8  Central Time.  Okay?

9          MR. IRGI:  Thank you.  Thanks, Your Honor.

10          THE COURT:  And so --

11          MR. IRGI:  Did you want a self-letter revised form of

12  order or did you --

13          THE COURT:  No, no, no, no, no, don't -- Marvin Isgur

14  will make fun of me if I can't type this in myself.  So I'm

15  going to make sure I get this in.  I've got it.  It's going to

16  hit the docket now.

17          MR. IRGI:  Thank you, Your Honor.  With that, I'll

18  pass the podium to my colleague, Mr. Celentino.

19          THE COURT:  Alrighty.  Mr. Celentino, I think you may

20  be on mute.  I don't know if I need to unmute your line.  Why

21  don't you try it again.  Let me see if I can -- there you are.

22          MR. CELENTINO:  -- Your Honor?

23          THE COURT:  I can hear you now.  Good afternoon.

24          MR. CELENTINO:  Good afternoon, Your Honor.  For the

25  record, Joseph Celentino with Latham & Watkins, proposed

1    counsel for the debtors.

2            Your Honor, the next item on the agenda is item

3    number 10.  That is the debtor's utilities motion, which we

4    filed a Docket Number 16.  Your Honor, it will not surprise you

5    to learn that the debtors use electricity, water, sanitation,

6    other utility services.  And to put it simply, we'd like to

7    continue doing so during the Chapter 11 cases.

8            More specifically, our utilities motion is seeking

9    approval of procedures regarding adequate assurance deposits

10   for our utility providers.  We've sized those deposits, Your

11   Honor, based on our historical average utility bills over the

12   past year.  And in total, we're proposing to deposit $700,000

13   in an adequate assurance account for the benefit of utility

14   providers, and to establish procedures if the utility provider

15   believes that a greater deposit is needed.

16           In the meantime, Your Honor, under our proposed

17   order, utility providers would be prohibited from discontinuing

18   service on account of those adequate assurance amounts.

19           Finally, Your Honor, we're requesting authority to

20   pay an estimated 40,000 in prepetition fees to our utility

21   payment processor, True North, which coordinates the payment of

22   nearly 1,000 utility bills for the debtors each month.  The

23   debtors shared our motion and proposed order with the Office of

24   the United States Trustee, and the UST had no comments.

25           We informally resolved a question that we received

1    this morning from one of our utility providers, Waste

2    Management, and no changes are needed to the proposed order

3    that is on file again at Docket Number 16-1.

4           So unless Your Honor has any questions for me, we

5    would ask that you enter the proposed order.

6           THE COURT:  No.  I'm going to just step on a limb on

7    this one, and I'm gonna grant the relief requested.  I would

8    note for the record, Mr. Celentino, just the utilities motion

9    was an interesting motion back in the day where you -- back in

10   the day, you know, after the Code got amended, many folks made

11   you give the deposit to the utility provider, but it was really

12   hard to get back after the end of the case.  So I do agree with

13   the proposed relief requested, which is to set up and provide

14   an account.  Therefore, they know that they get the adequate

15   assurance that is required under the Bankruptcy Code.

16          And for those who are listening for the first time,

17   if without a procedure and without this deposit, utilities

18   would be allowed to discontinue service to the debtor.  And

19   Congress has mandated that they be provided adequate assurance.

20   And a cash deposit is a statutory form of adequate assurance.

21   The procedures provided will allow a utility who believes that

22   they're entitled to more to have the opportunity to come back.

23   But this certainly provides some comfort that the light stay

24   on, that the internet continues, and that the trash will be

25   picked up and services, utility services will continue in the

1  ordinary course, and that no one can shut you off because a

2  bankruptcy case has been filed.

3          So the relief requested is appropriate.  The proposed

4  adequate assurance under the Code -- that should say in the

5  motion, I believe, comports with the Bankruptcy Code.  And I'm

6  going to grant the relief requested, but that is certainly

7  without prejudice to anyone who wants to come in and seek

8  additional relief.

9          But for purposes of today, this is a smart move, and

10  I'm granting the motion.

11          MR. CELENTINO:  Very good.  Thank you, Your Honor.

12          Your Honor, with that, the next item on the agenda is

13  item number 11, which is the debtors NOL motion.  We filed that

14  at Docket Number 17.

15          As Your Honor heard during Ms. Reckler's

16  presentation, Audacy Inc. is a public company.  We were

17  formerly traded on the New York Stock Exchange.  We are now

18  traded over the counter.  By this motion, the debtors are

19  seeking to establish procedures that will protect the potential

20  value of the debtors' consolidated tax attributes.

21          Here, those include consolidated net operating losses

22  and carry-forwards of disallowed business interest expense.  We

23  estimate the NOLs here to be approximately $218 million, and

24  the carry-forwards of disallowed business expense to be

25  approximately $259 million.  And during the hopefully short

1    tendency of these Chapter 11 cases, we do expect to generate

2    additional tax attributes.  As I'm sure Your Honor knows, those

3    attributes are very valuable to the estate, and the global deal

4    that's embodied in our prepackaged plan and RSA assumes their

5    continued availability to the debtors.

6          And as Your Honor has no doubt seen in other Chapter

7    11 cases like this, these tax attributes could be lost or

8    greatly reduced if certain trading activity occurs during the

9    Chapter 11 cases.  So to protect the debtors' estates from this

10   possibility, the proposed procedures are intended to impose

11   narrowly tailored restrictions and notification requirements

12   with respect to auditing stock.

13         I'll note for Your Honor that on an interim basis,

14   these procedures, the proposed procedures, are only binding on

15   those who receive notice of the motion.  And we anticipate,

16   while we are seeking entry of a final order on our second day

17   hearing, or when Your Honor believes would be appropriate to

18   schedule that request for final relief.

19         Once the interim order is entered, Your Honor, the

20   debtors, in addition to mail and email service, anticipate

21   publishing a notice in the New York Times of the procedures.

22   And I would just note, before answering any questions that Your

23   Honor has, that we reviewed this pleading with the United

24   States Trustee prior to this filing, and we've incorporated

25   comments received from the Office of the United States Trustee

1   into our proposed order.

2            So with that, Your Honor, unless you have any

3   questions, we would ask that you enter the NOL -- the proposed

4   order attached to the NOL motion.

5            THE COURT:  Anyone wish to be heard with respect to

6   the NOL motion?

