IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § | Chapter 11 |
| AUDACY, INC., *et al.*, | § § § | Case No. 24-90004 (CML) |
|  | § § | (Jointly Administered) |
| Debtors.[1] | § § | (Emergency Hearing Requested) |

### DEBTORS' EMERGENCY MOTION AUTHORIZING THE DEBTORS TO ENTER INTO SETTLEMENT AGREEMENT WITH BROADCAST MUSIC INC. AND OTIS PARENT, INC. AND GRANTING RELATED RELIEF

> **Emergency relief has been requested. Relief is requested not later than 1:00 p.m. (prevailing Central Time) on February 5, 2024.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on February 5, 2024 at 1:00 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002.**
>
> **You may participate in the hearing either in person or by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Audacy (the "**Case Website**"). The location of the Debtors' corporate headquarters and service address for purposes of these chapter 11 cases is: 2400 Market Street, 4th Fl, Philadelphia, PA 19103.

1

> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") file this emergency motion (the "**Motion**") seeking approval to enter into a settlement agreement between Debtor Audacy, Inc. ("**Audacy**"), Broadcast Music Inc. ("**BMI**"), and Otis Parent, Inc. ("**Otis**," and together with Audacy and BMI, the "**Parties**") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). The settlement agreement (the "**Settlement Agreement**") will be filed under separate cover prior to the hearing.

## RELIEF REQUESTED

1. The Debtors seek entry of an order, substantially in the form of the attached proposed order (the "**Order**"), (i) approving the Settlement Agreement and its terms (the "**Settlement**") and (ii) granting related relief.

2. The Debtors have consulted with certain members of the First Lien Ad Hoc Group and the Second Lien Ad Hoc Group regarding the principal business terms of the Settlement. All members with which the Debtors consulted indicated that they are supportive of the Settlement terms and the relief requested in this Motion. To the extent any such parties (or any other parties) object to the relief requested, the Debtors will work to resolve such objection(s) prior to a hearing on the Motion.

## EMERGENCY CONSIDERATION

3. The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1(i), the Complex Case Procedures, and Bankruptcy Rules 2002(a)(2) and 6004(b), which authorize a court to approve a use of property of the estate on an emergency basis "for cause shown." The Debtors believe that immediate resolution of this Motion

and approval of the Settlement are necessary to avoid irreparable injury to Debtors because, for the reasons described more fully below, any delay in granting the relief requested could risk delaying the closing of the subject merger and thus put in jeopardy the Debtors' receipt of the substantial funds at the center of the compromise. Critically, effectiveness of the Settlement Agreement is conditioned upon entry of the Order approving the settlement on or before February 14, 2024. As such, the Debtors believe that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003, and the Debtors believe that emergency consideration is necessary and respectfully request that this Motion be heard on an emergency basis.

## JURISDICTION AND VENUE

4. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and this Court may enter a final order consistent with Article III of the United States Constitution. The Debtors confirm their consent to the entry of a final order by the Court.

5. Venue is proper pursuant to 28 U.S.C. § 1408.

6. The bases for the relief requested herein are sections 105(a) and 363(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended and modified, the "**Bankruptcy Code**"), Rules 6004 and 9019 of the Bankruptcy Rules, and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), and the Procedures for Complex Cases in the Southern District of Texas (the "**Complex Case Procedures**").

## BACKGROUND

7. Audacy (formerly Entercom Communications Corp.) was founded in 1968 at the dawn of the FM radio industry as a Pennsylvania corporation. Over the next few decades, Audacy expanded its business in new markets across the United States and established itself as an industry leader. It was listed on the New York Stock Exchange in connection with its initial public offering

3

in 1999.  Later that year, the Company acquired more than 40 radio stations from the Sinclair Broadcasting Group.  After growing to the fourth largest industry player by revenue, in November 2017, the Company merged with CBS Radio, making it the second largest U.S. radio broadcaster with leading stations in most of the country's top 50 markets.

**A.    Chapter 11 Cases**

8.    On January 7, 2024 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code and commenced these chapter 11 cases (the "**Chapter 11 Cases**").  The Debtors are operating their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or an examiner has been made in the Chapter 11 Cases, and no official statutory committees have been appointed or designated by the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**").

9.    Additional information about the Debtors' business affairs, capital structure, prepetition indebtedness, and the events leading up to the Petition Date can be found in the *Declaration of Heath C. Gray in Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 26] (the "**First Day Declaration**").[2]

10.    The Chapter 11 Cases are "prepackaged" cases commenced for the purpose of implementing an agreed restructuring of the Debtors' first lien senior secured loan debt and the Debtors' second lien secured note debt.  Prior to the Petition Date, the Debtors entered into the Restructuring Support Agreement, dated as of January 4, 2024 (as may be amended, modified, or supplemented, the "**Restructuring Support Agreement**") with beneficial holders of

---

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

4

(a) approximately 82.2% of the Debtors' first lien senior secured loans and (b) approximately 73.6% of the Debtors' second lien secured notes.

