IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| AUDACY, INC., *et al.*, | § § § | Case No. 24-90004 (CML) |
| | § § | (Jointly Administered) |
| Debtors.[1] | § § § | |

**DECLARATION OF ROGER MELTZER IN SUPPORT OF CONFIRMATION OF THE JOINT PREPACKAGED PLAN OF REORGANIZATION FOR AUDACY, INC. AND ITS AFFILIATE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Roger Meltzer, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

**Professional Background and Qualifications**

1. Since November 7, 2023, I have served as an independent director (the "Independent Director") on the board of directors (the "Board") of Audacy, Inc. ("Audacy" and, together with its affiliated debtors and debtors in possession, collectively, the "Company" or the "Debtors") and the sole member of the Special Review Committee of the Board (the "Special Review Committee"). I have over 40 years of experience practicing corporate and securities law representing clients in a range of finance transactions, including mergers, acquisitions and dispositions, public offerings, and public and private placements of debt and equity securities. I hold a Bachelor of Arts from Harvard University and a Juris Doctorate from New York University

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Audacy. The location of the Debtors' corporate headquarters and service address for purposes of these chapter 11 cases is: 2400 Market Street, 4th Fl, Philadelphia, PA 19103.

School of Law. I have also served as an independent director to several non-profit and for-profit organizations.

2. While serving as an Independent Director to the Board, I also served as the Chairman Emeritus of DLA Piper ("DLA"). Prior to serving on the Board, I was a member of DLA's Global Board and the US Executive Committee (Co-Chair) and I managed DLA for nearly 15 years, including two terms as its chairman. I was also a partner and global chair of the Corporate and Finance practice at DLA where I counseled numerous corporate boards and executives on significant matters, including, among others, corporate governance and securities regulation, employment issues, investigations, and litigation. I started my career at Cahill Gordon & Reindel LLP where I also served as a member of the executive committee.

3. I submit this declaration (this "Declaration") in support of confirmation of the *Joint Prepackaged Plan of Reorganization for Audacy, Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 24] (as modified, amended, or supplemented from time to time, the "Plan"), including the Debtor Release (as defined below) contained therein.[2] Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtors' management team, the Debtors' legal counsel and other advisors, the Special Review Committee's independent legal counsel, Katten Muchin Rosenman LLP ("Katten"), and my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives. For the avoidance of doubt, I do not, and

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan, the *Disclosure Statement for the Joint Prepackaged Plan of Reorganization for Audacy, Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 25] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), and the *Declaration of Heath Gray in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 26], as applicable.

2

do not intend to, waive the attorney-client privilege or any other applicable privilege by submitting this Declaration.

**Appointment to the Board and Special Review Committee**

4. I understand that, prior to my appointment, on July 7, 2023, the Board established a Special Committee (the "Special Committee") comprised of independent directors Joel Hollander (as Chairman), David J. Berkman, and Sean R. Creamer. I understand that, since its formation, the Special Committee has held weekly meetings and has been responsible for evaluating potential restructuring transactions, directing the Company's advisors in their negotiations with stakeholders, and recommending to the full Board those transactions that it believes are in the best interests of the Company.

5. On November 7, 2023, the Board unanimously adopted resolutions (the "Resolutions") (a) appointing me as an Independent Director of the Board, (b) constituting the Special Review Committee and appointing me as its chairman and sole member, and (c) delegating specific authorities to the Special Review Committee. Since joining the Board, I have communicated regularly with the Debtors, their advisors, and Katten regarding matters within my delegated authority, as described herein. I have also attended the weekly meetings of the Special Committee. Accordingly, I have stayed apprised as the Special Committee evaluated potential restructuring transactions and directed negotiations with stakeholders.

