**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| AUDACY, INC., *et al.*, | § | Case No. 24-90004 (CML) |
| | § | (Joint Administration Requested) |
| Debtors.[1] | § | |

**DECLARATION OF WILLIAM EVARTS (PJT PARTNERS LP)**
**IN SUPPORT OF CONFIRMATION OF THE DEBTORS' CHAPTER 11 PLAN**

I, William Evarts, hereby declare under penalty of perjury as follows:

1. I am a Managing Director at PJT Partners LP ("**PJT**"), an investment banking firm with principal offices located at 280 Park Avenue, New York, New York 10017. PJT is the proposed investment banker to the debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

2. I submit this declaration (this "**Declaration**") in support of confirmation of the *Joint Prepackaged Plan of Reorganization for Audacy, Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 24] (as amended, modified, or supplemented, the "**Plan**").[2]

3. Unless otherwise indicated, all statements set forth in this Declaration are based upon (a) my personal knowledge or opinion based on my experience and expertise, (b) information I received from the Debtors, other members of the PJT team, or the Debtors' other advisors, (c) my

[1] A complete list of each of the Debtors in the chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Audacy. The location of the Debtors' corporate headquarters and service address for purposes of the Chapter 11 Cases is: 2400 Market Street, 4th Fl, Philadelphia, PA 19103.

[2] Defined terms used herein but not otherwise defined shall have the meanings provided to such terms in the Plan.

review of relevant documents, and/or (d) my opinion based on my experience as a restructuring professional. I am not being specifically compensated for this testimony other than through the proposed compensation that PJT receives in its capacity as an advisor to the Debtors. I am over the age of 18 years and am authorized to submit this Declaration on behalf of the Debtors. If I were called to testify, I would testify competently to the statements set forth below.

## I. Background and Qualifications

4. PJT is a leading global financial advisory services firm with more than 1,000 employees in 11 offices in the United States, Europe, and Asia. The firm offers integrated advisory services for mergers and acquisitions, restructuring and special situations, and fund placement. PJT is an industry leader in advising companies and creditors in all aspects of complex restructurings and bankruptcies. The firm has extensive experience providing financial advisory and investment banking services to financially distressed companies, including representing both debtors and lenders in the procurement and provision of postpetition financing. PJT is a registered broker-dealer with the U.S. Securities and Exchange Commission, a member of the Securities Investor Protection Corporation, and is regulated by the Financial Industry Regulatory Authority.

5. I received an A.B. from Harvard College, a J.D. from the University of Pennsylvania Law School, and an MBA from the Wharton School at the University of Pennsylvania. I have more than 15 years of restructuring and finance experience. Since joining The Blackstone Group's ("**Blackstone**") restructuring group in 2015 (which group was spun-off into PJT in 2015), I have provided restructuring advice to companies, creditors, shareholders, and other interested parties on restructuring transactions both in chapter 11 and on an out-of-court basis. Prior to working at Blackstone, I began my career at Morgan Stanley.

6. In addition to acting as the investment banker to the Debtors prior to and during the Chapter 11 Cases, some of my other most notable publicly disclosed restructuring assignments

include API Heat Transfer, Cazoo Group, Chaparral Energy, Denon + Marantz, Digicel, Encore Group, the Federal Oversight and Management Board of Puerto Rico with respect to the Commonwealth Title III cases, Gibson Brands, GWG Holdings, Hovnanian Enterprises, J. Crew Group, Molycorp, Noranda Aluminum, PetSmart, Premiere Global Services, Revlon, Sanjel Corporation, Seadrill Partners, Seritage Growth Properties, Serta Simmons Bedding, TPx Communications, and TridentUSA Health.

## II. PJT's Retention

7. In August 2022, PJT was initially retained by the Debtors in connection with an evaluation of the Debtors' strategic alternatives, including, but not limited to, exchange transactions and additional debt offerings. Thereafter, in June 2023, PJT was asked to assist the Debtors to more broadly evaluate their capital structure and strategic alternatives, including a potential restructuring of their funded debt obligations. Since its initial retention, PJT has worked closely with the Debtors and their other advisors to analyze the Debtors' business affairs, assets, financial position, contractual arrangements, and potential strategic transactions.

