IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| AUDACY, INC., *et al.*, | § § | Case No. 24-90004 (CML) |
| | § § | (Joint Administration Requested) |
| Debtors.[1] | § § | |

**DECLARATION OF HEATH C. GRAY (FTI CONSULTING, INC.)
IN SUPPORT OF CONFIRMATION OF THE DEBTORS' CHAPTER 11 PLAN**

I, Heath C. Gray, hereby declare under penalty of perjury:

1. I am a Senior Managing Director at FTI Consulting, Inc. ("**FTI**"), financial advisor to the above-captioned debtors and debtors-in-possession (the "**Debtors**"). I am duly authorized to make and submit this declaration (the "**Declaration**") in support of (a) confirmation of the *Joint Prepackaged Plan of Reorganization for Audacy, Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 24] (as amended, modified, or supplemented from time to time, the "**Plan**") and (b) the *Debtors' Memorandum of Law in Support of (I) Approval of the Disclosure Statement and (II) Confirmation of the Joint Prepackaged Plan of Reorganization for Audacy, Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (the "**Confirmation Brief**"),[2] filed contemporaneously herewith.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Audacy. The location of the Debtors' corporate headquarters and service address for purposes of these chapter 11 cases is:  2400 Market Street, 4th Fl, Philadelphia, PA 19103.

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Plan or the Confirmation Brief.

1

**I.      Background and Qualifications**

2. I have more than 15 years of corporate restructuring, financial advisory and interim management experience. I have restructuring and financial advisory expertise in, among other areas, traditional and digital media, direct marketing and advertising, entertainment, and telecommunications. My services have included serving as Interim Chief Financial Officer and as Chief Restructuring Officer, leading financial and operational due diligence, developing business plans and financial projections, managing cash flow and liquidity, and designing and implementing value creation and performance improvement initiatives, often in conjunction with financing, restructuring, and M&A transactions. In addition to the Debtors, I have advised numerous distressed companies, including in the recent chapter 11 cases of National CineMedia, LLC, MediaMath Holdings, Inc., Boxed, Inc. (as Chief Restructuring Officer), Starry Group Holdings, Inc., Quanergy Systems, Inc., Pareteum Corporation, Inc., and Sizmek, Inc. I hold a Bachelor of Arts in Public Policy Studies from Duke University.

3. Since April 2023, FTI has served as financial advisor to the Debtors. I, and other FTI professionals, have worked closely with the Debtors' management and other advisors to assist with their evaluation of financing alternatives and preparing for the possibility of an in-court restructuring process. These services have included: (a) evaluating the Debtors' business plan and cash flow projections and identifying strategies and initiatives to conserve cash and extend liquidity runway, (b) assisting with preparation of the initial DIP budget, (c) assisting with contingency planning, including preparation of financial and operating information and assistance with operational readiness, (d) assisting with the development of programs to maintain continuity through a transaction, (e) supporting management and other advisors in managing due diligence by pre-petition lenders, and (f) evaluating and negotiating post-petition financing and other terms

of the restructuring support agreement described further below. Previously, I supported the Company with integration planning relating to its 2017 merger with CBS Radio.

4. As a result of my role advising the Debtors, I am familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances that resulted in the commencement of the Chapter 11 Cases. I am also familiar with the terms of the Plan and the Disclosure Statement (as defined below). I participated directly in due diligence, discussions, and analysis related to the Plan and the *Disclosure Statement for the Joint Prepackaged Plan of Reorganization for Audacy, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 25] (the "**Disclosure Statement**"). I assisted the Debtors in the preparation of the liquidation analysis attached to the Disclosure Statement as Exhibit D (the "**Liquidation Analysis**"). Further, I have reviewed and am familiar with the financial projections attached to the Disclosure Statement as Exhibit E (the "**Financial Projections**").

5. Unless otherwise indicated, all matters set forth in this Declaration are based upon: (a) my personal knowledge, (b) my review of relevant documents, (c) reasonable inquiry of the Debtors and their advisors, and/or (d) my view, based upon my experience and knowledge of the Debtors' business and financial condition, as well as information supplied to me by other members of the Debtors' management and the other professional advisors retained by the Debtors in connection with the Chapter 11 Cases. I am over the age of 18 and competent to testify. If I were called upon to testify, I would testify competently to the facts set forth herein.