7            Okay.  The Court has considered what we will call the

8   NOL motion and the request for interim relief associated with

9   it.  I think Mr. Celentino did a great job outlining the issues

10  and why the relief requested is important.  It's a tax

11  attribute.  It's important to the estate to preserve the NOLs

12  and the other tax benefits sought in connection with the

13  motion, the procedures.  The Court has reviewed them, and they

14  are appropriate.  They are customary for the type of relief

15  here.  I believe that the relief requested is appropriate and

16  the limitations on an interim basis.

17           And so I'm going to grant interim relief here.  I'm

18  going to set sound exercise of the debtor's business judgment.

19  And again, I think it does protect the estate, but it also

20  protects the rights of those who want to come into a final

21  hearing as well.

22           So again, I'm going to set the final hearing on

23  February 5th at 1 p.m. with an objection deadline of January

24  29th.

25           So I have granted that motion.

1          MR. CELENTINO:  Thank you very much, Your Honor.

2          Your Honor, last one for me this morning is agenda

3 item number 12.  That is the Debtor's FCC Ownership Procedures

4 Motion, which we filed at Docket Number 27.  This is a motion

5 that probably comes up a little less frequently before, Your

6 Honor, but it is a familiar one in cases involving FCC

7 broadcast licenses.

8          As Ms. Reckler noted earlier, the debtors are radio

9 broadcasters, among other things, and so they hold broadcasting

10 licenses and are regulated by the Federal Communications

11 Commission, the FCC.  Your Honor, with a debtor who has that

12 kind of business, effectuating any reorganization that

13 equitizes pre-sufficient debt, in connection with that, the

14 debtors are going to need to seek FCC approval of the

15 transaction.  And we will need to comply with FCC rules

16 regarding equity ownership of the license holders, so the

17 equity holders of the reorganized debtors.

18          Here, Your Honor, our RSA provides that the debtors

19 have no more than 180 days following confirmation of the plan

20 to obtain FCC approval and emerge from bankruptcy.  And in

21 order to get that approval, the debtors will need to complete

22 an FCC initial long-form application and disclose whether our

23 post-reorganization equity holders have certain features that

24 would trigger additional FCC review and approval.

25          As a first step, Your Honor, we need to make

1 disclosures about our post-reorganization equity holders at the

2 time that we file our initial FCC application.  And since it

3 can take the FCC up to six months to process an application

4 like this, in order to keep that timeline, we need to submit

5 the application around our proposed confirmation hearing date.

6 This is a deadline for us, Your Honor, but we are specifically

7 targeting February 21 for submission of that application.

8         This motion proposes procedures by which we will

9 obtain from the future holders of plan securities, the future

10 reorganized equity holders of Audacy, the information that will

11 be needed to fill out that application.  And the motion is

12 designed to ensure that assuming -- assuming Your Honor

13 confirms the plan and assuming that the FCC grants initial

14 approval, that reorganized Audacy will continue to comply with

15 FCC requirements upon the -- when the plan securities are

16 issued on the effective date.

17         I will note very quickly just three things, Your

18 Honor, before answering any questions you have.  The first is

19 one I said already, which is that any reorganization of the

20 debtors that involves providing equity to prepetition debt

21 holders will require a motion like this, procedures where we

22 get the information needed to fill out our FCC application.

23         Second, and relatedly, I'll note for Your Honor, that

24 similar procedures to this were used in other radio

25 bankruptcies, specifically in this jurisdiction, in the iHeart

1   case.  Our procedures are patterned off of that as well.

2          And finally, I'll just note, Your Honor, that we have

3   worked very hard on this motion over the last few weeks with

4   the first lien and second lien ad hoc groups.  It has been the

5   subject of much thought and effort to make sure that these

6   procedures both get the debtors the information we need to meet

7   our regulatory requirements and ensure that first lien and

8   second lien lenders and noteholders have sufficient time to

9   provide the information that we require.

10         So with that, unless Your Honor has any questions

11   about these procedures, we would ask that you enter the

12   proposed order.

13         THE COURT:  Anyone wish to be heard with respect to

14   the -- what I will call the FCC procedures motion?

15         Okay.  Let me just check.

16         Again, I think Mr. Celentino hit the right tone on

17   this.  This is certainly a very specific relief requested for

18   this type of case.  But it's important, and the relief

19   requested is important.  The procedures, I believe, are fair

20   and appropriate under the circumstances, and it's important.

21   Very important matters are addressed there.

22         But, again, with every motion in which you're asking

23   for emergency consideration, a lot of times people aren't here

24   and didn't find out about the hearing and may not have had an

25   opportunity to review the motion.  So I do believe -- I take

1    these motions really seriously, and I read this one very

2    carefully last night and thought a lot about it.  And I think

3    that the procedures are fair and they're appropriate under the

4    circumstances.

5           Again, every case is different.  And just because you

6    have kind of a broadcasting case, you know, sometimes you grant

7    them, sometimes you don't.  But I think in this case the relief

8    requested and the procedures are appropriate, and I'm going to

9    sign the order at Docket Number 27.  So I'm going to grant it.

10          Mr. Celentino, I just have one question for you, and

11   that is that this --

12          MR. CELENTINO:  Your Honor?

13          THE COURT:  -- is a virtual hearing, and I'm sure a

14   Michigan man would have loved to have been in Houston today of

15   all days.  You do research on me.  I'm sure I do it on you too.

16   That's the lesson of the day.  Judges do research on people

17   too, but we're having a virtual hearing.  So it's an ugly day

18   in Houston, though, so -- but I'm sure you'll enjoy it from the

19   comfort of your home, and we'll see what happens.

20          MR. CELENTINO:  Thank you, Your Honor.

21          THE COURT:  Alrighty.

22          MR. CELENTINO:  And yes, hopefully we'll get down to

23   Houston.  Would have loved to be there today, but at some

24   point.

25          THE COURT:  Alrighty.  Anyway, where do we go next?

1              MR. CELENTINO:  With that, I will actually be passing

2    the podium back to Ms. Reckler for the DIP motion.

3              THE COURT:  Thank you.  And before anyone reads too

4    much --

5              MS. RECKLER:  Thank you.

6              THE COURT:  Go ahead, Ms. Reckler.  Let me just say

7    before anyone reads too much into my joke with Mr. Celentino,

8    my law school alma mater, University of Texas, is not competing

9    today, so thereby in no way am I rooting for anyone today or

10   showing any bias towards anyone.  My school is out, but it's in

11   Houston.  It was a friendly joke.  I don't want anyone reading

12   anything into that.

13             So anyway, Ms. Reckler, I'll turn it over to you.

14             MS. RECKLER:  Well, thank you, Your Honor, and I'll

15   just say for the record, go blue, because I am a Michigan alum

16   as well.  Mr. Irgi, who you heard from earlier, is a Washington

17   grad, and so we've had a lot of debate about the game on our

18   side.