11.     A plan of reorganization reflecting the terms of the Restructuring Support Agreement (as may be amended, modified, or supplemented, the "**Plan**") was filed on the Petition Date, along with a disclosure statement with respect to the Plan (as may be amended, modified, or supplemented, the "**Disclosure Statement**").  Solicitation of the Plan began prior to the Petition Date and is currently underway.  The Debtors are seeking combined approval of the Disclosure Statement and confirmation of the Plan at a hearing that is scheduled for February 20, 2024.  The Plan contemplates that all Allowed General Unsecured Claims (as defined in the Plan) will be unimpaired.  Holders of First Lien Claims and Second Lien Notes Claims are impaired and entitled to vote.

**B.     The Claims Against BMI**

12.     The claims being settled arise from the Debtors' status as stockholders in BMI, a privately held corporation organized under the laws of the State of Delaware.

13.     On November 20, 2023, BMI and certain affiliates of New Mountain Capital, L.L.C. ("**NMC**"), including Otis, executed a merger agreement, pursuant to which Otis would acquire BMI for cash (the "**Merger**").

14.     In connection with the potential acquisition of BMI, during December 2023 and January 2024, Audacy worked with BMI to review BMI's available corporate books and records relating to Audacy's ownership of shares of BMI stock.

15.     Audacy compiled evidence, from a combination of BMI's records, its own records, and publicly available information, that led it to believe that it was likely the holder of record of the shares of BMI stock represented by Certificate Nos. 1626, 1778, 1797, 1876, 1883, 2083, 2192, 2201 and 2259 in BMI's books and records (collectively, the "**Group 1 Shares**").  Audacy's claim

to the Group 1 Shares is based on its acquisition of, or acquisition of BMI shares from, entities or radio stations in whose name(s) the applicable stock certificates had been issued.

16. Audacy also compiled evidence that led it to believe that it had superior claims to certain additional shares of BMI stock (such shares, the "**Additional Shares**") that were issued in the name(s) of other entities, although Audacy expected BMI to question Audacy's ownership of such shares based on the evidence that Audacy compiled, as well as the lack of easily accessible evidence going back several decades. Moreover, a large portion of those shares appeared to be registered to other entities who, in the judgment of the Debtors' management, were likely to be highly motivated to contest any competing claims presented by Audacy.

17. As a result of its investigation into BMI's books and records, Audacy was prepared to file suit to compel the issuance of stock certificates pursuant to 8 Del. C. §§ 158 and 168, as well as for various other claims. In its lawsuit, Audacy was prepared to request that the Merger be enjoined until the Parties had resolved the outstanding questions regarding Audacy's stockholdings.

18. During the week of January 15, 2024, BMI informed Audacy that the transaction was scheduled to close imminently. As such, Audacy was prepared to file suit on Monday, January 22, 2024.

C. **BMI's Claims Against Audacy**

19. In the years preceding the Chapter 11 Cases, BMI and Audacy had been negotiating a potential resolution to two pending claims that BMI has asserted against Audacy arising from their commercial relationship. First, since prior to the filing of the Chapter 11 Cases, BMI and Audacy have been negotiating claims that BMI has asserted in connection with an audit (the "**2017-2019 Audit**") that BMI conducted of Audacy's calculation and reporting to BMI of Audacy's 2017, 2018, and 2019 revenue subject to license fees pursuant to the licensing agreement between

6

BMI and Audacy for the period of January 1, 2017 to December 31, 2021 (the "**2017-2021 Licensing Agreement**"), as well as potential claims that BMI could assert in connection with Audacy's calculation and reporting to BMI of Audacy's 2020 revenue subject to license fees pursuant to that 2017-2021 Licensing Agreement. Based on the results of the 2017-2019 Audit, BMI asserted that Audacy owed approximately $1.68 million in fees to BMI. Audacy promptly disputed BMI's claim and, since 2020, has been negotiating with BMI to settle that matter and any potential claims relating to Audacy's 2020 revenue subject to license fees. Second, BMI has asserted that Audacy owes approximately $9.26 million in unpaid license fees and accrued late fees (the "**Fee Dispute**"). Audacy has disputed the sums asserted by BMI since 2018.