6. Pursuant to the Resolutions, the Special Review Committee is vested with the authority to conduct or authorize reviews into any matters germane to the potential restructuring of the Company as it deems appropriate. In furtherance of its mandate, the Special Review Committee commenced an independent investigation (the "Independent Investigation") into whether the Debtors hold any viable claims and causes of action against any of the Company's

3

equity holders, affiliates, directors, managers, and officers, or other stakeholders (collectively, the "Related Parties"). In my capacity as Independent Director and sole member of the Special Review Committee, I retained Katten as independent legal counsel to conduct the Independent Investigation and to provide advice and legal services in connection with the exercise of my fiduciary duties in carrying out the authority delegated to me pursuant to the Resolutions. I selected Katten as independent legal counsel based on prior positive experiences working with Katten, and in particular the lead attorneys from Katten working on this matter, including Steven J. Reisman and Marc B. Roitman. In hiring Katten, I relied on the fact that the lead attorneys from Katten working on this matter are widely regarded as market leaders in the representation of independent directors and, in recent years, have represented independent directors—including myself—in some of the largest and most complex chapter 11 cases throughout the United States and in additional confidential out-of-court restructuring matters.

## Consideration of the Restructuring Support Agreement and Plan

7. I understand that, beginning in June 2023, the Debtors and their advisors began extensive negotiations regarding potential restructuring transactions with the principals and advisors of two groups of lenders: (i) an ad hoc group of holders of the Debtors' First Lien Credit Facility (the "First Lien Ad Hoc Group"), and (ii) an ad hoc group of holders of the Debtors' Second Lien Secured Notes (the "Second Lien Ad Hoc Group"), each representing substantial majorities of their respective debt instruments. During my time on the Board, the Board and the Special Committee have met regularly to discuss the status of negotiations and the Company's restructuring options.

8. After extensive, arm's-length negotiations, on January 3, 2024, the Board was presented with the proposal as memorialized in the restructuring support agreement (the

4

"Restructuring Support Agreement"), dated January 4, 2024, which enjoyed the broad support of Holders whose claims at the time represented approximately (i) 82.2% of the Debtors' first lien senior secured loans, and (ii) 73.6% of the Debtors' second lien secured notes. After deliberating with the Company and its advisors, the Board determined that the Restructuring Support Agreement would result in a material deleveraging and a value-maximizing plan of reorganization that would pave the way for an expeditious exit from chapter 11. Moreover, the Restructuring Support Agreement included a robust "fiduciary out" in the event that the Company, the Board, or a governing body of the Company determined that proceeding with the transactions contemplated by the Restructuring Support Agreement would be inconsistent with the exercise of its fiduciary duties. Although the Debtors and the Board retained full fiduciary flexibility to consider other alternatives, no superior offer has emerged. The Board concluded that the transaction described in the Restructuring Support Agreement and the Plan constituted the best available transaction for the Debtors and their stakeholders.

### The Special Review Committee's Investigation

9. Since its engagement, the Special Review Committee, with the assistance of Katten, has conducted the Independent Investigation. Between November 2023 and February 2024, Katten and I regularly discussed matters relevant to the Independent Investigation and the progress of the chapter 11 cases. At my direction, Katten submitted twenty-nine categories of diligence requests to the Debtors seeking documents and information relevant to the Independent Investigation, including, among other things, board materials and minutes, corporate formation and governance documents, corporate structure charts, material agreements, and financial information. Katten received and reviewed over 1,000 documents from the Debtors, and also reviewed the Company's filings with the U.S. Securities and Exchange Commission.

Additionally, Katten conducted an interview of Andrew Sutor, the Company's General Counsel, and met with the Debtors' lead counsel, Latham & Watkins LLP, regarding the Independent Investigation.

10. In connection with the Independent Investigation, the Special Review Committee, with the assistance of Katten, analyzed if there were any viable claims and causes of action held by the Debtors' Estates relating to, among other things: (i) the Company's transactions with and payments to Related Parties; (ii) the Board's process to approve certain significant transactions; and (iii) significant transfers between Company entities.

11. Based on Katten's findings in connection with the Independent Investigation, the Special Review Committee concluded that the Debtors' Estates do not have viable causes of action against Related Parties that are worthy of pursuit, particularly in the context of the value-maximizing prepackaged Plan supported with material contributions by the Related Parties, as discussed below.