8. In my representation of the Debtors, I have, among other things, provided advice on strategic transaction alternatives, restructuring options, and financings. I have participated in negotiations among the Debtors, their creditors, and other parties in interest. In particular, I have participated in numerous meetings with the Debtors' board of directors and special committee in order to, among other things, address the Debtors' need for, and access to, exit financing in the form of (a) the proposed exit receivables securitization program (the "**Exit Securitization Program**") and (b) the proposed exit term loan facility (the "**Exit Term Loan Facility**" and, together with the Exit Securitization Program, the "**Exit Financings**").

9. Through this and other work, my team and I have become familiar with the Debtors' capital structure, liquidity needs, and business operations, as well as the strategic transaction and

refinancing options available to the Debtors. Members of my team and I have also assisted the Debtors and their other advisors in reviewing the terms, conditions, and potential impact of certain fees associated with the Exit Financings, including the Backstop Fee, the Commitment Fee, and the DIP-to-Exit Equity Distribution (each as defined below).

## III. The Terms of the Exit Financings are Reasonable under the Circumstances of the Chapter 11 Cases

10. Based on my experience with postpetition financing transactions, as well as my involvement in the negotiation of the Exit Financings and pursuit of alternative postpetition financing proposals, I believe the Exit Financings are reasonable and the best available option under the circumstances.

11. ***Exit Securitization Program.*** I understand that the Plan contemplates reinstating the Exit Securitization Program on substantially similar economic terms to those of the Postpetition Securitization Program. The Exit Securitization Program will continue to provide the Debtors with the ability to access $100 million in financing on a post-emergence basis, including $25 million in incremental financing compared to what was previously available under the Prepetition Securitization Program. The Exit Securitization Program provides for (a) an applicable "Investor Margin" of 3.00% per annum, (b) a "Make-Whole Fee" payable annually, and (c) a "Non-Use Fee" calculated with respect to the portions of the Investors' commitment that remain undrawn, each consistent with the Postpetition Securitization Program.

12. ***Exit Term Loan Facility.*** I understand that the Plan provides the Debtors with access to the Exit Term Loan Facility in the principal amount of $250 million, which consists of (a) first-lien, first-out exit term loans in an initial principal amount as of the Effective Date equal to the principal amount of DIP Loans outstanding as of the Effective Date not to exceed $25 million

(the "**First-Out Exit Term Loans**")[3] and (b) first lien, second-out exit term loans in the principal amount of $250 million minus the principal amount of the First-Out Exit Term Loans. The First-Out Exit Term Loans provide for (i) payment of interest at a rate of SOFR + 7%, subject to standard AARC credit spread adjustments, and (ii) payment of (a) a backstop fee equal to 2.0% of the principal amount of the First-Out Exit Term Loans (the "**Backstop Fee**") and (b) a commitment fee equal to 1.0% of the principal amount of the First-Out Exit Term Loans (the "**Commitment Fee**"), in each case, payable in cash on the Effective Date. The Second-Out Exit Term Loans provide for payment of interest at a rate of SOFR + 6%, subject to standard AARC credit spread adjustments.

13. ***DIP-to-Exit Equity Distribution.*** I understand that the Plan provides that each Holder of an Allowed DIP Claim is entitled on account of such DIP Claim, at such Holder's option, to elect to either (i) have such DIP Claim be repaid in full in cash or (ii) have its pro rata share of DIP Loans converted into First-Out Exit Term Loans on a dollar-for-dollar basis (such election in (ii), the "**DIP-to-Exit Election**"). I understand that, subject to the occurrence of the Effective Date of the Plan, each Electing DIP Lender is entitled to a pro rata distribution of 10% of the New Common Stock issued and outstanding on the Effective Date (subject to dilution by the MIP Equity and the New Second Lien Warrants).

14. I believe that the principal economic terms proposed under the Exit Securitization Program and the Exit Term Loan Facility, such as the contemplated fees and interest rates, are customary and usual for financings of these types, and are the best available option for the Debtors. The blended cost of capital of the Exit Financings, viewed on a combined basis, is generally

[3] The principal amount of First-Out Exit Term Loans shall be adjusted downward on a dollar-for-dollar basis to the extent that the Debtors are, immediately prior to the Effective Date, projected to have in excess of $50 million in cash immediately following the Effective Date.

consistent with the cost of exit financings in comparable circumstances. Moreover, the interest rates and fees were the subject of arm's-length and good-faith negotiations, are integral components of the overall terms of the Exit Financings, and were required as consideration for the extension of the Exit Financings. Further, the DIP-to-Exit Equity Distribution was designed to incentivize the Debtors' DIP Lenders to elect, in their respective Ownership Certifications, to roll their DIP Claims into the First-Out Exit Term Loans, rather than elect to seek cash repayment at maturity.