## II. Certain Confirmation Requirements Under Section 1129 of the Bankruptcy Code

6. To the best of my knowledge, I believe that the Debtors proposed the Plan in good faith and not by any means forbidden by law. The Plan is the product of extensive arm's-length, good faith negotiations among the Debtors, the Ad Hoc First Lien Group, and the Ad Hoc Second Lien Group (together with the Ad Hoc First Lien Group, the "**Ad Hoc Groups**"), which resulted

3

in, among other things, the prepetition execution of the Restructuring Support Agreement, dated as of January 4, 2024, by (a) the Debtors, (b) beneficial owners of approximately 82.2% of the Debtors' first lien senior secured loans (the "**Consenting First Lien Lenders**"), and (c) beneficial owners of approximately 73.6% of the Debtors' second lien secured notes (the "**Consenting Second Lien Noteholders**" and, together with the Consenting First Lien Lenders, the "**Consenting Lenders**").  The terms of the Restructuring Support Agreement, including the Restructuring Term Sheet, are incorporated into the Plan.

7. I believe that the Plan has been proposed with the legitimate and honest purposes of restructuring the Debtors' funded indebtedness, recapitalizing their business, and maximizing the recoveries available to creditors of the Debtors.  Indeed, it is my understanding that the Plan will (a) leave the Debtors' business intact and substantially de-levered, by permanently reducing approximately $1.6 billion of debt, (b) provide the Debtors with a new post-emergence term loan facility (the "**Exit Term Loan Facility**"), (c) continue the Debtors' trade receivables program on a post-emergence basis (the "**Exit Securitization Program**"), and (d) leave general unsecured creditors unimpaired.

8. Further, based upon my review of the Plan and my discussions with the Debtors' legal counsel, it is my understanding that after the Effective Date the Reorganized Debtors will continue to honor all of the Specified Employee Plans, including any retiree benefits.  As a result, Section 1114's requirement that the Debtors "shall timely pay and shall not modify any retiree benefits" is satisfied and, therefore, Section 1129(a)(13) of the Bankruptcy Code is satisfied.

9. It is also my understanding that the Plan does not provide for any rate changes over which a governmental regulatory commission has jurisdiction.  In addition, the Debtors are not

(a) required to pay any domestic support obligations, (b) individuals, or (c) nonprofit corporations or trusts.

10. Finally, it is my understanding, based on discussions with the Debtors' advisors, that the primary purpose of the Plan is not avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, and that there has been no objection filed by any governmental unit asserting such avoidance.

### III. Assumption of the Debtors' Executory Contracts and Unexpired Leases

11. I understand that Article VI of the Plan proposes appropriate treatment for executory contracts and unexpired leases pursuant to Section 365 of the Bankruptcy Code. I believe that the assumption by the Debtors of their executory and postpetition contracts and unexpired leases in accordance with and subject to the terms and conditions of the Plan is both beneficial and necessary to the Debtors' and Reorganized Debtors' business operations upon and subsequent to emergence from chapter 11. Accordingly, I believe that the assumption of each of the executory and postpetition contracts and unexpired leases pursuant to Section 365 of the Bankruptcy Code and the Plan is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors, their Estates and their creditors.

12. Based upon, among other things, the Debtors' extensive analysis of the Reorganized Debtors' anticipated financial wherewithal after the Effective Date, including, without limitation, the operating cash and liquidity available to the Reorganized Debtors to fund their post-emergence business operations, each Reorganized Debtor that is assuming an executory contract or unexpired lease pursuant to the Plan will be fully capable of meeting its financial obligations under the respective contract or lease to be assumed or assumed and assigned on and after the Effective Date.

13. The assumption by the Debtors, and upon the Effective Date, the Reorganized Debtors, of (a) all of the D&O Liability Insurance Policies pursuant to Article VI.D of the Plan, (b) the Indemnification Provisions pursuant to Article VI.E of the Plan, (c) the Specified Employee Plans pursuant to Article VI.F of the Plan, and (d) the Insurance Contracts pursuant to Article VI.G of the Plan, is of fundamental importance to the Debtors' reorganization process, is a sound exercise of the Debtors' business judgment, and is in the best interest of the Debtors and their Estates.