19             But Your Honor, I will turn to the DIP motion, which

20   was filed at Docket Number 18, and the interim order is

21   attached to that filing.  I don't believe there have been any

22   changes that have been made.  We did receive some comments that

23   I will read at the appropriate time into the record from a

24   landlord, but we have addressed that objection, informal as it

25   was, and our lenders, I believe, are on board with the

1   revision.

2          Your Honor, we are here today seeking approval of $32

3   million in DIP financing and the use of cash collateral on an

4   interim basis.  To start with a bit of a broader context, the

5   relief we're seeking here complements the relief that will be

6   sought in the post-petition securitization motion, and both are

7   essential to the debtor's ability to meet their liquidity

8   needs.

9          While the post-petition securitization program, if

10  approved, will provide the debtors with continued access to the

11  100 million financing, that is, in and of itself, not enough to

12  fund these cases.  Only $25 million of that would be new

13  financing, and the rest is just a continuation of already drawn

14  financing.

15         The DIP lenders currently consist of a subset of our

16  first-lien lender group.  However, all of the first-lien

17  lenders will have the opportunity to participate in the DIP

18  facility if they so choose, and we've already heard from some

19  who do want to participate.  And in any event, the full amount

20  will be backstopped by certain members of the first lien ad hoc

21  group.

22         Before I go too much further, I want to make sure I

23  note the evidentiary support for our interim DIP relief, and

24  Your Honor has entered those declarations.  Again, they can be

25  found at Docket Numbers 19 and 20, respectively, and they were

1    the declarations of Mr. Evarts, our investment banker, and

2    Mr. Gray, our financial advisor.  And Your Honor, I will be

3    referring to those declarations from time to time.

4         Your Honor, together, those declarations make clear

5    that the debtors have a real need for DIP financing in an

6    amount no less than $32 million in addition to access to the

7    post-petition securitization program, and that can be found at

8    the Gray Declaration in Paragraphs 8 to 14.  Entry into the DIP

9    represents an exercise of sound business judgment by the

10   debtors, and the terms of the DIP are reasonable and

11   appropriate under the circumstances, and that can be found at

12   the Evarts Declaration at Paragraphs 21 to 24.

13        The debtors could not obtain an alternate actionable

14   DIP on an unsecured or junior basis or otherwise on better

15   terms than the DIP facility to supplement the post-petition

16   securitization program, and that can be found in Paragraphs 18

17   and 19 of the Evarts Declaration.

18        The declarations also make clear that on an interim

19   basis, the debtors need immediate access to the full $32

20   million of DIP and continued use of cash collateral.  Without

21   belaboring the points in the motion or those declarations, in

22   the longer term, the DIP facility is critical to the debtors'

23   ability to implement the restructuring transactions

24   contemplated by the restructuring support agreement.  And in

25   the short term, the interim relief we seek today is essential

1  to the debtors' continued operations and preservation of the

2  value of their assets while these cases are pending.

3       Notably, the debtors filed these cases with only

4  approximately $33 million of cash on hand.  Needless to say,

5  they would not be able to fund critical business expenses,

6  including payroll, using cash collateral and proceeds of the

7  securitization receivables alone.  The DIP is not only

8  essential to fund ongoing operations and the cost of these

9  cases, it's the best and only actionable means for obtaining

10 the full amount of financing needed for the debtors to

11 successfully reorganize, which I understand is not before the

12 Court today.

13      Specifically, as discussed in the Evarts Declaration,

14 PJT undertook a marketing process to ensure that the debtors

15 were obtaining the best financing terms possible.  As part of

16 that process, PJT solicited interest from six financial

17 institutions outside of the debtors' existing capital structure

18 and considered all potential financing options, unsecured

19 junior and senior financing.

20      Understandably, no party that PJT contacted was

21 interested in providing post-petition financing to the debtors

22 on an unsecured junior or senior basis, particularly

23 considering the risk and uncertainty attendant to a priming

24 fight with the debtors' prepetition secured funders.  The

25 debtors believe that the proposed DIP facility is the best and

1    only actionable alternative financing currently available to

2    supplement the post-petition securitization program.  And

3    again, that can be found in Paragraphs 18 and 19 of the Evarts

4    Declaration.

5              Turning to the terms of the DIP, Your Honor, I'll

6    start with the core economic terms.  The DIP will bear interest

7    at an adjusted term SOFR plus 6 percent per annum in the case

8    of term SOFR loans and base rate plus 5 percent per annum in

9    the case of any base rate loans.  The DIP also contemplates a

10   commitment fee of 2 percent and a back fee of 3 percent, both

11   of which will be paid in cash on the closing date of the DIP

12   facility, and if approved, that date would be tomorrow.  The

13   fees will be deducted from the interim DIP financing.

14             The DIP does contemplate a prepayment penalty or

15   premium in the amount of 15 percent if any portion of the DIP

16   is repaid prior to maturity pursuant to a third-party sale, DIP

17   refinancing, or change of control, as set forth in the DIP

18   credit agreement.

19             Your Honor, turning to the order, I'd like to

20   highlight some of the critical points that we know Your Honor

21   and the other judges in this district have always found on an

22   interim DIP -- have always focused on in an interim DIP order.

23   We think we've addressed them all.  As I've mentioned, there is

24   no roll-off for cross-collateralization contemplated under the

25   DIP facility.

1          The DIP liens do attach to substantially all assets

2    of the debtors on a priming basis, including the prepetition

3    first and second lien collateral.  That priming, though, is

4    entirely consensual, and statutory and other existing liens

5    held by parties other than the first lien and second lien note

6    holders are not being primed.  The debtors' lenders under the

7    RSA agree to this structure based on the adequate protection

8    package negotiated in the DIP order.

9          Both the first lien and second lien lenders will

10   receive, subject to the carve-out, replacement liens junior to

11   the DIP facility, superpriority claims to the extent of any

12   diminution in value of their collateral, which are junior-to-

13   the-DIP superpriority claims, and superpriority claims sought

14   under the post-petition securitization program order, payment

15   of the lender's advisor's fees and expenses, and certain

16   reporting and information rights.

17         Your Honor, the DIP contemplates liens on avoidance

18   action proceeds, as well as waivers of the 506(c) surcharge,

19   marshaling, and waiver of the 552 equities of the case

20   exception, but solely upon entry of the final order.  And those

21   provisions can be found in Paragraphs 38, 39, and 40 of the

22   proposed order.