**D.      Settlement Agreement**

20.      After extended discussions and negotiations, BMI and Audacy reached a preliminary resolution of Audacy's claims and certain of BMI's claims. The material terms of the Settlement, as set forth in the Settlement Agreement, are:[3]

     a.      **Group 1 Shares**: Prior to the closing of the Merger, Audacy will submit lost-security affidavit and indemnity agreements in respect of the Group 1 Shares to BMI, which include indemnification obligations of Audacy consistent with those set forth in the Settlement Agreement (the "**Lost Security Affidavit and Indemnity**"), and BMI will issue to Audacy new stock certificates with respect to such Group 1 Shares, such that, upon closing of the merger, Audacy can submit the relevant documentation to the paying agent to receive payment of the merger consideration in respect of the Group 1 Shares, an amount totaling approximately $25.4 million in the aggregate;

---

[3]  To the extent of any conflict between the summary presented herein and the forthcoming Settlement Agreement, the terms of the Settlement Agreement govern.

7

b. **Group 2 Shares**: The merger consideration for a subset of the Additional Shares represented by Certificate No. 2053 in BMI's books and records (the "**Group 2 Shares**"), an amount totaling approximately $3.44 million in the aggregate, will be held by the paying agent for a period of 90 days after the closing of the merger. Should a competing claimant ("**Claimant**") assert a claim to the Group 2 shares during this 90-day period and provide reasonable documentation to support its claim, BMI and Audacy will attempt in good faith to retain a neutral third-party reasonably acceptable to all parties (including the Claimant) to resolve such dispute, whose decision as to the ownership of the Group 2 Shares will be final and binding on all parties; provided, however, that if the Claimant is unwilling to appear before an arbitrator, BMI and Audacy may proceed to resolve the dispute before a court of competent jurisdiction (the "**Claims Resolution Process**"). If no such Claimant appears within 90 days after the closing of the merger, Audacy will submit a Lost Security Affidavit and Indemnity to BMI, which shall be countersigned by BMI, such that Audacy can submit the countersigned Lost Security Affidavit and Indemnity to the paying agent (along with any additional documentation required by the paying-agent in accordance with the paying agent agreement) to receive payment of the merger consideration in respect of the Group 2 Shares.

c. **Group 3 Shares**: The merger consideration for an additional subset of the Additional Shares represented by Certificate No. 2038 in BMI's books and records (the "**Group 3 Shares**," and together with the Group 2 Shares, the "**Pending Shares**"), an amount totaling approximately $10.14 million in the aggregate, will be held by the paying-agent for a period of 120 days after the closing of the merger. Should a Claimant assert a claim to the Group 3 Shares during the 120 days following the closing of the merger,

resolution of the ownership of the Group 3 Shares will be subject to the Claims Resolution Process described above. If no such Claimant appears within 120 days after the closing of the merger, Audacy will submit a Lost Security Affidavit and Indemnity to BMI, which shall be countersigned by BMI, such that Audacy can submit the countersigned Lost Security Affidavit and Indemnity to the paying agent (along with any additional documentation required by the paying agent in accordance with the paying agent agreement) to receive payment of the merger consideration in respect of the Group 3 Shares.

      d.    **Audit Dispute**: Audacy will pay to BMI $550,000 in full settlement of claims arising out of (x) the 2017-2019 Audit and (y) Audacy's 2020 revenue subject to license fees pursuant to the 2017-2021 Licensing Agreement (together, the "**Audit Dispute**"). That payment will be made within five business days after the Settlement Agreement is approved by this Court and becomes effective in accordance with its terms. For the avoidance of doubt, no aspect of the Fee Dispute is resolved by this settlement of the Audit Dispute.

      e.    **Fee Dispute**: The Fee Dispute will be resolved by BMI and Audacy separately within 60 days of the closing of the merger, with the unpaid amount treated as an allowed general unsecured claim against the Debtors. Audacy will be required to provide notice of any such resolution to the First Lien Ad Hoc Group and the Second Lien Ad Hoc Group; no further notice will be required.

      f.    **Releases**: The Parties will provide for mutual releases to be further detailed in the Settlement Agreement, including that both parties will fully release any claims they have or could have asserted with respect to any and all BMI shares (with respect to the

Pending Shares, outside of the Claims Resolution Process and subject to certain exceptions detailed in the Settlement Agreement), regardless of whether or not those shares were specifically the subject of, or were otherwise referenced in, prior discussions between the Parties, as well as with respect to the Audit Dispute and the merger.

g.  **Indemnification**:  Audacy will provide an indemnity to BMI, Otis, NMC and certain other related parties related to or arising from (a) the representations made by Audacy or any of Audacy's subsidiaries in any Lost Security Affidavit and Indemnity and (b) third-party claims to ownership of the Group 1 Shares, Group 2 Shares, and Group 3 Shares.

h.  **Merger Timeline:**  The merger will not close earlier than two business days after the Settlement Agreement is approved by this Court and becomes effective in accordance with its terms.