## Evaluation of Certain Plan Terms

12. In my role as sole member of the Special Review Committee, I have reviewed the reasonableness and appropriateness of the global settlement and the release, exculpation, and injunction provisions in the Plan. I believe the global settlement embodied in the Plan is the product of extensive good faith, arm's-length negotiations, and reflects a reasonable compromise of the various positions of the parties. The settlement embodied in the Plan contemplates, among other things, the materiality of the release, exculpation, and injunction provisions with respect to the parties' support of the Plan, the value of potential litigation Claims, and the expenses of litigating such Claims. Thus, and as set forth more fully below, I believe that the Plan, including the release, exculpation, and injunction provisions, is reasonable under the circumstances,

appropriate, and in the best interest of the Debtors, their Estates, and all of the Debtors' stakeholders.

        **A.**        **The Releases in the Plan Are Appropriate.**

13.     Article X.B.1 of the Plan provides for releases by, among others, the Debtors and their Estates of any and all Claims and Causes of Action, including any derivative claims the Debtors could assert, against the "Released Parties," which includes, among others, certain of the Related Parties, the Consenting Lenders, the First Lien Agent, the Second Lien Indenture Trustee, the DIP Agent, the DIP Lenders, the DIP Backstop Parties, the Securitization Program Parties, and the Exit Backstop Parties (the "Debtor Release").[3] The Special Review Committee reviewed the Debtor Release and concluded it is appropriate, justified, in the best interests of the Debtors and their stakeholders, and an integral part of the Plan for the reasons set forth below.

14.     *First*, the Released Parties have provided valuable consideration. The Restructuring Transactions embodied in the Plan (including the Debtor Release) were negotiated by sophisticated parties and counsel, including months of prepetition negotiations among the Debtors and the Consenting Lenders that resulted in the Restructuring Support Agreement. The Debtors' key stakeholders and current directors and officers were critical participants in the Plan process, in terms of negotiating a consensual deal for the benefit of all stakeholders, voting in favor of the plan, and cooperating with the Independent Investigation. In particular, each of the Released Parties has worked collaboratively and constructively with the Debtors and have provided (whether by their execution of the Restructuring Support Agreement, voting to accept the Plan, or otherwise) value to the Estates in the form of, among other things, impairment of their debt-related

---

[3] The foregoing description is meant as a summary of the operative Plan provisions only. Certain of the Released Parties are defined as such in multiple capacities. To the extent there is any conflict between the foregoing summary and the definition of "Released Party" contained in Article I of the Plan, the Plan shall control.

claims, negotiation and formulation of the Plan, and/or providing necessary consents under the Company's governing documents, in each case as may be applicable to the specific Released Party. They have done so with the understanding that they would receive releases from the Debtors, subject to the Independent Investigation. The Debtor Release is an essential *quid pro quo* for the Released Parties' contributions to and support of the Debtors' restructuring. In the absence of the Released Parties' support, the Debtors would not be in a position to confirm the Plan, consummate the Restructuring Transactions, effectuate the transactions contemplated thereunder, and maximize value for the benefit of the Debtors' stakeholders. The Debtor Release, therefore, is a critical component of the Plan.

15. ***Second***, all relevant economic stakeholders, including holders of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims—the stakeholders that would benefit from any valuable claims—support the restructuring and the Releases that are an essential component of it. And they do so after representatives of those stakeholders engaged in months of negotiations and careful consideration of the alternatives. This reasoned support thus confirms the reasonableness of the Releases.

16. I believe that all parties in interest benefit from the Restructuring Transactions contemplated by the Plan. The Special Review Committee concluded the releases given by holders of Claims and Interests included in Article X.B.2 of the Plan (the "Third-Party Release") are appropriate, justified, in the best interests of the Debtors and their stakeholders, and an integral part of the Plan for the reasons set forth below.

17. ***First***, I believe that the Third-Party Release is a consensual release. I understand that all Holders of Claims entitled to Vote had the opportunity to opt out of the Third-Party Release through their Ballots and that remaining Holders of Claims and Interests had the opportunity to

opt out through the Opt Out Forms. Importantly, the Ballots, the Notice of Non-Voting Status, the Opt Out Forms, and the Combined Notice, each as appended to the *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Fixing Deadline to Object to Disclosure Statement and Plan; (III) Approving (A) Solicitation Procedures, (B) Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline, and (C) Notice of Non-Voting Status and Opt Out Opportunity; (IV) Conditionally Approving Disclosure Statement; (V) Conditionally (A) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities; and (VI) Granting Related Relief* [Docket No. 82], quoted the entirety of the Third-Party Release in bold, conspicuous font, clearly informing such Holders of Claims and Interests of the steps they should take if they disagreed with the scope of the release. Thus, affected parties were on notice of the Third-Party Release, including the option to opt out of the Third-Party Release. As such, I believe that the Third-Party Release is consensual as to all creditors and interest holders who did not opt out.