15. Based on my experience and my involvement in the Chapter 11 Cases, I believe that the terms of the Exit Financings and the DIP-to-Exit Equity Distribution, taken as a whole, are reasonable given the unique facts and circumstances of the Chapter 11 Cases. Further, I believe that the negotiation process in respect of such Exit Financings and DIP-to-Exit Equity Distribution was conducted at arm's-length and in good faith.

## IV. The Terms of the Restructuring Support Agreement are Reasonable under the Circumstances of the Chapter 11 Cases

16. The Restructuring Support Agreement contains certain fee reimbursement provisions that are reasonable and appropriate under the circumstances. Specifically, pursuant to the Restructuring Support Agreement, the Debtors have agreed to pay the reasonable and documented fees and out-of-pocket expenses (including travel costs and expenses) of certain advisors to the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group (together, the "**Ad Hoc Groups**" and, such fees and expenses, the "**Plan Supporters' Fees and Expenses**"). The Plan Supporters' Fees and Expenses were offered in consideration of the various contributions and concessions made by the Ad Hoc Groups during these negotiations.

17. The Plan Supporters' Fees and Expenses were the result of arm's-length and good faith negotiations between the Debtors and the Ad Hoc Groups. The Ad Hoc Groups have spent

substantial time and expense negotiating the Restructuring Transactions with the Debtors. Based on my experience, expense reimbursement of this kind is both customary in connection with transactions like those contemplated under the Plan and Restructuring Support Agreement and reasonable under the circumstances.

## V. <u>Valuation Analysis</u>

18. As described in the Disclosure Statement, PJT also performed an analysis of the estimated range of total enterprise value (the "**<u>Total Enterprise Value</u>**") and range of implied equity value (the "**<u>Equity Value</u>**") of the Reorganized Debtors on a going concern basis and pro forma for the transactions contemplated by the Plan (the "**<u>Valuation Analysis</u>**"), which is attached as Exhibit F to the Disclosure Statement. The Valuation Analysis was based on financial information and projections provided by the Debtors' management, including the financial projections attached to the Disclosure Statement as Exhibit E (the "**<u>Financial Projections</u>**"), and other publicly-available third-party information. The Valuation Analysis valued the Debtors as of January 7, 2024, with an assumed Effective Date of June 30, 2024.

19. Solely for the purposes of the Plan and the Disclosure Statement, the estimated range of Total Enterprise Value was between approximately $600 million and approximately $800 million, with a midpoint of approximately $700 million. Based on an assumed total funded indebtedness of approximately $350 million (and no excess balance sheet cash), the Total Enterprise Value implies a post-Effective Date Equity Value range between approximately $250 million and approximately $450 million, with a midpoint of approximately $350 million.

20. Impaired Claims under the Plan consist of the First Lien Claims and the Second Lien Notes Claims. My understanding is that the First Lien Claims total approximately $852.5 million in aggregate principal amount, plus interest, fees, and other charges, and the Second Lien Notes Claims total approximately $1 billion in aggregate principal amount, plus interest, fees, and

other charges. Because these Claims far exceed the estimated Total Enterprise Value, there is no residual value available for distribution to Holders of Existing Parent Equity Interests (though Holders of General Unsecured Claims are to be paid in full under the Plan).

21. The absence of value attributable to Holders of Existing Parent Equity Interests is also supported by the fact that Holders of (a) approximately 82.2% of the First Lien Loans and (b) approximately 73.6% of the Second Lien Notes are signatories to the Restructuring Support Agreement, despite estimated recoveries of 49.6 to 68.8% and 3.6 to 6.8%, respectively. Notably, I understand that, despite this impairment, none of the First Lien Lenders or the Holders of the Second Lien Notes have objected to the Plan. I also understand that, based on my review of relevant Financial Industry Regulatory Authority trade activity data, in the days before and after the Restructuring Support Agreement was signed, the Second Lien Notes transacted in the secondary market at prices between one and two cents for each dollar of principal amount.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 16, 2024
New York, New York

Respectfully submitted,

By: */s/William Evarts*
William Evarts
Managing Director
PJT Partners LP