**IV.     The Release and Exculpation Provisions**

14. I understand that the Plan provides for exculpation of the Debtors, and for the Debtors and certain Holders of Claims and Equity Interests and related parties to give releases to certain parties.

15. The Restructuring Support Agreement and the Plan were heavily negotiated among the Debtors and the Ad Hoc Groups prior to the Petition Date, who all expended substantial time and effort during such negotiations and in drafting and finalizing the Plan. As reflected in the Restructuring Term Sheet attached to the Restructuring Support Agreement, I understand that the releases and exculpation provisions were a negotiated and requisite element of the global settlement. Without the continued support of the Consenting Lenders, the Debtors would have been unlikely to achieve the broadly consensual Plan that they intend to present to the Court for confirmation at the Combined Hearing. The success of the proposed Plan depends on the support of the Debtors' major constituencies, which may not have been provided and, in fact, could still be withdrawn, if the releases by the Debtors (the "**Debtor Release**") and the releases by Holders of Claims and Equity Interests (the "**Third Party Release**") included in the Plan are not approved.

16. The release, exculpation and injunctive provisions contained in the Plan, including the Debtor Release and the Third Party Release, arose from good faith, arm's-length negotiations

with the Debtors' key stakeholders, represented by able counsel and financial advisors, are integral to the Debtors' consensual resolution of the Chapter 11 Cases, and were a material inducement for parties to enter into the Restructuring Support Agreement.

17. As set forth in the *Declaration of Roger Meltzer in Support of Confirmation of the Joint Prepackaged Plan of Reorganization for Audacy, Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (the "**Meltzer Declaration**") filed contemporaneously herewith, I understand that the Special Review Committee (as defined in the Meltzer Declaration) is unaware of any significant potential claims and causes of action against Related Parties (as defined in the Meltzer Declaration) released by the Debtor Release. I also understand that the Debtors are unaware of any significant potential claims and causes of action against other Released Parties released by the Debtor Release. In addition, in my opinion, the Released Parties have provided substantial and valuable contributions to the Chapter 11 Cases, which include, among other things, (a) compromising Claims and accepting diminished recoveries, (b) participating in providing "new money" to fund the Chapter 11 Cases and the Debtors' operations, (c) permitting the use of encumbered assets and cash collateral during the Chapter 11 Cases, (d) negotiating and supporting the Plan, and (e) in the case of the Debtors' directors, officers, and employees, their immense efforts on behalf of the Debtors both prior to and throughout the Chapter 11 Cases. Indeed, because key constituent support for the Plan is contingent upon the granting of the releases set forth therein, I believe that the failure to effect the release provisions set forth in the Plan may impair the Debtors' ability to confirm the Plan, which would significantly reduce the value available for distribution to creditors. Based on the foregoing, the Debtor Release is in the best interest of the Estates.

18.    Recognizing the importance of the director, officer, and employee efforts to the Debtors' value in the Chapter 11 Cases, the Debtors sought and obtained the support of the Consenting Lenders for the Third Party Release relating to these key persons in exchange for their efforts during the Chapter 11 Cases.  Since before the Petition Date, the Debtors' directors, officers, employees, and professionals have worked diligently to maximize the value of the Debtors' assets and position the Debtors to successfully emerge from chapter 11 with sufficient liquidity and capitalization to operate their businesses and position them for success post-emergence.  They have worked, and will continue to work, to create value for the Debtors' Estates and their stakeholders by, among other things:

    a.    negotiating and documenting the Restructuring Support Agreement;

    b.    developing and implementing plans relating to the Debtors' emergence from chapter 11;

    c.    gathering extensive and accurate data in connection with the filing of the Chapter 11 Cases;

    d.    negotiating with the Debtors' constituents to allow for, among other things, entry into the DIP Facility and continued use of cash collateral;

    e.    closely monitoring the Debtors' operations to ensure they continue to perform at an optimal level and that capital is being deployed efficiently to maintain and maximize value for the benefit of the Debtors' stakeholders;

    f.    working to secure exit financing through the Exit Term Loan Facility and the Exit Securitization Program, and negotiating the documentation in connection therewith;

    g.    ensuring that all terms, closing conditions, and contingencies set forth in the exit financing documents will be met; and

    h.    implementing and administering plan-related transactions.