23         The DIP liens do attach to the proceeds of avoidance

24   actions in Section 549, Actions for Unauthorized Post-Petition

25   Transfers, but not to the actions themselves, and this language

1   can be found in paragraphs 6(e) and 6(f) of the interim DIP

2   order.  Again, it's worth noting that liens attached to the

3   proceeds of avoidance actions only upon entry of the final

4   order.

5            The interim DIP order and DIP credit agreement do

6   contain certain case milestones, which would cause an event of

7   default under the DIP credit agreement, subject to any

8   extensions agreed to by the DIP lenders.

9            Specifically, as relevant to the complex case

10  procedures, the Chapter 11 milestones include that the debtors

11  will obtain approval of the interim DIP order no later than

12  three calendar days from yesterday, an entry of a final DIP

13  order by the earlier of 45 days from the petition date or entry

14  of the confirmation order.  Next, there is the confirmation

15  milestone requiring the debtors to obtain entry of the

16  confirmation order 45 calendar days from the petition date.

17  And finally, Your Honor, there is an emergence milestone

18  requiring the plan to become effective no later than 60

19  calendar days from the petition date, which is subject to an

20  automatic extension to 180 calendar days after the entry of the

21  confirmation order, in the event the condition precedents to

22  effectiveness of the plan relating to the receipt of regulatory

23  approvals, most notably the FCC approval, has not been

24  satisfied within 60 days.

25            We worked together with the DIP lenders to negotiate

1  milestones that made sense for this prepackaged case, and also

2  to afford the debtors the time necessary to obtain FCC approval

3  to emerge from bankruptcy as planned.

4         With respect to exercise of remedies, the interim DIP

5  order provides that before the DIP agent can exercise remedies

6  against collateral, beyond simply terminating commitments,

7  accelerating debt, or charging default interest and the like,

8  it must file a stay-relief motion on at least five business

9  days' written notice.  During this period, the debtors can also

10  petition the Court to seek non-consensual use of cash

11  collateral, which they can continue to use for critical

12  expenses during the notice period, regardless of whether they

13  file such a motion.  And the relevant provisions in the DIP

14  order are Paragraphs 27(a) through 27(c).

15         And finally, Your Honor, we make sure that the

16  challenge provisions are consistent with the complex case

17  procedures.  We do not think there's a need for a creditors'

18  committee in the context of this consensual prepackaged case,

19  which leaves general unsecured creditors unimpaired.

20  Nonetheless, the challenge deadline for any committee, if

21  appointed, will be 60 days from the date of such formation, and

22  the deadline, of course, can be extended prior to the

23  expiration consensually or by the Court, and 60 days following

24  the entry of the interim order for all other parties.  The

25  proposed investigation budget for the committee, if appointed,

1   would be $50,000.  And the relevant paragraphs in the DIP order

2   are paragraphs 30 and 35.

3          And finally, Your Honor, we should note that we

4   shared the proposed form of order with the United States

5   Trustee, and we were able to address a comment raised by

6   Mr. Nguyen.

7          Your Honor, we'd ask that you enter the order unless

8   Your Honor has any questions.

9          THE COURT:  Anyone wish to be heard with the DIP

10  motion?

11         MR. STAMER:  Your Honor, this is Mike Stamer from

12  Akin Gump.

13         THE COURT:  Yes, sir.

14         MR. STAMER:  Your Honor, if I could be heard briefly,

15  it's really a scheduling issue more than anything.

16         THE COURT:  Okay.

17         MR. STAMER:  And if I'm wrong, I'll sit down very

18  quickly.  Your Honor, we're not objecting to the interim of the

19  interim DIP order.  As you heard debtor's counsel say, there

20  are two milestones that I'd like to address.  One is the

21  deadline for the company -- for the debtors to confirm the

22  plan, which is 45 days, and the deadline for the final entry of

23  the DIP order.  My understanding is that the tentative

24  confirmation hearing is to be set for February 20th, which is

25  well within both milestones.  And based upon the conversations

1   we had had previously, it was our understanding that the final

2   DIP order would happen on the same day of the confirmation.

3          Your Honor, as you heard, the debtors are asking --

4   the lenders are asking the debtors to waive at the final

5   hearing what we think are potentially valuable claims under

6   506(c) marshalling in 552.  And again, Your Honor, this should

7   be a completely consensual case.

8          But from our perspective, the second lien holders,

9   again, we're not objecting to the DIP.  What we're talking

10  about is what we thought was an agreement where the final

11  hearing and the confirmation hearing would happen

12  simultaneously on the same day and not have the waivers that

13  are contemplated on the entry of the final order happen in

14  advance of confirmation if confirmation was happening within

15  the milestones.

16         THE COURT:  Let me just see if anyone else wishes to

17  be heard.

18         MR. WILLIAMS:  Your Honor?

19         THE COURT:  Yes.

20         MR. WILLIAMS:  It's Matthew Williams, Gibson Dunn.

21  Can you hear me?

22         THE COURT:  Just fine.  And I know that there's --

23         MR. WILLIAMS:  Great.

24         THE COURT:  -- before you start, I know there's

25  someone else.  I'm going to just unmute your line.  There's a

1   949.  You don't need to say anything.  I'm going to hear

2   counsel, and then I will turn to you.  I see you there, and

3   I'll unmute your line in a second.

4           Go ahead, counsel.

5           MR. WILLIAMS:  Yeah, yeah, I'll be very quick.  At

6   least from our perspective, we agreed to milestones.  And so

7   long as the date that the final hearing happens is within the

8   milestones we agreed to, that's fine.  I don't think we're

9   agreeing by definition that the DIP order will, by definition,

10  be tied to confirmation to the extent confirmation were to be

11  kicked.  But if we want to schedule it for a later date and the

12  debtor is amenable to that and we're within the milestones that

13  we negotiated, we certainly have no objection to that.  That's

14  all I wanted to say.

15          THE COURT:  Thank you.

16          There's a --

17          MS. RECKLER:  Your Honor --

18          THE COURT:  Just one second, Ms. Reckler.  There's

19  someone here, and I just want to make sure that if they wanted

20  to be heard, they could be heard.  There was a 949 number, and

21  I don't know if you were listening -- wanted to be heard.

22          MR. GREGER:  Yes, Your Honor.  Michael Greger of

23  Allen Matkins Leck Gamble Mallory & Natsis.  I represent

24  Landlord 5670 Wilshire Owner LLC.

25          THE COURT:  Okay.

1            MR. GREGER:  Your Honor, I am not admitted to the

2  Texas Bar.  I'm a California attorney admitted to the

3  California Bar, not admitted to the Southern District of Texas.

4  I would request authority for purposes of today's hearing to be

5  heard.