## MERITS OF THE COMPROMISE

21.  The Debtors believe the Settlement is in the best interests of the Debtors and their estates and seek approval thereof.  Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," "after notice and a hearing."  A debtor may use property of the estate outside the ordinary course of business if there is a good business reason for doing so.  *See, e.g.*, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011).

22.  Bankruptcy Rule 9019 authorizes bankruptcy courts to approve compromises and settlements.  Ultimately, a compromise must be "fair, equitable, and in the best interest of the estate."  *In re Roqumore*, 393 B.R. 474, 479 (Bankr. S.D. Tex. 2008) (citation omitted).  The decision to approve a compromise lies within the sound discretion of the bankruptcy court.  *See United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984).  The Fifth

Circuit recognized that compromises are a "normal part of the process of reorganization . . . oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated, and costly." *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968)).

23.     In determining the reasonableness of a settlement, courts in the Fifth Circuit consider the following three factors: (a) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (b) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (c) all other factors bearing on the wisdom of the compromise. *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997); *Jackson Brewing*, 624 F.2d at 602. Factors "bearing on the wisdom of the compromise" include: (a) the paramount interest of creditors, with proper deference to their reasonable views; and (b) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion. *See Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917-18 (5th Cir. 1995).

24.     Here, the Settlement is a fair and reasonable compromise, is in the best interest of the Debtors' estates, and is a sound exercise of the Debtors' business judgment.

### Probability of Success

25.     First, while the Debtors believe that they have a valid claim to ownership of all of the Group 1 Shares and all of the Additional Shares, the strength of the evidence of ownership of the shares is varied, and Audacy's claims to each would be subject to defenses that could be asserted by BMI and by other potential stockholders. Additionally, Audacy expects BMI to assert

that Delaware law imposes a burden of proof in connection with claims under 8 Del. C. § 168 that requires a plaintiff to prove its ownership of the stock in question with "reasonable certainty." *Petróleos de Venezuela, S.A. v. PDV Holding, Inc.*, 2023 Del. Ch. LEXIS 582, at *16 (Del. Ch. Nov. 28, 2023). These issues, along with the normal uncertainty and risk inherent in litigation, weigh heavily in favor in the Settlement that the Debtors negotiated.

26. In its judgment and that of its advisors, Audacy had the best chance of establishing clear title to the Group 1 Shares, which are shares that are primarily registered in the name of companies that Audacy has acquired over the years. As part of the Settlement proceeds, Audacy will be entitled to receive the merger consideration in respect of all of the Group 1 Shares upon closing of the merger—*i.e.*, a 100% recovery—in an amount totaling approximately $25.4 million in the aggregate.

27. After extensive discussions with BMI's counsel, Audacy also believed that it could, with sufficient time, provide evidence sufficient to establish a claim to all of the Pending Shares, but the evidence currently available to support those claims is less complete than with regard to the Group 1 Shares, thus presenting a risk that Audacy might not prevail in court if those claims were contested. The Pending Shares are also addressed in the settlement; so long as a competing Claimant does not assert and prove a superior claim to ownership of those shares supported by reasonable supporting documentation during the timelines described above, Audacy will also receive <u>100%</u> of the merger consideration in respect of the Pending Shares—an amount totaling up to approximately $13.58 million in the aggregate.

28. As to the remaining Additional Shares, for which Audacy is releasing its claims, Audacy expects BMI to argue that Audacy's claims are subject to a high burden of proof and evidentiary hurdles to definitively establish a chain of custody of such shares to Audacy; further,

12

a significant portion were registered to other entities or individuals who would have been entitled to a presumption that their claim was valid under Delaware law. Moreover, BMI and others would likely have asserted time-based defenses, including laches and applicable statutes of limitation, which Audacy would have to overcome in a contested litigation.

### Complexity, Duration, and Expense

29. Second, the time and expense necessary to prevail in a contested litigation also weighs heavily in favor of the settlement. Even an expedited litigation in Chancery Court would likely last several months and cost millions of dollars, and the present value of any likely recovery would be greatly diminished. Much of the evidence that would be required to support a claim likely to prevail in litigation has been in off-site storage for years and would take a great deal of time and expense to locate, retrieve, and analyze.