18. ***Second***, the Third-Party Release is critical for a successful restructuring. For months prior to the commencement of these chapter 11 cases and throughout the pendency of these chapter 11 cases, the Debtors' key stakeholders, including the Consenting Lenders, worked constructively with the Debtors to negotiate and ultimately implement the Restructuring Transactions embodied in the Plan, which will enable the Debtors to emerge from these chapter 11 cases with a deleveraged balance sheet, maximize the value of the Debtors' estates, and provide the best recovery to stakeholders. In particular, the Debtors' key stakeholders and current directors and officers have provided significant contributions, resulting in Restructuring Transactions that will allow the Debtors to emerge from these chapter 11 cases with a deleveraged balance sheet,

positioning them for future success. It is my understanding that the Debtors' key stakeholders were unwilling to support the Plan without the assurance that they and their collateral and interests would not be subject to post-emergence litigation or other disputes related to restructuring. The Third-Party Release therefore benefits the Debtors' post-emergence enterprise as a whole.

19. ***Third***, the parties bound by the Third-Party Release have received consideration in exchange for the release of their Claims against the Released Parties. Each of the Released Parties has provided and/or continues to provide benefits that flow to all parties in interest from the Restructuring Transactions contemplated by the Plan.

20. Accordingly, I believe that the Debtor Release and the Third-Party Release are integral and essential provisions of the Plan and provide finality for the Released Parties regarding the parties' respective obligations under the Plan. I also believe the Debtor Release and the Third-Party Release have been provided in exchange for good and valuable consideration from the Released Parties, are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, are fair, equitable and reasonable, and are given and made after due notice and opportunity to be heard. As such, I believe the Debtor Release and the Third-Party Release should be approved.

B. **The Exculpation and Injunction Provisions in the Plan Are Appropriate.**

21. The Special Review Committee also reviewed the appropriateness of the exculpation provision (the "<u>Exculpation Provision</u>") contained in Article X.E of the Plan. I believe the Exculpation Provision in the Plan is an integral piece of the overall settlement embodied by the Plan. It is limited to the Debtors and is the product of good faith, arm's-length negotiations. I understand the Exculpation Provision is narrowly tailored to exclude criminal acts and acts of actual fraud, willful misconduct, or gross negligence, and relates only to acts or omissions in

connection with, or arising out of, the Debtors' restructuring. As such, I believe the Exculpation Provision is a critical component of the Plan, and along with the Debtor Release and Third-Party Release, forms an integral piece of the overall settlement embodied in the Plan.

        **C.**        **The Injunction Provision Is Appropriate.**

        22.        The injunction provision set forth in Article X.F of the Plan (the "Injunction Provision") is also a necessary part of the Plan because it enforces the discharge, release, and exculpation provisions. Further, the Injunction Provision affords the Debtors and their stakeholders (including, among others, the Released Parties and the Exculpated Parties) a greater degree of certainty with respect to these chapter 11 cases and the Restructuring Transactions by requiring the Court's authorization for parties to commence or pursue Claims or Causes of Action that relate to or are reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to the Debtor Release, the Third-Party Release, or the Exculpation Provision.

        23.        I also understand that the "gatekeeper" provision is a material and necessary term of the Plan. The purpose of the gatekeeper provision is to ensure that the Debtors or other Released Parties do not become bogged down in meritless litigation. Accordingly, considering the broad support for the Plan from nearly all stakeholders, along with the importance of the gatekeeper provision, I believe that the gatekeeper provision is in the best interest of the Estates.

        24.        Based on these considerations, as an Independent Director of the Board and sole member of the Special Review Committee, I determined that the Debtor Release, the Third-Party Release, the Exculpation Provision, and the Injunction Provision should be approved as part of confirmation of the Plan.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 16, 2024

*/s/ Roger Meltzer*
Roger Meltzer
Independent Director and Sole Member of the Special Review Committee of the Board of Audacy, Inc.