19.    Additionally, the Debtors' officers and directors participated in negotiations regarding the reorganization of the Debtors' businesses, including in securing the capital commitments that have underpinned this restructuring and ensuring that all terms, closing

conditions, and contingencies will be met to allow the Debtors to emerge from chapter 11. It is also my understanding that many of the Released Parties may be entitled to indemnification or reimbursement from the Debtors in the event they incur a loss on account of the causes of action to be released. I believe that the Debtors' proposed reorganization would not have been possible without the contributions of the Debtors' officers, directors, and employees, materially above and beyond their normal day-to-day duties, and that the Plan would have little likelihood of success without their participation.

20. The Consenting Lenders have also made significant contributions to the Debtors' restructuring. Foremost, I understand that the paid-in-full recoveries for all Allowed General Unsecured Claims under the Plan were made possible by the Consenting Lenders' agreement to receive less value on account of their Claims as set forth in the Plan. In addition, the DIP Backstop Parties' commitment to backstop the DIP Facility and the Exit Backstop Parties' commitment to backstop the First-Out Exit Term Loans ensured that the Debtors and the Reorganized Debtors would have access to necessary liquidity to operate their businesses during and after the Chapter 11 Cases, respectively. These negotiated concessions are critical to the Debtors' ability to successfully reorganize and emerge from chapter 11 with a strong balance sheet and sufficient capital to operate their business.

21. Absent the hard work and concessions of the Debtors' key stakeholders, the Debtors' restructuring could have resulted in lengthy, expensive, and value-destructive litigation. The negotiated and broadly consensual global restructuring reflected in the Plan saved the Estates many months of costly, distracting litigation and paved the way for the expeditious restructuring that the Court is being asked to approve through confirmation of the Plan.

22. The Released Parties have also contributed and will continue to contribute to the smooth implementation of the Debtors' restructuring, including, as applicable, by (a) negotiating the Restructuring Support Agreement, the Plan, and the Disclosure Statement, (b) negotiating the DIP Credit Agreement and entering into the DIP Facility, (c) negotiating the Exit Term Loan Facility Credit Agreement and agreeing to provide the Exit Term Loan Facility, (d) negotiating the Exit Securitization Program Documents and agreeing to provide the Exit Securitization Program, (e) assisting the Debtors in the solicitation process and the ultimate implementation of the Plan, and (f) supporting the Plan.

### V. The Plan Satisfies the "Best Interests" Test

23. I understand that the "best interests" test under Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation of a plan of reorganization, that each holder of a claim or interest in each impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the confirmed plan, that is not less than the amount such holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

24. I understand that the best interests test does not apply to holders in Classes 1 (Other Priority Claims), 2 (Other Secured Claims), 3 (Secured Tax Claims), and 6 (General Unsecured Claims) as they are Unimpaired and, therefore, are presumed to have accepted the Plan. I further understand that to the extent Classes 8 (Intercompany Claims) and 9 (Intercompany Interests) are Impaired, they consent to such treatment as sponsors of the Plan. The only other Impaired Classes are Classes 4 (First Lien Claims), 5 (Second Lien Notes Claims), 7 (510(b) Claims), and 10 (Existing Parent Equity Interests).

25. Together with my team at FTI and the Debtors' other advisors, I assisted the Debtors in preparing a hypothetical, reasonable, and good faith estimate of the proceeds that would

be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis reflects the Debtors' best estimate of cash proceeds, net of liquidation related costs, that would likely be available to the Debtors' Estates if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.

26. Because I was directly involved in its preparation, I am familiar with the methods used and the conclusions reached in the preparation of the Liquidation Analysis. The Liquidation Analysis was based on a variety of assumptions, which are detailed therein and in the notes thereto. I would note that since the preparation of the Liquidation Analysis, the Debtors entered into a settlement with Broadcast Music, Inc.,[3] which resulted in approximately $25.4 million of funds for the Debtors' Estates, and exceeds the approximately $5.2 million that had been estimated in the Liquidation Analysis. While the settlement would allow for higher recoveries to creditors, it does not otherwise change the conclusions set forth in the Liquidation Analysis.