6            THE COURT:  Absolutely.  No problem.

7            MR. GREGER:  Thank you, Your Honor.

8            Your Honor, I represent Landlord 5670 Wilshire Owner

9  LLC, and I didn't, unfortunately, hear Ms. Reckler read into

10  the record the compromise that we reached on the language of

11  the DIP order.  I just want to make certain that it didn't get

12  missed.

13            MS. RECKLER:  Your Honor, this is Caroline Reckler

14  for the record.  I can read that language now or when we finish

15  the conversation about the scheduling.  And from the debtor's

16  perspective, we are fine with having the DIP -- the final DIP

17  hearing, whenever the first lien or second lien lenders want,

18  so long as it's inside the milestone.  And if that's on the

19  18th, that is no issue for us.

20            MR. STAMER:  But is confirmation the 18th?

21            THE COURT:  It's --

22            MS. RECKLER:  We have a confirmation hearing

23  scheduled for -- excuse me, for February 20th.

24            MR. GREGER:  Thank you.

25            MR. STAMER:  Your Honor, if I could just add one more

1    thing --

2            THE COURT:  Okay.

3            MR. STAMER:  -- briefly, and that is we talked about

4    very lengthy, sometimes spirited negotiations that got us here.

5    This was actually a point that was negotiated.  It was a hard

6    one.  And, Your Honor, we were willing to take the risk that if

7    confirmation got pushed beyond 45 days, that the final DIP

8    order had to be done, you know, within the milestone.  We think

9    it's completely contrary to the things we talked about, the

10   spirit and actually the words of the agreement we struck to

11   have the confirmation hearing in advance of -- the final DIP

12   hearing held in advance of the confirmation hearing if the

13   confirmation hearing is scheduled within the 45-day milestone.

14   I think what you've heard is there's no skin off of anyone's

15   nose if we push this to February 20th, and we think that's

16   consistent with what we agreed to with the parties.

17           THE COURT:  Ms. Reckler, what are your thoughts?

18   Well, why don't you read in the statement for counsel, and then

19   we can talk.  When I -- I should probably approve the DIP, and

20   then we can talk about final hearing.  But --

21           MS. RECKLER:  Thank you, Your Honor.  I will read the

22   statement with 5670 Wilshire Owner LLC, and the language is as

23   follows.  Notwithstanding any other provision in this interim

24   order or the DIP loan documents to the contrary, none of the

25   liens granted pursuant to this interim order or the DIP loan

1  documents shall attach to or encumber, and DIP collateral shall

2  not include that certain office lease dated June 4, 2004, as

3  amended, the "Wilshire lease", and any related storage leases

4  between 5670 Wilshire Owner LLC as landlord and Audacy

5  California LLC as tenant.

6         Any leasehold or other interest created by or under

7  the Wilshire lease or any related storage leases or any

8  security deposits or similar collateral, including any letter

9  of credit proceeds, held pursuant to such Wilshire lease or any

10  related storage leases, but such liens shall attach solely to

11  the proceeds of any disposition of the Wilshire lease and

12  related storage leases as applicable.

13         In addition, paragraph 19(d) of this interim order

14  shall not apply to the Wilshire lease or related storage

15  leases.

16         THE COURT:  Counsel, it's been read into the record.

17  Any issues about that?

18         MR. GREGER:  No, Your Honor.  Thank you.

19         THE COURT:  Thank you very much.

20         So with respect to timing for the final hearing, if

21  we had a final hearing on February 20th at 2:30 p.m., can the

22  parties confirm for me that that doesn't blow any milestone?

23         MR. STAMER:  45-day milestone, Your Honor.

24         THE COURT:  I know.  I just don't want to do the

25  math.

1          MR. STAMER:  Well, I -- neither do I.

2          UNIDENTIFIED:  Yeah, I don't either.  I wasn't sure

3    how to --

4          MS. RECKLER:  Your Honor, I believe that's 44 days.

5          THE COURT:  Okay.

6          MS. RECKLER:  So even I said 44 (indiscernible).

7          THE COURT:  In other words, I'm signing this with the

8    understanding that I'm not creating a footfall.  That's my --

9    that's what I wanted to make sure.

10          And with respect to an objection deadline, what do

11    the parties contemplate there?

12          MS. RECKLER:  A week prior, Your Honor.

13          THE COURT:  All right.  We'll do that.

14          MS. RECKLER:  The 13th.

15          THE COURT:  I think that's fair.  Okay.

16          Mr. Stamer, does that work?

17          MR. STAMER:  Your Honor, that's perfect.

18          THE COURT:  Okay.  We'll then note before the Court

19    is consideration of an interim order for debtor in possession

20    financing.  The Court -- based upon all the statements made,

21    this DIP is certainly -- should be granted.  It's certainly a

22    sound exercise of the debtor's business judgment.  Clearly,

23    plenty of negotiations have gone into this DIP, and it

24    satisfies the requisite standards under Section 364 of the

25    Bankruptcy Code.

1          And there's clearly a need for financing, and I'm

2  relying on the declarations in support of the DIP financing to

3  provide the evidentiary basis for that finding.  The terms are

4  incredibly favorable for the debtor as well, and the interim

5  relief that is being provided certainly preserves rights for

6  parties on a final hearing, and so we're going to set the final

7  hearing on February 20th, 2024 at 2:30 p.m. with an objection

8  deadline of February 13th, 2024.

9          I'm going to note for the record that I'm signing

10  this order with the understanding that these dates don't blow

11  any or bust any milestones.  It's not my intent to do so to the

12  extent, and it sounds like I did some Google calendar here, it

13  looks like it's 44 days, but to the extent that it's not, and

14  to the extent that we're wrong, I want somebody to come back

15  immediately, and I will amend the order to make sure that we --

16  it's not my intention to sign something that will create a

17  milestone default.  But certainly I would just ask parties to

18  be conscious of that or work it out so that we can hold this in

19  connection with plan confirmations with no foot faults, as I

20  will call them, the legal term, the legal foot fault term.

21          So I will sign the order, and I will get this signed

22  on the docket.

23          MR. STAMER:  Thank you, Judge.

24          THE COURT:  All right, Ms. Reckler, where do we go

25  next?

1           MS. RECKLER:  Your Honor, to my colleague out on the

2    West Coast, Mr. Mispagel.

3           THE COURT:  Okay.

4           MR. MISPAGEL:  Good afternoon, Your Honor.  Can you

5    hear me?

6           THE COURT:  Just fine.  Good afternoon.

7           MR. MISPAGEL:  Good afternoon.  For the record,

8    Jeffrey Mispagel from Latham & Watkins, proposed counsel for

9    the debtors.