30. Lending further complexity to any litigation the Debtors could pursue in order to obtain the Group 1 Shares and Additional Shares is the risk that the very act of seeking injunctive relief to stop the merger, and the undoubtedly contentious litigation that would follow, could cause NMC and BMI to abandon the merger altogether. If that were to happen, it is possible the recovery to the Debtors' estates from its ownership of BMI shares would be *zero*. BMI could elect not to pursue a sale to another party and, even if BMI did elect to pursue another sale, it is possible that no new buyer would emerge. Even if a subsequent buyer did emerge, it is possible that the new buyer would not be willing to pay as much for BMI or that the transaction would not occur for an extended period of time, as the new buyer engages in due diligence, negotiates the terms of the transaction, and works to secure the necessary regulatory approvals. Therefore, the very act of filing suit—even if the suit is otherwise successful on the merits—could result in no recovery at all.

**Wisdom of the Compromise**

31. Third, the Settlement is the product of hard-fought, good-faith, arms'-length bargaining. And the Settlement is in the best interest of all stakeholders (including Debtors' secured creditors, the only impaired parties) because it will, subject to the closing of the merger, bring in at least ***$25 million*** of funds to the Debtors' estates (potentially within days of this settlement being approved), with the possibility for up to an additional ***$13.6 million*** in the following months. These proceeds far exceed the approximately $5.2 million that that had been estimated in the DIP Budget to be received from the merger, and therefore represent an unanticipated and significant contribution to the Debtors' estates.[4] Securing these proceeds now also avoids the risk that the Debtors' estates would achieve no recovery at all, which would be possible if the Debtors pursued litigation.

32. In addition, prior to entering into the Settlement, the Debtors consulted with certain members of the First Lien Ad Hoc Group and the Second Lien Ad Hoc Group regarding the principal business terms of the Settlement. All members with which the Debtors consulted indicated that they are supportive of the principal business terms of the Settlement and the relief requested in this Motion.[5] Thus, representatives of the stakeholders with the greatest economic interest in the Settlement approve of it, which the Debtors considered when deciding how to proceed.

---

[4] Under the DIP Credit Agreement, the Debtors may either retain BMI proceeds or use them to prepay the DIP Loans, depending on the Debtors' liquidity at the time or as projected through the Effective Date. *See* DIP Credit Agreement § 2.05(b) (allowing the Debtors to retain BMI proceeds to the extent the Debtors' liquidity, after giving effect to any prepayments made with the proceeds, would fall below $50 million or would be projected to so before the Effective Date). In the event that any prepayments are made under the DIP Credit Agreement using the BMI proceeds, the Debtors will not incur any prepayment penalties. *See* DIP Credit Agreement § 2.05(b)(i).

[5] Out of an abundance of caution, to avoid members of the Ad Hoc Groups having material nonpublic information that could restrict them from trading, the Debtors were only able to consult with a subset of holders who were willing to accept the information under a confidentiality agreement. However, based on their feedback, the Debtors are optimistic that the full membership of the Ad Hoc Groups will support the Settlement.

33. For all of the reasons above, the Debtors have determined in their reasonable business judgment that the benefits of the Settlement outweigh the costs and request that the Court approve it.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

34. The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

35. The Debtors have provided or will provide notice of this Motion to: (a) the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors; (c) the agent and counsel for the agent for the First Lien Credit Facility; (d) the trustee and counsel for the trustee for the Second Lien Secured Notes; (e) the agent and counsel for the agent for the Postpetition Securitization Program; (f) counsel for the First Lien Ad Hoc Group; (g) counsel for the Second Lien Ad Hoc Group; (h) the agent and counsel for the agent for the DIP Facility; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors believe that no other or further notice is required or needed under the circumstances.

[*The remainder of this page is intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the proposed Order, substantially in the form attached hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: January 31, 2024

Respectfully submitted,
*/s/ John F. Higgins*
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
**PORTER HEDGES LLP**
1000 Main St., 36th Floor
Houston, Texas 77002
Tel:   713-226-6000
Email: jhiggins@porterhedges.com
           sjohnson@porterhedges.com
           myoung-john@porterhedges.com

– and –

George A. Davis (NY Bar No. 2401214)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Tel:   212-906-1200
Email:  george.davis@lw.com

– and –

Caroline Reckler (IL Bar No. 6275746)
Joseph C. Celentino (NY Bar No. 5508809)[6]
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Tel:   312-876-7700
Email: caroline.reckler@lw.com
           joe.celentino@lw.com

– and –

Jeffrey T. Mispagel (NY Bar No. 4842779)
Deniz A. Irgi (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Tel:   213-485-1234
Email: jeffrey.mispagel@lw.com
           deniz.irgi@lw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

---

[6]   Not admitted to practice in Illinois. Admitted to practice in New York.