27. The Liquidation Analysis assumes that (a) the Chapter 11 Cases would be converted to chapter 7 on or about February 29, 2024 (the "**Conversion Date**"), (b) a trustee would be appointed to manage the estates, (c) the Debtors would cease all material operations as of the Conversion Date except those necessary to maintain the value of assets held for sale, (d) the Debtors would immediately lose the ability collect on their accounts receivable (which are held by a non-Debtor special purpose entity and are subject to liens by the Securitization Program Agent), limiting the Debtors to cash on-hand, and (e) the trustee would conduct an orderly wind-down of operations and liquidation of substantially all of the Debtors' assets pursuant to chapter 7 of the Bankruptcy Code within a four-month period.

---

[3] *See* Order Approving Compromise [Docket No. 218].

28. The Liquidation Analysis (a) estimated the cash proceeds that would be generated from a hypothetical orderly liquidation of the Debtors' assets (the "**Liquidation Proceeds**"), (b) determined the distribution of those cash proceeds net of liquidation and other wind-down costs (the "**Liquidation Distribution**") that each Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7 of the Bankruptcy Code, and (c) compared each Holder's Liquidation Distribution to the estimated distribution under the Plan that such Holders would receive if the Plan is confirmed and consummated.[4]

29. As set forth in the Liquidation Analysis, subject to the assumptions and limitations contained therein, and incorporated herein by reference, the liquidation of the Debtors' assets would result in Liquidation Proceeds ranging from $216.1 million to $249.9 million, before liquidation and wind-down costs. After applying available Liquidation Proceeds in accordance with the Bankruptcy Code and applicable law, the Liquidation Analysis establishes that all Holders of Claims in Impaired Classes will receive or retain property under the Plan valued, as of the Effective Date, in an amount equal to or greater than what they would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

30. Based on the Liquidation Analysis, I believe that the Plan satisfies the "best interests" test requirement under Section 1129(a)(7) of the Bankruptcy Code. Further, based on my involvement in the preparation of the Liquidation Analysis and my expertise as a restructuring professional in the Debtor's industry, I believe that the methodology used to prepare the Liquidation Analysis is appropriate and represents the best judgment of FTI and the Debtors'

---

[4] Estimated Plan recoveries were determined, where applicable, based on the valuation analysis prepared by PJT Partners LP and attached as Exhibit F to the Disclosure Statement.

management with regard to the results of a hypothetical chapter 7 liquidation, and that the assumptions and conclusions set forth therein are fair and reasonable under the circumstances.

## VI. The Plan is Feasible

31. I understand that Section 1129(a)(11) of the Bankruptcy Code requires a court to determine that a chapter 11 plan is feasible, and that confirmation of such plan is not likely to be followed by the liquidation or further financial reorganization of the debtor.

32. In connection with the development of the Plan, the Debtors' management, with support from FTI, assessed the Debtors' ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. In preparing the Financial Projections (which cover the fiscal first quarter 2024 through fiscal year 2027), the Debtors developed a multi-year business plan covering the time from emergence from the Chapter 11 Cases (which is assumed to occur on or about June 30, 2024) through fiscal year 2027.

33. I am familiar with the Financial Projections and material assumptions set forth therein and believe that they were prepared in good faith and based on a set of sound assumptions rooted in the experience of the Debtors' management and advisors. The Financial Projections assume the new capital structure as contemplated in the Plan—in particular, that the Debtors will have projected total funded debt of $350 million at emergence (down from approximately $1.9 billion in principal as of the Petition Date). The Debtors expect to operate their business and service their obligations with existing cash on hand and operating cash flow, which is supported by the Financial Projections, subject to the assumptions and limitations set forth therein.

34. Accordingly, I believe that the Reorganized Debtors will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by a liquidation or the need for a further reorganization of the Debtors.

Therefore, I believe the Plan satisfies the feasibility requirements of Section 1129(a)(11) of the Bankruptcy Code.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  February 16, 2024            */s/ Heath C. Gray*
                                                  Heath C. Gray
                                                  Senior Managing Director
                                                  FTI Consulting, Inc.