10           Next item on the agenda is the securitization program

11    motion.  It's Agenda Number 14, Docket Number 21, and an

12    affidavit of service was filed at Docket Number 50.

13    Declarations in support of the relief sought by the motion were

14    filed at Dockets Number 19 and 20, and those are the same

15    declarations filed in support of the debt financing.

16           By the securitization program motion, the debtors

17    seek to continue and increase the size of their receivable

18    securitization program.  This program consists of a few

19    different agreements and transactions that, taken together,

20    provide the debtors with low-cost liquidity.  I'll provide a

21    very brief, high-level overview of those transactions.

22           Under a purchase and sale agreement, various debtor

23    entities, referred to as originators, sell their accounts

24    receivable automatically when generated to Debtor Audacy New

25    York, LLC.  Audacy New York, LLC then sells or contributes its

1   receivables and those purchased from the other originators to

2   its wholly-owned, non-debtor special-purpose entity subsidiary,

3   Audacy Receivables, LLC.  That happens under the sale and

4   contribution agreement.

5          Then, under the receivables purchase agreement,

6   investors provide funding to Audacy Receivables, LLC that is

7   secured by the receivables owned by that entity.  There's also

8   a performance guarantee under which Debtor Audacy, Inc.

9   guarantees the performance of the originators under the other

10  documents.

11         By this motion, the debtors seek to enter into

12  various amendments to their prepetition securitization program

13  documents that will enable the program to continue post-

14  petition and that will provide for an increase in the

15  availability under the program from $75 million to $100

16  million.  Due to the nature of the securitization program,

17  without an agreement from the agent to continue the program

18  post-petition, the debtors would lose access to the critical

19  liquidity provided by the program.

20         Fortunately, the debtors were able to reach an

21  agreement with the agent that will not only allow the

22  securitization program to continue post-petition but will also

23  increase the liquidity available to the debtors.

24         In addition, the amended documents contemplate the

25  securitization program continuing in place through the debtors'

1    emergence from bankruptcy.  Under the proposed order, the agent

2    is granted liens on the debtors' receivables just in case any

3    post-petition sale or contribution of the receivables is

4    subsequently found not to constitute a true sale or a true

5    contribution.  The proposed order also provides for the grant

6    of a lien on the debtors' equity interest in Audacy

7    Receivables, LLC, the non-debtor special purpose entity.

8         In addition, the proposed order provides for the

9    agent in Audacy Receivables, LLC to have superpriority claims

10   against the debtors, pari passu with the superpriority claims

11   of the DIP lenders that would cover any obligations of the

12   debtors under the securitization program.

13        Thanks to productive negotiations, there is

14   harmonization between the DIP facility and the securitization

15   program such that the scope and priority of claims and liens

16   have been agreed to among the debtors, the securitization

17   program agent, and the DIP lenders.  The securitization program

18   also includes milestones to track those under the DIP facility

19   requiring entry of the interim order within three days of the

20   petition date and the final order within 45 days.

21        Your Honor, I'd be happy to answer any questions you

22   have regarding the securitization program or the proposed

23   order.  Otherwise, I would respectfully request that Your Honor

24   enter the proposed order filed with the motion with Paragraph 1

25   updated to add in the date and time of the hearing and

1  objection deadline which can match those with respect to the

2  final DIP hearing.

3           THE COURT:  Okay.

4           Does anyone wish to be heard with respect to the

5  securitization motion?

6           Okay.  This is an interesting motion, but the relief

7  request that you got to breathe and understand kind of where we

8  are with respect to the case and the other relief that is

9  requested.  So I think it made sense to use the DIP.  You do

10 the DIP first and then come here, and you can kind of see how

11 it all fits together.

12          So the relief requested is appropriate under the

13 circumstances.  The Court has already approved the DIP motion.

14 This is going to -- it's another form of financing, but it's

15 also in the best interest of the estate.  I'm relying on the

16 declarations which provide the evidentiary basis for the relief

17 requested.

18          The debtors are just being commercial here and

19 understanding kind of where they are, the additional liquidity

20 needs, and how and when it's going to find additional liquidity

21 to kind of get through the Chapter 11 process.  So kind of look

22 at where the debtor is and what the debtor is hoping to

23 accomplish in Chapter 11 and that this was kind of already in

24 place.  And so this is just debtor knows how to do this and

25 operate this.  The relief requested is appropriate.

1           I take comfort that the debtor, this was kind of part

2    of something that was already in place and alleviates the

3    concerns about, you know, kind of hiccups that could happen

4    going really fast in a Chapter 11 case.  But I'm comfortable.

5    I think 364 is approved.  The relief requested is certainly

6    needed under the circumstances, and I'm going to grant the

7    relief requested.

8           Counsel mentioned that we're going to go.  I just

9    want to confirm what we're using as the final now for this one.

10          MR. MISPAGEL:  Yes.  So for this one, we can use the

11   same as the DIP, which is February 20th at 2:30 p.m. for the

12   hearing.

13          THE COURT:  Okay.  You have --

14          MR. MISPAGEL:   And the week before that.

15          THE COURT:  You have learned kind of the first rule

16   of reading Lopez, which is remind him of the dates that he said

17   he would give you.  That is really smart.  Other than that, I

18   like giving them, I'm really hard remembering them.  I don't

19   know what it is about me.  Let's see, 2:30 p.m.  And then the

20   objection deadline, we're going to go February 13th, right?

21   One week before.  Okay.

22          I have signed that order, and it is off to docketing.

23          MR. MISPAGEL:  Thank you, Your Honor.

24          Next item on the --

25          THE COURT:  Go ahead.

1          MR. MISPAGEL:  The next item on the agenda is the

2    employee wages motion.  This is Agenda Number 15 and Docket

3    Number 22.  And same affidavit of service was filed at Docket

4    Number 50.

5          Your Honor, the debtor's employees are the lifeblood

6    of the business, and by this motion, the debtor seeks to

7    continue to compensate employees and other members of the

8    workforce without any disruptions and to maintain employee

9    benefits programs post-petition.  The debtors do not, by this

10   motion, seek to pay any bonuses, retention payments, or

11   severance to insiders, and the proposed order is clear about

12   that.

13         The debtors do seek to continue paying all of those

14   to non-insiders in the ordinary course, including the

15   continuation of a retention program for non-insiders

16   contemplated by the restructuring support agreement.

17         Due to these cases being filed only a week into the

18   new year, the debtors have not yet been able to determine the

19   amount of many bonuses and commissions earned during the

20   monthly, quarterly, and annual period ending on December 31st.

21   As a result, there are quite a few employees with claims

22   exceeding the statutory priority cap, all of whom are non-

23   insiders, and the debtors seek to pay such amounts.

24         The proposed order, which reflects discussions with

25   the U.S. Trustee and which we believe is acceptable to the U.S.

1   Trustee, provides parties with an opportunity to object to

2   certain of the relief, including payments exceeding the

3   priority cap, without disrupting the timing of employees

4   receiving compensation when expected.

5        I'd be happy to answer any questions that Your Honor

6   may have.  Otherwise, I respectfully request that the Court

7   enter the proposed order attached to the motion.

8        THE COURT:  Yeah.  So what did you mean by you

9   believe you reached comments with the United States Trustee?

10  What exactly?  Has there been any change to what's been

11  proposed in the order, or what are you all proposing?

12       MR. MISPAGEL:  So no changes to what was filed, Your

13  Honor.  We discussed with the U.S. Trustee before the motion

14  was filed, before the order was filed, and we believe that the

15  order that was submitted reflects those discussions.

16       One of the key points is the payment of those

17  employees who have prepetition claims exceeding the statutory

18  priority cap and giving any parties that wish to object to that

19  as much notice as possible under the circumstances.  And the

20  order has a few bespoke provisions that break up the payments

21  under the cap into a few different buckets and provide notice

22  periods for each one.  It will allow those to be paid in the

23  ordinary course on their expected time.

24       THE COURT:  Where is the docket number for this

25  motion is what?

1           MR. MISPAGEL:  Docket Number is 22.

2           THE COURT:  22.  I see it.  I read it last night.

3   Let me read it again to make sure we're all good.

4           MR. MISPAGEL:  Specifically, Paragraph 8 of the

5   order, Your Honor, is the one addressing payments over the

6   priority cap.

7           THE COURT:  Okay.

8           I'm going to grant the motion.  I think the relief

9   requested is appropriate, and I think in light of where this

10  case is and all trade getting paid, I think the relief

11  requested is appropriate.

12          I do understand and I do appreciate the comments that

13  the trustee has made.  It is not -- I should say, you know,

14  every Chapter 11 case where, you know, I would grant this

15  relief.  And so I don't want anyone to, you know, cite In re

16  Audacy, you know, in a first date motion before me in another

17  case.  But you've got to look at every case and kind of where

18  it is and what the facts are.  And I do believe that the relief

19  requested is appropriate.

20          I see some Audacy executives still on the line.  I

21  appreciate it.  This is, to me, the most important motion of

22  all the things that we've heard today because real people are

23  affected by this one, are impacted by it the most.  You know,

24  rent was just due.  You know, people have insurance, and they

25  get really nervous when a company files.  And I want to make

1   sure that you have the comfort to tell people that they're

2   going to get paid for the work that they've done and the work

3   that they will continue to do.

4           And I need you to -- I want -- that's just really

5   important because real life is happening out there.  And not

6   everyone understands everything, but understanding the comfort

7   to know, may not understand the technical intricacies of what's

8   happening today or what is being proposed, but just some

9   comfort to know, you know, that if you worked some overtime or

10  if you got some vacation that you can take it or if your, you

11  know, child got sick that you can take them to the doctor and

12  that this is not going to be affected is incredibly important

13  to bankruptcy judges and especially this one.  So I want to

14  make sure that you have the comfort to go out there.

15          There are some non-insiders, and again, I stress non-

16  insiders who I understand have earned some performance bonuses.

17  And I think giving people 14 days to come in and say that they

18  disagree, what some of those amounts being paid I think is

19  fair.  It's providing due process for anyone who wants to come

20  in and be able to file an objection to the relief requested.

21          I take some comfort.  I already approved that general

22  and secure creditors can be paid.  But, again, normally what is

23  approved on a first day is an amount for employees subject to a

24  congressional statutory cap for priority.  It doesn't mean they

25  weren't going to get paid.  This is really just a timing motion

1   for everyone.  So I take comfort with where we are.

2            But, again, every case is different.  You've got to

3   look at the facts and circumstances of every case.  It is

4   granted today.  There is no guarantee that I don't make someone

5   come back at another time in connection with another case.  But

6   I'm looking at where this case is.  The funding, the large

7   consent that I see here, and some folks who have real skin in

8   the game are here, and they are supporting the relief

9   requested.

10           And so I'm going to grant the relief requested in the

11   motion.  And I'm going to sign the order.

12           MR. MISPAGEL:  Thank you, Your Honor.

13           Finally, Your Honor, we have the last item on the

14   agenda, the solicitation procedures motion.  It's Agenda Number

15   16, Docket Number 23, and affidavit of service was filed at

16   Docket Number 50.

17           So as Your Honor knows by now, the debtors commence

18   solicitation of votes on a plan of reorganization prior to

19   filing these cases.  The disclosure statement used for that

20   solicitation process was filed at Docket Number 25, and the

21   plan was also filed separately at Docket Number 24.

22           Before getting into the relief sought by this motion,

23   I will just note that the U.S. Trustee reviewed the motion

24   prior to filing and had one comment, which we reflected in the

25   opt-out form for non-voting classes, making clear that opting

1    out of the releases will not impact any distribution that those

2    are entitled to receive under the plan.

3           THE COURT:  I saw it.

4           MR. MISPAGEL:  Your Honor, this motion seeks a

5    variety of relief, which is summarized in a list on the first

6    few pages of the motion.  The motion also includes a chart of

7    proposed dates and a chart of the exhibits attached to the

8    proposed order.

9           I'll address the scheduling aspects first.  The first

10   piece of relief sought is the scheduling of a combined hearing

11   to consider confirmation of the proposed plan, as well as final

12   approval of the disclosure statement.  The date we've asked for

13   that hearing to be scheduled is Tuesday, February 20th.  And as

14   we understand from our co-counsel reaching out to your case

15   manager this morning and from a few of the other motions

16   earlier in this hearing, we understand that Your Honor has that

17   date available, and so we would ask that Tuesday, February 20th

18   at 2:30 p.m. also be the combined hearing for confirmation of

19   the plan and final approval of the disclosure statement.

20          The other dates are related to that date.  We seek to

21   establish Monday, February 12th as the deadline for parties to

22   object to the plan and disclosure statement.  That date is 32

23   days after the debtors proposed to provide notice of the

24   combined hearing, which complies with applicable rules.  Other

25   dates include the debtors filing an initial plan supplement on

1  February 5th, which is seven days prior to the confirmation

2  objection deadline, or the proposed objection deadline, with

3  any supplemental plan supplement to be filed at least one day

4  before the combined hearing.

5       Debtors also propose to file a proposed confirmation

6  order seven days prior to the objection deadline and to file

7  any briefs in support of confirmation order five briefs by

8  February 16th.  And finally, the debtors seek approval of

9  Monday, February 12th, as the voting deadline, which is 38 days

10  after the debtors commence solicitation.

11       And I'll pause there in case Your Honor would like to

12  discuss any of those dates before I move on.

13       THE COURT:  Nope.

14       MR. MISPAGEL:  The next, Your Honor, by this motion,

15  the debtors seek conditional approval of the disclosure

16  statement to the extent required in order for the debtors to

17  solicit votes post-petition from any holders of claims who are

18  not eligible to be solicited prepetition.

19       Under the plan, creditors in both of the voting

20  classes will be receiving securities, and as a result, and as

21  is common in straddled prepackaged cases, the ballots require

22  that any holders submitting a ballot prior to conditional

23  approval of the disclosure statement certify as to its status

24  as an eligible holder.

25       One thing I want to be clear about is that

1    conditional approval of the disclosure statement for the

2    purpose of continuing solicitation post-petition will not

3    prejudice the rights of any party to object to the disclosure

4    statement or the adequacy of the information contained therein

5    at the combined hearing.

6          Next, Your Honor, the debtors seek by this motion

7    approval of various forms, ballots, and notices, each of which

8    is attached to the proposed order.  These include the ballots

9    that were sent to members of the voting classes prepetition, a

10    cover letter that was sent to Class 5 note holders, along with

11    the other solicitation materials, a notice of non-voting status

12    and release to opt-out form that the debtors proposed to send

13    to members of non-voting classes, and the combined notice which

14    the debtors proposed to send to provide both notice of the

15    commencement of these cases and notice of the combined hearing.

16          Finally, the debtors seek by this motion that the 341

17    meeting not be scheduled within the first 60 days of the case

18    and that the debtors not be required to file schedules and

19    statements within the first 60 days of the case.  The debtors

20    proposed schedule contemplates a confirmation hearing on the

21    44th day of the case for a plan that leaves general unsecured

22    creditors unimpaired.  So the debtors believe that this relief

23    with respect to the 341 meeting and the schedule of

24    statements -- schedules and statements is appropriate under

25    these circumstances.

1          Be happy to answer any questions that Your Honor may

2    have regarding this motion or the proposed order, and would

3    otherwise respectfully request that the Court enter the

4    proposed order filed with the motion with the one change of

5    adding in the hearing time of 2:30 p.m. on February 20th.

6          THE COURT:  Anyone wish to be heard in connection

7    with this motion?

8          Okay.  Before the Court is consideration of motion

9    seeking various relief requested in connection with a

10   confirmation hearing.  It was filed at Docket Number 23.

11         The Court is going to find that emergency

12   consideration of this is appropriate and relief requested is

13   appropriate as well.  This is what I would consider very much a

14   procedural motion seeking to establish dates.  The one semi

15   material and substantive point really has to do with -- well,

16   two.  One with the conditional approval of the disclosure

17   statement which under section 1125 of the Bankruptcy Code

18   requires at a minimum adequate information but that's really

19   scheduled for the final hearing.  What parties are asking is to

20   solicit and essentially run the risk that someone could come in

21   on the final and make all those objections on a final basis.

22         But I still, as the Court, believe it's important for

23   me to review it and see it on its face whether there's at least

24   a modicum of adequate information on its face.  And I do.  I've

25   reviewed the disclosure statement, every page of it, and I do

1   find that on its face there's adequate information there for --

2   to allow parties to make an informed decision to whether to

3   vote to accept or reject the plan.

4          Again, that's subject to a full final hearing there.

5   But I am comfortable that knowingly there's good information,

6   plenty of good information in there and that would satisfy a

7   disclosure statement but again everyone's rights are preserved

8   on that point.

9          I'm going to find that the proposed dates, the

10  proposed noticing procedures, the proposed publishing are

11  appropriate.  I really want to thank the United States Trustee

12  for taking -- I know they read a lot these days and I very much

13  appreciate all the work that they do here.  So I've reviewed

14  the ballot and the proposed tweaks to the ballot and the opt-

15  outs and I reviewed the form of ballots here and the

16  solicitation procedures.  And I do find that they're

17  appropriate.  I also think the dates work as well.

18         So I'm going to approve the scheduling motion and I

19  have added in the dates there and they work.  And I will get

20  that signed and get it on the docket.

21         MR. MISPAGEL:  Thank you, Your Honor.

22         And Your Honor, that was the last item on our agenda.

23  We'd like to thank you for your time today and we look forward

24  to seeing you at the next hearing I guess is February 5th.

25  Looks like there may be others who would like to speak before

1    the hearing concludes.

2              THE COURT:  Okay, yeah.  Let me just open it up.

3    Anyone else wish to be heard?  Let me just check.

4              Well, I will just thank everyone.  It really -- I

5    know a lot of work goes into first day motions and into the

6    declarations and all the graphics that go into it.  I really do

7    find it incredibly helpful.  Helps me get very prepared for the

8    hearings.  I thought they were incredibly well done.  I very

9    much thank everyone who worked on this motion.  It's clear that

10   there's been a lot of work that has gone on behind the scenes

11   to reach such consensus on a first day hearing.

12             So thanks to all those who presented.  Thanks to all

13   those who didn't present today but had a hand in making sure

14   that today went well for all the parties involved, for the

15   lender parties and for the debtor parties as well.

16             And for those who may have been wondering, yes, I do

17   think it's incredibly important for young lawyers to have the

18   opportunity to appear in court.  I think they did a fantastic

19   job.  You set up a standard for yourselves.  Now I know who you

20   are.  And you've got to be as -- you know, the trick is you've

21   got to be as prepared as you were today every time you stand

22   up.  And that is going to be the challenge for everyone paying

23   attention.  That's what the greats do.

24             So that being said, is there anything else we need to

25   take care of today or talk about?

1        MS. RECKLER:  No, Your Honor.  Thank you again for

2   your time.

3        THE COURT:  Okay.  Alrighty, folks.  I will -- the

4   orders should be hitting the docket now.  Thank you very much.

5   Have a great day.

6        MR. STAMER:  Thank you, Judge.

7        MS. RECKLER:  Thank you.

8     (Proceedings concluded at 1:59 p.m.)

9                          *  *  *  *  *

10

11

12

13

14              **C E R T I F I C A T I O N**

15

16        I, Alicia Jarrett, court-approved transcriber, hereby

17   certify that the foregoing is a correct transcript from the

18   official electronic sound recording of the proceedings in the

19   above-entitled matter.

20

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428      DATE:  January 12, 2024

25   ACCESS TRANSCRIPTS, LLC