**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| AUDACY, INC., *et al.*, | § | Case No. 24-24-90004 (CML) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF
(I) APPROVAL OF THE DISCLOSURE STATEMENT AND
(II) CONFIRMATION OF THE JOINT PREPACKAGED PLAN OF
REORGANIZATION FOR AUDACY, INC. AND ITS AFFILIATE
DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Audacy.  The location of the Debtors' corporate headquarters and service address for purposes of these chapter 11 cases is:  2400 Market Street, 4th Fl, Philadelphia, PA 19103.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..................................................................................................1

I.  BACKGROUND ..........................................................................................................2

    A.  The Restructuring Support Agreement ..............................................................2

    B.  The Solicitation Process and Voting Results .....................................................3

    C.  Non-Voting Classes ...........................................................................................6

    D.  Service of Combined Notice and Publication ....................................................8

    E.  Plan Supplement and Confirmation Order.........................................................8

II.  OVERVIEW OF THE PLAN ......................................................................................9

III.  PLAN OBJECTION ..................................................................................................16

ARGUMENT ................................................................................................................18

I.  APPROVAL OF THE DISCLOSURE STATEMENT IS WARRANTED .....................19

    A.  Creditors Received Sufficient Notice of the Hearing and Objection
        Deadline for Approval of the Disclosure Statement. ...............................19

    B.  The Disclosure Statement Satisfies the Requirements of the Bankruptcy
        Code and Should Be Approved.....................................................................21

        1.  The Disclosure Statement Demonstrates That the Debtors Complied
            With Applicable Nonbankruptcy Law With Respect to the
            Prepetition Solicitation..................................................................21

        2.  The Disclosure Statement Contains Adequate Information......................23

    C.  The Debtors' Solicitation of Votes Complied With the Bankruptcy Code,
        the Bankruptcy Rules, and Solicitation Procedures Order.....................................25

        1.  The Ballots Used to Solicit Holders of Claims Entitled to Vote on
            the Plan Complied With the Bankruptcy Rules. ........................................26

        2.  The Voting Record Date Complied With Bankruptcy Rules and the
            Solicitation Procedures Order. ....................................................................27

        3.  The Debtors' Solicitation Period Complied With Bankruptcy
            Rule 3018 and the Solicitation Procedures Order.......................................27

**Page**

|   | 4. | The Debtors' Vote Tabulation Was Appropriate and Complied with the Solicitation Procedures Order. | 28 |
|   | 5. | Waiver of Certain Solicitation Package Mailings Is Reasonable and Appropriate and Complied with the Solicitation Procedures Order. | 29 |
|   | 6. | Solicitation of the Plan Complied With the Bankruptcy Code and Was in Good Faith. | 29 |

II. THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE. .................................................................30

A. The Plan Complies With All Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(1). ...............................................................................31

1. The Classification of Claims and Equity Interests in the Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ...................................................................................31

2. The Plan Satisfies the Requirements of Section 1123(a) of the Bankruptcy Code. ...................................................................................33

3. The Plan Complies With the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code. ...........................................................38

4. The Assumption or Rejection of Executory Contracts and Unexpired Leases Under the Plan Are Appropriate Pursuant to Section 365 and Section 1123(b)(2) of the Bankruptcy Code. ...........................................39

5. Assumption of the Restructuring Support Agreement Is Appropriate. .........................................................................................42

6. The Plan Complies With Section 1123(d) of the Bankruptcy Code. .........43

7. The Plan's Release, Exculpation, and Injunction Provisions Comply With the Bankruptcy Code. ......................................................................44

    a. The Debtor Releases Comply With the Bankruptcy Code and Are Appropriate. ...................................................................44

    b. The Consensual Third-Party Releases Comply With the Bankruptcy Code and Are Appropriate. ......................................47

    c. The Exculpation Provision Complies With the Bankruptcy Code and is Appropriate. ...............................................................52

    d. The Injunction Provision Complies With the Bankruptcy Code and is Appropriate. ...............................................................53

**Page**

B.  The Debtors Have Complied With the Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(2)........................................................55

C.  The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law – 11 U.S.C. § 1129(a)(3). ........................................................56

D.  The Plan Provides That Payments Made by the Debtors for Services or Costs and Expenses Are Subject to Approval – 11 U.S.C. § 1129(a)(4)..............58

E.  The Debtors Have Disclosed All Necessary Information Regarding the Debtors' Directors and Officers and Insiders – 11 U.S.C. § 1129(a)(5). ............59

F.  The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission – 11 U.S.C. § 1129(a)(6)...........60

G.  The Plan is in the Best Interests of Creditors – 11 U.S.C. § 1129(a)(7)...............61

H.  The Plan Has Been Accepted by Each Impaired Voting Class – 11 U.S.C. § 1129(a)(8)........................................................................................62

I.  The Plan Provides for Payment in Full of All Allowed Priority Claims – 11 U.S.C. § 1129(a)(9)........................................................................................63

J.  At Least One Impaired Class Has Accepted the Plan – 11 U.S.C. § 1129(a)(10)......................................................................................64

K.  The Plan is Feasible – 11 U.S.C. § 1129(a)(11). ....................................................64

L.  All Statutory Fees Have Been or Will Be Paid – 11 U.S.C. § 1129(a)(12)...........67

M.  Plan Does Not Modify Any Retiree Benefit Obligations – 11 U.S.C. § 1129(a)(13)......................................................................................67

N.  Sections 1129(a)(14)-(a)(16) of the Bankruptcy Code Are Inapplicable. .............67

O.  Section 1129(b): Confirmation of the Plan Over Nonacceptance of Impaired Classes.......................................................................................................68

   1.  The Plan Does Not Discriminate Unfairly.................................................68

   2.  The Plan Is Fair and Equitable...................................................................70

P.  The Plan Is Not an Attempt to Avoid Tax Obligations – 11 U.S.C. § 1129(d). ........................................................................................70

III.  WAIVER OF STAY OF EFFECTIVENESS IS APPROPRIATE ...................................71

CONCLUSION.........................................................................................................................71

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*In re 203 N. LaSalle St. P'ship*,
  126 F.3d 955 (7th Cir. 1997) *rev'd on other grounds*, 526 U.S. 434 (1999)..........................30

*Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de C.V. (In re Vitro S.A.B. de
  C.V.)*,
  701 F.3d 1031 (5th Cir. 2012) ................................................................47

*In re Altera Infrastructure L.P.*,
  No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) ......................................30, 54

*In re Apex Oil Co.*,
  118 B.R. 683 (Bankr. E.D. Mo. 1990)........................................................59

*In re Applegate Prop., Ltd.*,
  133 B.R. 827 (Bankr. W.D. Tex. 1991)....................................................23, 24

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood
  Chair Co.)*,
  203 F.3d 914 (5th Cir. 2000) ................................................................48

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)........................................................................61

*Bank of New York Trust Co. v. Official Unsecured Creditors' Comm. (In re
  Pacific Lumber Co.)*,
  584 F.3d 229 (5th Cir. 2009) .............................................................47, 54

*In re Beyond.com Corp.*,
  289 B.R. 138 (Bankr. N.D. Cal. 2003) ......................................................59

*In re Bigler LP*,
  442 B.R. 537 (Bankr. S.D. Tex. 2010) ......................................................44

*Brite v. Sun Country Dev. (In re Sun Country Dev.)*,
  764 F.2d 406 (5th Cir. 1985) ................................................................56

*In re Buttonwood Partners, Ltd.*,
  111 B.R 57 (Bankr. S.D.N.Y. 1990)..........................................................69

*Cadle Co. v. Mims (In re Moore)*,
  608 F.3d 253 (5th Cir. 2010) ................................................................45

*In re Camp Arrowhead, Ltd.*,
   451 B.R. 678 (Bankr. W.D. Tex. 2011) ..................................................47, 54

*In re CJ Holding Co.*,
   597 B.R. 597 (S.D. Tex. 2019) ...........................................................47, 48

*In re Conseco Inc.*,
   301 B.R. 525 (Bankr. N.D. Ill. 2003) ........................................................52

*In re Cross Canyon Energy Corp.*,
   No. 10-30747 (Bankr. S.D. Tex. Mar. 11, 2010) ....................................28

*In re Davis Offshore, L.P.*,
   644 F.3d 259 (5th Cir. 2011) ....................................................................30

*In re Davis Petroleum Corp.*,
   No. 06-20152 (Bankr. S.D. Tex. Mar. 10, 2006) ....................................28

*In re Drexel Burnham Lambert*,
   138 B.R. .....................................................................................................69

*In re Drexel Burnham Lambert Grp. Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992) ................................................56, 61

*In re Eagle Bus Mfg., Inc.*,
   134 B.R. 584 (Bankr. S.D. Tex. 1991), *aff'd sub nom NLRB v. Greyhound*
   *Lines (In re Eagle Bus. Mfg.)*, 158 B.R. 421 (S.D. Tex. 1993) ...........32, 41

*In re Energy & Expl. Partners, Inc.*,
   No. 15-44931 (RFN) (Bankr. N.D. Tex. April 21, 2016) ........................49

*Feld v. Zale Corp. (In re Zale Corp.)*,
   62 F.3d 746 (5th Cir. 1995) ......................................................................47

*In re Fieldwood Energy LLC*,
   No. 20-33948 (MI), 2021 WL 2853151 (Bankr. S.D. Tex. June 25, 2021) ............................30

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans*
   *Ltd. P'ship)*,
   116 F.3d 790 (5th Cir. 1997) ...............................................................56, 65

*Floyd v. Hefner*,
   No. H-03-5693, 2006 WL 2844245 (S.D. Tex. Sept. 29, 2006)...............24

*FOM Puerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*,
   255 Fed. App'x 909 (5th Cir. 2007) .........................................................48

*In re Food City, Inc.*,
110 B.R. 808 (Bankr. W.D. Tex. 1990) ...................................................................56

*Matter of Foster Mortg. Corp.*,
68 F.3d 914 (5th Cir. 1995) ...................................................................................46

*In re Gen. Homes Corp.*,
134 B.R. 853 (Bankr. S.D. Tex. 1991) ..............................................................44, 45

*In re GenOn Energy, Inc.*,
No. 17-33695 (DRJ), 2019 WL 13192461 (Bankr. S.D. Tex. Aug. 14, 2019).......................49

*In re Greate Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) .........................................................................65

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*,
994 F.2d 1160 (5th Cir. 1993), *cert. denied*, 510 U.S. 992 (1993)
...............................................................................................30, 31, 32, 65

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007).................................................................44, 45

*Hernandez v. Larry Miller Roofing, Inc.*,
628 Fed. App'x 281 (5th Cir. 2016) .......................................................................48

*In re Hunt*,
146 B.R. 178 (Bankr. N.D. Tex. 1992) ....................................................................20

*In re Idearc, Inc.*,
423 B.R. 138 (Bankr. N.D. Tex. 2009).................................................................32, 41

*In re Ill. Power Generating Co.*,
No. 16-36326 (Bankr. S.D. Tex. Jan. 25, 2017) .......................................................50

*In re Indianapolis Downs, LLC*,
486 B.R. 286 (Bankr. D. Del. 2013) .......................................................................51

*In re J.D. Mfg., Inc.*,
No. 07-36751, 2008 WL 4533690 (Bankr. S.D. Tex. Oct. 2, 2008).........................................23

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1986), *aff'd sub nom*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ........................................69

*Kane v. Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988)...................................................................................30

*In re Lakeside Global II Ltd.*,
   116 B.R. 499 (Bankr. S.D. Tex. 1989) ...........................................................................18, 65

*In re Landing Assocs.*,
   157 B.R. 791 (Bankr. W.D. Tex. 1993) ..........................................................................59, 65

*In re Landmark at Plaza Park, Ltd.*,
   7 B.R. 653 (Bankr. D.N.J. 1980) ..........................................................................................65

*In re Lone Star Utils. LLC*,
   No. 13–34302–SGJ–11, 2014 WL 4629129 (Bankr. N.D. Tex. Sept. 15, 2014) ..................18

*Lubrizol Enters., Inc. v. Richmond Metal Finishers (In re Richmond Metal
   Finishers, Inc.)*,
   756 F.2d 1043 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986).......................................41

*Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
   150 F.3d 503 (5th Cir. 1998) .....................................................................................24, 56, 58

*In re Mayer Pollock Steel Corp.*,
   174 B.R. 414 (Bankr. E.D. Pa. 1994) ...................................................................................65

*In re McCommas LFG Processing Partners, LP*,
   Nos. 07–32222–HDH–11, 07–32219–DHD–11, 2007 Bankr. LEXIS 4053
   (Bankr. N.D. Tex. Nov. 29, 2007) .........................................................................................58

*In re Metrocraft Publ'g Servs., Inc.*,
   39 B.R. 567 (Bankr. N.D. Ga. 1984) ....................................................................................24

*In re Mirant Corp.*,
   348 B.R. 725 (Bankr. N.D. Tex. 2006) ......................................................................44, 45, 46

*In re Mirant Corp.*,
   No. 03–46590DML11, 2007 WL 1258932 (Bankr. N.D. Tex. Apr. 27, 2007).......................32

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
   139 S. Ct. 1652 (2019) ...........................................................................................................41

*Monitronics Int'l, Inc.*,
   No. 23-90332 (Bankr. S.D. Tex. June 26, 2023) ...................................................................50

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)................................................................................................................19

*NexPoint Advisors, L.P., et al. v. Highland Capital Mgmt., L.P. (In re Highland
   Capital Mgmt., L.P.)*,
   48 F.4th 419 (5th Cir. 2022) ..................................................................................................54

*NLRB v. Bildisco & Bildisco (In re Bildisco)*,
    465 U.S. 513 (1984) ..............................................................................................41, 57

*Norwest Bank Worthington v. Ahlers*,
    485 U.S. 197 (1988) ......................................................................................................46

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun*
    *Elec. Power Coop.)*,
    119 F.3d 349 (5th Cir. 1997) ........................................................................................45

*Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III*
    *Joint Venture)*,
    995 F.2d 1274 (5th Cir. 1991) ......................................................................................32

*In re Phoenix Petroleum*,
    278 B.R. 385 (Bankr. E.D. Pa. 2001) ...........................................................................24

*In re Pilgrim's Pride Corp*,
    No. 08–45664–DML–11, 2010 WL 200000 (Bankr. N.D. Tex. Jan. 14, 2010) ...................54

*In re Pipeline Health Sys., LLC*,
    No. 22-90291 (MI) (Bankr. S.D. Tex. Jan. 13, 2023) [Docket No. 1041] ..............................54

*In re Placid Oil Co.*,
    753 F.3d 151 (5th Cir. 2014) ........................................................................................19

*In re Prussia Assocs.*,
    322 B.R. 572 (Bankr. E.D. Pa. 2005) ...........................................................................65

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000) ....................................................................................52, 53

*Republic Supply Co. v. Shoaf*,
    815 F.2d 1046 (5th Cir. 1987) ......................................................................................48

*Richmond Leasing Co. v. Capital Bank, N.A.*,
    762 F.2d 1303 (5th Cir. 1985) ......................................................................................41

*In re Rusty Jones, Inc.*,
    110 B.R. 362 (Bankr. N.D. Ill. 1990) ...........................................................................59

*Sequa Corp. v. Christopher (In re Christopher)*,
    28 F.3d 512 (5th Cir. 1994) ..........................................................................................20

*In re Sherwood Square Assoc.*,
    107 B.R. 872 (Bankr. D. Md. 1989) .............................................................................59

*In re Star Ambulance Serv. LLC*,
    540 B.R. 251 (Bankr. S.D. Tex. 2015) .............................................................18, 61

*In re Stratford Assocs. Ltd. P'ship*,
    145 B.R. 689 (Bankr. D. Kan. 1992) ....................................................................59

*Sundance Energy Inc.*,
    No. 21-30882 (Bankr. S.D. Tex. April 19, 2021) ...................................................50

*In re Sunguard AS New Holdings, LLC*,
    No. 22-90018 (DRJ) (Bankr. S.D. Tex. Oct. 17, 2022) ..........................................30

*In re Swiftco, Inc.*,
    No. 85–07083–H1–5, 1988 WL 143714 (Bankr. S.D. Tex. Oct. 5, 1988) .............30

*In re Talen Energy Supply, LLC*,
    No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) ....................................30, 54

*In re Temple Zion*,
    125 B.R. 910 (Bankr. E.D. Pa. 1991) ...................................................................65

*In re Tex. Extrusion Corp.*,
    844 F.2d 1142 (5th Cir. 1988) ..............................................................................24

*In re Tex. Tamale Co., Inc.*,
    219 B.R. 732 (Bankr. S.D. Tex. 1998) .................................................................20

*Toibb v. Radloff*,
    501 U.S. 157 (1991) ..............................................................................................57

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) ..............................................................59, 65

*In re Transcoastal Corp.*,
    No. 15-34956 (Bankr. N.D. Tex. Dec. 18, 2015) ..................................................28

*In re Transcon. Energy Corp.*,
    764 F.2d 1296 (9th Cir. 1985) ..............................................................................46

*In re U.S. Brass Corp.*,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) ............................................................23, 24

*United States v. Whiting Pools, Inc.*,
    462 U.S. 198 (1983) ..............................................................................................57

*In re Wool Growers Cent. Storage Co.*,
    371 B.R. 768 (Bankr. N.D. Tex. 2007) .......................................................47, 48, 49

*In re WorldCom Inc.*,
   No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct 31, 2003) ........................69

*In re Zenith Elecs. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) ........................................................................56

**STATUTES**

11 U.S.C.
   § 101(31) .............................................................................................................59
   § 157(b)(2)(L) .....................................................................................................53
   § 341 ....................................................................................................................5
   § 365 ........................................................................................................39, 40, 41
   § 365(a) ...............................................................................................................40
   § 365(b)(1) ..........................................................................................................43
   § 507(a)(1) ..........................................................................................................64
   § 507(a)(2) ....................................................................................................34, 64
   § 507(a)(3) ....................................................................................................34, 64
   § 507(a)(4) ..........................................................................................................64
   § 507(a)(5) ..........................................................................................................64
   § 507(a)(6) ..........................................................................................................64
   § 507(a)(7) ..........................................................................................................64
   § 507(a)(8) ....................................................................................................34, 64
   § 510(b) .........................................................................................................46, 69
   § 1114(e) .............................................................................................................67
   § 1122 ............................................................................................................31, 32
   § 1122(a) ...................................................................................................31, 32, 33
   § 1122(b) .......................................................................................................31, 64
   § 1123 ...........................................................................................31, 33, 39, 40
   § 1123(a) .............................................................................................................33
   § 1123(a)(1) ...............................................................................................32, 33, 34
   § 1123(a)(2) ........................................................................................................34
   § 1123(a)(3) ........................................................................................................34
   § 1123(a)(4) ........................................................................................................35
   § 1123(a)(5) ...............................................................................................35, 36, 37
   § 1123(a)(6) ........................................................................................................37
   § 1123(a)(7) ...................................................................................................37, 38
   § 1123(a)(8) ........................................................................................................33
   § 1123(b) .......................................................................................................38, 39, 44
   § 1123(b)(1) ........................................................................................................39
   § 1123(b)(2) ...................................................................................................39, 43
   § 1123(b)(3) ...................................................................................................38, 44
   § 1123(b)(3)(A) ...................................................................................................44
   § 1123(b)(6) ........................................................................................................38
   § 1123(d) .............................................................................................................43
   § 1124 ...........................................................................................................16, 38
   § 1125 ..................................................................................................... *passim*

§ 1125(a) .................................................................................................23, 24
§ 1125(a)(1) .............................................................................................23, 24
§ 1125(b) ...........................................................................................21, 23, 26
§ 1125(e) .................................................................................................29, 30
§ 1125(g) ......................................................................................................26
§ 1126 ....................................................................................................*passim*
§ 1126(b)(1) ..................................................................................................23
§ 1126(b)(2) .............................................................................................23, 26
§ 1126(c) .................................................................................................62, 63
§ 1126(f) ...........................................................................................29, 62, 63
§ 1126(g) ........................................................................................................7
§ 1129 ....................................................................................................*passim*
§ 1129(a) .............................................................................30, 31, 55, 68
§ 1129(a)(1) .............................................................................................31, 55
§ 1129(a)(2) .............................................................................................55, 56
§ 1129(a)(3) .......................................................................................53, 56, 57
§ 1129(a)(4) ..................................................................................................58
§ 1129(a)(5) .............................................................................................59, 60
§ 1129(a)(5)(A)(i) ..........................................................................................59
§ 1129(a)(5)(A)(ii) .........................................................................................59
§ 1129(a)(5)(B) ..............................................................................................59
§ 1129(a)(6) .............................................................................................60, 61
§ 1129(a)(7) .............................................................................................17, 61
§ 1129(a)(8) .......................................................................................62, 63, 68
§ 1129(a)(9) .............................................................................................63, 64
§ 1129(a)(9)(C) ..............................................................................................16
§ 1129(a)(9)(D) ..............................................................................................16
§ 1129(a)(10) ..................................................................................................64
§ 1129(a)(11) .......................................................................................64, 65, 66
§ 1129(a)(12) ..................................................................................................67
§ 1129(a)(13) ..................................................................................................67
§ 1129(a)(14) .............................................................................................31, 67
§ 1129(b) ................................................................................................*passim*
§ 1129(b)(1) .............................................................................................31, 68
§ 1129(b)(2)(B)(ii) .........................................................................................70
§ 1129(b)(2)(C)(ii) .........................................................................................70
§ 1129(d) ......................................................................................................70

15 U.S.C. § 77 ...................................................................................22, 23, 70

28 U.S.C. § 1930 ...........................................................................................67

## RULES

Fᴇᴅ. R. Bᴀɴᴋʀ. P.
    2002(b) ...........................................................................................19, 20
    3017(a) .......................................................................................19, 20, 26

3017(d) .............................................................................................................21, 26, 27
3017(e) .....................................................................................................................21
3018 ....................................................................................................................27, 28
3018(b) .........................................................................................................21, 27, 28
3018(c) .............................................................................................................21, 26, 27

## REGULATIONS

17 C.F.R.
   § 230.506 ...............................................................................................................23
   § 230.901 ...............................................................................................................22
   § 230.903 ...............................................................................................................23

## OTHER AUTHORITIES

7 Collier on Bankruptcy ¶ 1129.02[2] (Richard Levin & Henry J. Sommer eds.,
   16th ed.) .........................................................................................................55, 60

H.R. Rep. No. 95-595 (1977) ...........................................................................31, 55

S. Rep. No. 95-989 (1978) ................................................................................31, 55

Audacy, Inc. ("**Audacy**") and the other above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby submit this memorandum of law in support of (i) final approval of the *Disclosure Statement for the Joint Prepackaged Plan of Reorganization for Audacy, Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 25] (as may be amended, modified or supplemented from time to time, the "**Disclosure Statement**") and (ii) confirmation of the *Joint Prepackaged Plan of Reorganization for Audacy, Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code*, dated January 4, 2024 [Docket No. 24] (as may be amended, modified or supplemented from time to time, the "**Plan**"), pursuant to Section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**").[2]

## PRELIMINARY STATEMENT

1.      The Debtors seek approval of a disclosure statement and confirmation of a plan of reorganization that implements a comprehensive restructuring of the Debtors' prepetition funded debt obligations.   The Plan is the result of the Debtors' extensive negotiations with an overwhelming majority of their key stakeholders, including the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group (the "**Ad Hoc Groups**").   Critically, all voting creditors support the Plan: (a) 100% in amount of the Class 4 First Lien Claims that voted and 100% in number of Holders of Class 4 First Lien Claims that voted and (b) 100% in amount of the Class 5 Second Lien Notes Claims that voted and 100% in number of Holders of Class 5 Second Lien Notes Claims that voted.

2.      Approval of the Disclosure Statement and confirmation of the Plan will allow the Debtors to emerge from these chapter 11 cases as reorganized entities better positioned to succeed

---

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

in the highly competitive broadcast radio and audio content industry.  Specifically, the Plan will (a) leave the Debtors' business intact and substantially de-levered by permanently reducing approximately $1.6 billion of its prepetition funded debt obligations, (b) provide the Debtors with access to new post-emergence exit term loan and receivables financing facilities, and (c) leave general unsecured creditors unimpaired.  The Plan represents a highly successful outcome for the Chapter 11 Cases and should be confirmed.

## I. BACKGROUND

### A. The Restructuring Support Agreement

3.     The Debtors entered into the Restructuring Support Agreement, dated as of January 4, 2024 (as amended, modified, or supplemented, the "**Restructuring Support Agreement**"), with (a) Holders of approximately 82.2% of First Lien Claims (the "**Consenting First Lien Lenders**") and (b)  Holders of approximately 73.6% of the Second Lien Notes Claims (the "**Consenting Second Lien Noteholders**" and, together with the Consenting First Lien Lenders, the "**Consenting Lenders**").  The Plan incorporates the terms of the Restructuring Support Agreement, which has provided a roadmap for the Debtors' restructuring process.  As noted above, upon the occurrence of the Effective Date, the Debtors will significantly de-lever their balance sheet while keeping their operations intact and paying all general unsecured creditors in full or otherwise leaving them Unimpaired.

### B.      The Solicitation Process and Voting Results

4.      On January 5, 2024, prior to commencing the Chapter 11 Cases, and as more fully described in the Solicitation Procedures Motion,[3] the Debtors commenced the solicitation of votes on the Plan from Holders of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims (such Classes, the "**Voting Classes**").  Specifically, the Debtors, through their claims, balloting, and noticing agent, Epiq Corporate Restructuring, LLC (the "**Solicitation Agent**"), transmitted copies of a solicitation package (the "**Solicitation Package**")[4] to Holders of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims.  The Solicitation Package contained the Disclosure Statement, including the Plan and other exhibits thereto,[5] the Class 4 Ballot, and the Class 5 Ballots (together with the Class 4 Ballot, the "**Ballots**"), and with respect to Holders of Class 5 Second Lien Notes Claims, the Class 5 Cover Letter (as defined in the Solicitation Procedures Motion).  In addition, each Holder of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims that submitted a Ballot prior to the Petition Date was required to certify that it is an Eligible Holder (as that term is defined in the Solicitation Procedures Motion), and Ballots received from Non-Eligible Holders (as that term is defined in the Solicitation Procedures Motion) dated prior to the entry of the Solicitation Procedures Order (as defined below) were not counted.

---

[3]    *See Debtors' Emergency Motion for Entry of an Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Fixing Deadline to Object to Disclosure Statement and Plan; (III) Approving (A) Solicitation Procedures, (B) Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline, and (C) Notice of Non-Voting Status and Opt Out Opportunity; (IV) Conditionally Approving Disclosure Statement; (V) Conditionally (A) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities; and (VI) Granting Related Relief* [Docket No. 23] (the "**Solicitation Procedures Motion**").  The facts and the legal arguments set forth in the Solicitation Procedures Motion are incorporated herein by reference in their entirety.

[4]    *See Certificate of Service*, dated January 18, 2024 [Docket No. 157] (the "**First Certificate of Service**") and *Certificate of Service*, dated January 23, 2024 [Docket No. 168] (the "**Second Certificate of Service**," and together with the First Certificate of Service, the "**Certificates of Service**").

[5]    In accordance with customary procedures, the Disclosure Statement, including the Plan and other exhibits thereto, was distributed in PDF format via electronic mail (through a weblink) and PDF format on a flash drive.

5.      The Solicitation Package was sent to Holders of Class 4 First Lien Claims via electronic mail.   Beneficial Holders of Class 5 Second Lien Notes Claims received their Solicitation Package from the brokers, dealers, commercial banks, trust companies, or other agents or nominees (collectively, "**Nominees**").   The Nominees were served via electronic mail and/or via next business day service.   The Nominees were provided with a sufficient number of Solicitation Packages for use by the Nominees to tabulate votes submitted by such beneficial Holders.  The Nominees were provided with instructions to distribute (or to make available through customary means) the Solicitation Package for beneficial Holders of Second Lien Notes Claims. The Disclosure Statement and Plan, among other case-related pleadings and information, were also made   publicly   available   free   of   charge   on   the   Solicitation   Agent's   website, https://dm.epiq11.com/Audacy.

6.      On January 8, 2024, the Court entered an order granting the Solicitation Procedures Motion [Docket No. 82] (the "**Solicitation Procedures Order**"), which, among other things, (a) scheduled a combined hearing (the "**Combined Hearing**") on February 20, 2024 to (i) approve the adequacy of the Disclosure Statement on a final basis and (ii) consider confirmation of the Plan; (b) established February 12, 2024 at 4:00 p.m. (Prevailing Central Time) as the deadline to file objections to the adequacy of the Disclosure Statement or confirmation of the Plan (the "**Objection Deadline**");  (c) approved the Solicitation Procedures (as defined in the Solicitation Procedures Motion) with respect to the Plan, including the forms of Ballots, the voting instructions contained therein, and the Class 5 Cover Letter; (d) approved the form and manner of the Notice of Non-Voting Status and Opt Out Opportunity;[6] (e) approved the form and manner of

---

[6]   This notice, among other things, provided an opportunity for each Non-Voting Holder (as defined below) to "opt out" of the Plan's Third Party Release, a form of which is annexed as <u>Exhibit 2</u> to the Solicitation Procedures Order (the "**Notice of Non-Voting Status and Opt Out Opportunity**").

the Combined Notice[7] of (i) the commencement of the Chapter 11 Cases, (ii) the Combined Hearing, and (iii) the Objection Deadline; (f) conditionally approved the Disclosure Statement; and (g) so long as the Plan is confirmed on or before March 7, 2024, (i) directed the Office of the United States Trustee for the Southern District of Texas not to convene an initial meeting of creditors under Section 341(a) of the Bankruptcy Code and (ii) waived the requirement that the Debtors file statements of financial affairs and schedules of assets and liabilities.

7. The Solicitation Package sent to Holders of Claims in the Voting Classes advised such Holders, among other things, that the deadline for submitting a Ballot containing a vote to accept or reject the Plan was February 12, 2024 at 5:00 p.m. (Prevailing Central Time) (the "**Voting Deadline**").  Because certain Holders of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims may be Non-Eligible Holders and could not be solicited prior to the Petition Date, the Debtors sought to provide Non-Eligible Holders of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims with the opportunity to vote to accept or reject the Plan on a postpetition basis.  The Solicitation Packages, including the Ballots, clearly identified the voting record date as December 28, 2023 (the "**Voting Record Date**").

8. The materials in the Solicitation Packages also established and communicated how the Solicitation Agent would tabulate the votes and elections contained in the Ballots.  Those tabulation rules provided, among other things, that the following Ballots would not be counted in determining the acceptance or rejection of the Plan: (i) any Ballot that is illegible or contains insufficient information to permit the identification of the claimant, (ii) any Ballot cast by a Person that does not hold a Claim in a Class entitled to vote on the Plan, (iii) any unsigned Ballot, (iv) any

---

[7]   A form of the Combined Notice is annexed as <u>Exhibit 1</u> to the Solicitation Procedures Order (the "**Combined Notice**").

Ballot that does not contain an original signature, and (v) any Ballot not marked to accept or reject the Plan, or marked both to accept and reject the Plan.[8]

9.     The Debtors, through their Solicitation Agent, completed the solicitation and tabulation of votes following the Voting Deadline.  The Debtors received votes in favor of the Plan from (a) 100% in amount of the Class 4 First Lien Claims that voted and 100% in number of Holders of Class 4 First Lien Claims that voted and (b) 100% in amount of the Class 5 Second Lien Notes Claims that voted and 100% in number of Holders of Class 5 Second Lien Notes Claims that voted.[9]  In addition to soliciting votes on the Plan, the Ballots also allowed Holders of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims to "opt out" of the Third Party Release contained in Article X.B of the Plan.

### C.     Non-Voting Classes

10.     The Plan provides that specific classes of Claims against and Equity Interests in the Debtors are presumed to accept or reject the Plan (collectively, the "**Non-Voting Classes**," and the holders of such Claims and Equity Interests, collectively, the "**Non-Voting Holders**").  Specifically, the Plan provides that Holders of Claims and Equity Interests in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 3 (Secured Tax Claims), and Class 6 (General Unsecured Claims) are Unimpaired and are therefore not entitled to vote on the Plan.  Pursuant to Section 1126(f) of the Bankruptcy Code, each holder of a claim or interest in an unimpaired class is "conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class . . . is not required."[10]  Accordingly, Holders of Claims and

---

[8]    *See* Solicitation Procedures Motion, ¶ 29.

[9]    *See Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC Regarding the Solicitation and Tabulation of Ballots Cast on the Debtors' Chapter 11 Plan*, dated February 16, 2024 (the "**Kjontvedt Declaration**"), filed contemporaneously herewith, Ex. A.

[10]   11 U.S.C. § 1126(f).

Equity Interests in Classes 1, 2, 3 and 6 are conclusively presumed to accept the Plan and their votes were not solicited.

11.     Holders of Claims and Equity Interests in Class 7 (510(b) Claims) and Class 10 (Existing Parent Equity Interests) are Impaired and not expected to receive any recovery on account of their Claims or Equity Interests and are thus deemed to reject the Plan.  Pursuant to Section 1126(g) of the Bankruptcy Code, each holder of a claim or equity interest "is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests."[11]  Accordingly, Holders of Claims and Equity Interests in Classes 7 and 10 are deemed to reject the Plan and their votes were not solicited.  Additionally, Holders of Affiliate Claims and Equity Interests in Class 8 (Intercompany Claims) and Class 9 (Intercompany Interests) are either Unimpaired or Impaired and not expected to receive any recovery on account of their Claims or Equity Interests.  As a result, such Holders of Claims and Equity Interests are either conclusively presumed to accept the Plan or are deemed to reject the Plan.  Thus, the Holders of Claims and Equity Interests in each of the above-mentioned Non-Voting Classes are conclusively presumed to either accept or reject the Plan, as applicable, and their votes were not solicited.

12.     As described above, however, the Solicitation Procedures Order approved service of the Notice of Non-Voting Status and Opt Out Opportunity to Non-Voting Holders that, among other things, provided an opportunity for each Non-Voting Holder to "opt out" of the Third-Party

---

[11]   11 U.S.C. § 1126(g).

Release.[12]  The Notice of Non-Voting Status and Opt Out Opportunity was served on non-Affiliate Non-Voting Holders by the Solicitation Agent on January 9 and 11, 2024.[13]

### D.    Service of Combined Notice and Publication

13.    Following the entry of the Solicitation Procedures Order, on January 8, 2024, the Debtors caused the Solicitation Agent to serve the Combined Notice to the Debtors' creditor matrix and master service list, including all holders of Equity Interests, in accordance with the terms of the Solicitation Procedures Order.[14]  In addition, the Debtors caused a form of the Combined Notice to be published in the national edition of *USA Today* on January 16, 2024 (the "**Publication Notice**"), in accordance with the terms of the Solicitation Procedures Order.[15]

### E.    Plan Supplement and Confirmation Order

14.    On February 5, 2024, the Debtors filed with the Court the *Notice of Filing of Plan Supplement for the Joint Prepackaged Plan of Reorganization for Audacy, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 216] (the "**First Plan Supplement Filing**"), which included (a) the Restructuring Transaction Steps Memorandum, (b) the Equity Allocation Mechanism, (c) the Special Warrants Agreement (including the Special Warrants), (d) the Second Lien Warrants Agreement (including the Second Lien Warrants), and (e) the Schedule of Retained Causes of Action.  On February 13, 2024, the Debtors filed with the Court the *Notice of Filing of First Supplement to the Plan Supplement for the Joint Prepackaged Plan of Reorganization for Audacy, Inc. and its Affiliate Debtors Under Chapter 11 of the*

---

[12]   With respect to Holders of Existing Parent Equity Interests, the methods of service included service to registered holders of Existing Parent Equity Interests and Nominees on behalf of beneficial Holders of Existing Parent Equity Interests, which are typical for chapter 11 cases involving publicly traded companies.  *See* Kjontvedt Declaration, ¶ 15.

[13]   *See* First Certificate of Service, ¶ 4; Second Certificate of Service, ¶ 2.

[14]   *See* First Certificate of Service, ¶ 4; Second Certificate of Service, ¶ 2.

[15]   *See Verification of Publication*, dated January 17, 2024 [Docket No. 149] (the "**Affidavit of Publication**").

*Bankruptcy Code* [Docket No. 255] (the "**Second Plan Supplement Filing**"), which included (a) the New Governance Term Sheet, (b) an updated form of the Special Warrants Agreement (including the Special Warrants), and (c) an updated form of the Second Lien Warrants Agreement (including the Second Lien Warrants).  The Debtors intend to file additional Plan Supplement Documents prior to the Combined Hearing.  Further, on February 5, 2024, the Debtors filed the form of the proposed confirmation order, and expect to file a further revised form of the proposed confirmation order on the date hereof (the "**Proposed Confirmation Order**").  Accordingly, the Debtors are in a position to satisfy all conditions precedent to the Effective Date shortly after the Court's entry of an order confirming the Plan.

## II.    OVERVIEW OF THE PLAN

15.    As noted above, the restructuring contemplated in the Plan will allow the Debtors to emerge from the Chapter 11 Cases well-capitalized and poised for long-term growth and increased profitability, with a stronger balance sheet and a more competitive market position. Specifically, the Plan provides for the restructuring of the Debtors' prepetition indebtedness by eliminating approximately $1.6 billion in funded debt in exchange for (a) Holders of First Lien Claims receiving their *pro rata* share of (x) the First Lien Claims Equity Distribution (*i.e.* 75% of the New Common Stock subject to dilution on account of the MIP Equity and the New Second Lien Warrants)[16] and (y) Second-Out Exit Term Loans and (b) Holders of Second Lien Notes Claims receiving their *pro rata* share of the Second Lien Notes Claims Equity Distribution (*i.e.*

---

[16] The Plan provides that each holder of a DIP Claim is entitled to elect to (i) have such DIP Claim be repaid in full in cash or (ii) have its DIP Claim converted into First-Out Exit Term Loans on a dollar-for-dollar basis.  Pursuant to the FCC Ownership Procedures Order, elections were due on or before February 12, 2024 at 4 p.m. (Prevailing Central Time).  Each entity holding DIP Claims that timely elected the conversion option became an "**Electing DIP Lender**."  Subject to the occurrence of the Effective Date of the Plan and compliance with the FCC Ownership Procedures, each Electing DIP Lender will receive its *pro rata* distribution of 10% of the New Common Stock issued and outstanding on the Effective Date (subject to dilution by the MIP Equity and the New Second Lien Warrants).

15% of the New Common Stock subject to dilution on account of the MIP Equity and the New Second Lien Warrants and 100% of the New Second Lien Warrants).  The Plan further provides for new exit financing consisting of (a) the continuation of the Debtors' existing trade receivables securitization program on a post-emergence basis (the "**Exit Securitization Program**"), which will provide the Reorganized Debtors with access to $100 million in post-emergence financing, and (b) a new $250 million exit term loan credit facility (the "**Exit Term Loan Facility**"), which will consist of the First-Out Exit Term Loans and the Second-Out Exit Term Loans.  The Plan further leaves the Debtors' business intact and provides that General Unsecured Claims will be paid in full or otherwise Unimpaired.

16.     The following table summarizes the treatment of Claims and Equity Interests under the Plan, which Classes are Impaired by the Plan, and which Classes of Claims and Equity Interests are entitled to vote on the Plan:[17]

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery[18] |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Subject to Article VIII of the Plan, to the extent such Class 1 Claim has not already been paid in full during the Chapter 11 Cases, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Class 1 Claim shall receive in full and final satisfaction, settlement, discharge and release of, and in exchange for, such Class 1 Claim, at the option of the Debtors (with the consent of the Required Consenting First Lien Lenders and the reasonable consent of the Required Consenting Second Lien Noteholders) or the Reorganized Debtors, as applicable: (a) payment | Unimpaired | Presumed to Accept | 100% |

---

[17]   The table is qualified in its entirety by reference to the full text of the Plan.

[18]   The ranges set forth under Approximate Percentage Recovery are based on the range of reorganized equity value of the Debtors as described in the Valuation Analysis.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery[18] |
|---|---|---|---|---|---|
| | | in full in Cash in an amount equal to the due and unpaid portion of such Allowed Class 1 Claim; (b) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 1 Claim shall have agreed upon in writing; or (c) such other treatment such that such Allowed Class 1 Claim will be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code; *provided* that Class 1 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court. | | | |
| 2 | Other Secured Claims | Subject to Article VIII of the Plan, to the extent such Class 2 Claim has not already been paid in full during the Chapter 11 Cases, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Class 2 Claim shall receive in full and final satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the option of the Debtors (with the consent of the Required Consenting First Lien Lenders and the reasonable consent of the Required Consenting Second Lien Noteholders) or the Reorganized Debtors, as applicable: (a) payment in full in Cash in an amount equal to the due and unpaid portion of such Allowed Class 2 Claim; (b) the return or abandonment of the Collateral securing such Allowed Class 2 Claim; (c) reinstatement of such Allowed | Unimpaired | Presumed to Accept | 100% |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery[18] |
|---|---|---|---|---|---|
| | | Class 2 Claim; (d) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 2 Claim shall have agreed upon in writing; or (e) such other treatment such that such Allowed Class 2 Claim will be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code; *provided* that Class 2 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court. | | | |
| 3 | Secured Tax Claims | Subject to Article VIII of the Plan, to the extent such Class 3 Claim has not already been paid in full during the Chapter 11 Cases, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Class 3 Claim shall receive in full and final satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the option of the Debtors (with the consent of the Required Consenting First Lien Lenders and the reasonable consent of the Required Consenting Second Lien Noteholders) or the Reorganized Debtors, as applicable: (a) payment in full in Cash in an amount equal to the due and unpaid portion of such Allowed Class 3 Claim; (b) such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Class 3 Claim shall have agreed upon in writing; (c) the return | Unimpaired | Presumed to Accept | 100% |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery[18] |
|---|---|---|---|---|---|
| | | or abandonment of the Collateral securing such Allowed Class 3 Claim; (d) such other treatment such that such Allowed Class 3 Claim will be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code; or (e) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or the Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided* that Class 3 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. Any installment payments to be made under clause (d) or (e) above shall be made in equal quarterly Cash payments beginning on the Effective Date (or as soon as reasonably practicable thereafter), and continuing on a quarterly basis thereafter until payment in full of the applicable Allowed Class 3 Claim. | | | |
| 4 | First Lien Claims | Except to the extent that such Holder agrees in writing to less favorable treatment, on the Effective Date each Holder of an Allowed First Lien | Impaired | Entitled to Vote | 49.6% - 68.8% |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery[18] |
|---|---|---|---|---|---|
| | | Claim (other than Restructuring Expenses) will receive, in full and final satisfaction, settlement, discharge and release of, and in exchange for, its Allowed First Lien Claim, its *Pro Rata* share of: <br><br> • the Second-Out Exit Term Loans; and <br><br> • the First Lien Claims Equity Distribution. | | | |
| 5 | Second Lien Notes Claims | Except to the extent that such Holder agrees in writing to less favorable treatment, on the Effective Date each Holder of Allowed Second Lien Notes Claims (other than Restructuring Expenses) will receive, in full and final satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Second Lien Notes Claim, its *Pro Rata* share of the Second Lien Notes Claims Equity Distribution. | Impaired | Entitled to Vote | 3.6% - 6.8% |
| 6 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim and the Debtors agree to less favorable treatment on account of such Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, on or as soon as practicable after the Effective Date or when such obligation becomes due in the ordinary course of business in accordance with applicable law or the terms of any agreement that governs such Allowed General Unsecured Claim, whichever is later, either, in the discretion of the Debtors and, to the extent practicable, in consultation with the Required Consenting First | Unimpaired | Presumed to Accept | 100% |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery[18] |
|---|---|---|---|---|---|
| | | Lien Lenders, (a) payment in full in Cash, or (b) such other treatment as to render such Holder Unimpaired in accordance with section 1124 of the Bankruptcy Code; *provided* that no Holder of an Allowed General Unsecured Claim shall receive any distribution for any Claim that has previously been satisfied pursuant to a Final Order of the Bankruptcy Court. | | | |
| 7 | 510(b) Claims | On the Effective Date, each Class 7 Claim shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of 510(b) Claims shall not receive any distribution on account of such 510(b) Claims. | Impaired | Deemed to Reject | 0% |
| 8 | Intercompany Claims | On the Effective Date, each Class 8 Claim shall be, at the option of the Debtors (with the consent of the Required Consenting First Lien Lenders and the reasonable consent of the Required Consenting Second Lien Noteholders) or the Reorganized Debtors, as applicable, reinstated, compromised, or canceled and released without any distribution. | Unimpaired / Impaired | Presumed to Accept / Deemed to Reject | 0% - 100% |
| 9 | Intercompany Interests | On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors (with the consent of the Required Consenting First Lien Lenders and the reasonable consent of the Required Consenting Second Lien Noteholders) or the Reorganized Debtors, as applicable, reinstated, compromised, or canceled and released without any distribution. | Unimpaired / Impaired | Presumed to Accept / Deemed to Reject | 0% - 100% |
| 10 | Existing Parent Equity Interests | On the Effective Date, all Existing Parent Equity Interests shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Existing Parent Equity Interests shall | Impaired | Deemed to Reject | 0% |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery[18] |
|---|---|---|---|---|---|
| | | not receive any distribution on account of such Existing Parent Equity Interests. | | | |

## III.  PLAN OBJECTION

17.     As discussed below, the Debtors have a single outstanding objection to confirmation of the Plan in a letter submitted to the Court by a *pro se* shareholder, Mr. Alan Adams.[19]  The Debtors received two other formal objections and other informal comments to the Plan, all of which have been resolved via the inclusion of language in the Proposed Confirmation Order that will be filed prior to the Combined Hearing.[20]  A chart summarizing all objections and comments, and their resolution or status, is attached hereto as Exhibit A.

18.     In the letter, Mr. Adams states that "the company should be liquidated for its asset value, debtors [*sic*] paid off and remaining funds provided to equity holders" and contends that the Debtors' "asset value exceeded outstanding debt by more than $500 million."[21]  The Debtors interpret the letter to raise a "best interests" challenge to the Plan—*i.e.*, that Mr. Adams would receive or retain more value in a liquidation of the Debtors than under the Plan.

19.     The Shareholder Objection should be overruled.  *First,* numerous indications of value show that equity holders would not receive a recovery in a chapter 7 liquidation of the Debtors.  Notably, prior to the Petition Date, the bid-ask spread for the First Lien Term Loans was

---

[19]   *Letter from Alan Adams re Obligation to Shareholders* [Docket No. 229] (the "**Shareholder Objection**"). Although the Shareholder Objection is styled as a letter, Mr. Adams has advised the Debtors that it should be treated as an objection to confirmation of the Plan.

[20]   *See* Docket Nos. 249 and 254.

[21]   *See Shareholder Objection*.

reported to be in the range of 47.7 to 50.1 cents for each dollar of principal amount.[22]  Further, over the same period, the Debtors' Second Lien Notes were trading in the secondary market at prices between one and two cents for each dollar of principal amount, suggesting, as with the First Lien Term Loans, that the Debtors' *secured* debt was unlikely to receive a full recovery, much less its equity holders.[23]  Indeed, the fact that all Holders of First Lien Claims and Second Lien Notes Claims voted to accept an impaired recovery suggests that such Holders are not entitled to a full recovery such that there would be any residual value for Holders of Existing Parent Equity Interests.  Moreover, the Valuation Analysis prepared in connection with the Plan and Disclosure Statement confirms that the enterprise value of the Debtors upon emergence is estimated to be between approximately $600 million and $800 million (with a midpoint of approximately $700 million), which is insufficient to provide a recovery in full to the Debtors' secured lenders holding approximately $1.9 billion in long-term debt.[24]  There is no residual value available for distribution to Holders of Existing Parent Equity Interests.

20.     *Second*, the book value of the Debtors' assets prior to the Petition Date is not equivalent to their fair market value at any time, much less the value of their assets in a hypothetical liquidation under chapter 7 of the Bankruptcy Code as of the Effective Date.[25]  As described in the Liquidation Analysis attached to the Disclosure Statement, and as the evidence will demonstrate

---

[22]  *See* Bloomberg L.P. (2024) Description Date. Retrieved Feb. 16, 2024 from Bloomberg terminal.

[23]  *See* Trade History for Entercom Media Corp. (CUSIP: U2937MAA0), Dec. 29, 2023 to Jan. 7, 2024, FINRA, https://www.finra.org/finra-data/fixed-income/trade-history?cusip=U2937MAA0&bondType=CA      (select Dec. 29, 2023 in the Start Date field and Jan. 7, 2024 in the End Date field); Trade History for Entercom Media Corp. (CUSIP: U2937MAC6), Dec. 29, 2023 to Jan. 7, 2024, FINRA, https://www.finra.org/finra-data/fixed-income/trade-history?cusip=U2937MAC6&bondType=CA (select Dec. 29, 2023 in the Start Date field and Jan. 7, 2024 in the End Date field).

[24]  *See* Evarts Declaration, ¶¶ 19-20.

[25]  *See* 11 U.S.C. § 1129(a)(7) ("With respect to each impaired class of claims or interests . . . each holder of a claim or interest of such class . . . . (ii) will receive or retain under the plan on account of such claim or interest property of a value, *as of the effective date of the plan*, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title *on such date* . . . ." (emphases added)).

at the Combined Hearing, the reality of a liquidation of the Debtors is much worse.  The Debtors estimate that the liquidation of their assets would yield gross proceeds of approximately $233 million, which is the midpoint of the high- and low-end of the range of estimated proceeds (*i.e.*, approximately $250 million and $216 million, respectively).[26]  As such, the liquidation value of the Debtors' assets would be significantly less than their prepetition funded debt obligations, including approximately $1.9 billion of principal long-term debt, to say nothing of claims by creditors, including general unsecured creditors, that would be entitled to recovery before Holders of Existing Parent Equity Interests.  For these reasons, the Plan satisfies the best interests test because Holders of Existing Parent Equity Interests *would not receive any recovery* in a hypothetical liquidation.

## **ARGUMENT**

21.     This brief is divided into two parts.  First, the Debtors request final approval of the Disclosure Statement and a finding that the Debtors complied with the Solicitation Procedures Order.  Second, the Debtors demonstrate that the Plan satisfies Section 1129 of the Bankruptcy Code and, accordingly, request that the Court confirm the Plan and approve the Restructuring Transactions provided for therein.[27]   In support of the Plan, the Debtors have filed contemporaneously herewith (a) the *Declaration of Heath C. Gray (FTI Consulting, Inc.) in Support of Confirmation of the Debtors' Chapter 11 Plan* (the "**Gray Declaration**"), (b) the

---

[26]  *See* Gray Declaration, ¶ 29.

[27]  *See In re Lakeside Global II Ltd.*, 116 B.R. 499, 505 (Bankr. S.D. Tex. 1989) ("In order to confirm a reorganization plan, the bankruptcy court must be satisfied that the plan complies with all of the requirements of § 1129(a) of the Bankruptcy Code."); *In re Star Ambulance Serv. LLC*, 540 B.R. 251, 259 (Bankr. S.D. Tex. 2015) ("As the proponent of the Plan, the Debtor must establish by a preponderance of the evidence that each of the confirmation requirements set forth in Bankruptcy Code [section] 1129 has been met.") (internal citation omitted); *In re Lone Star Utils. LLC*, No. 13–34302–SGJ–11, 2014 WL 4629129, at *2 (Bankr. N.D. Tex. Sept. 15, 2014) ("The Debtor has the burden of proving the elements of Bankruptcy Code sections 1129(a) by a preponderance of the evidence.").

*Declaration of William Evarts (PJT Partners LP) in Support of Confirmation of the Debtors'*
*Chapter 11 Plan* (the "**Evarts Declaration**"), and (c) the *Declaration of Roger Meltzer in Support*
*of Confirmation of the Joint Prepackaged Plan of Reorganization for Audacy, Inc. and Its Affiliate*
*Debtors Under Chapter 11 of the Bankruptcy Code* (the "**Meltzer Declaration**").  The Debtors
also rely upon the First Day Declaration,[28] the Certificates of Service, and the Kjontvedt
Declaration.

I.    **APPROVAL OF THE DISCLOSURE STATEMENT IS WARRANTED**.

    A.    **Creditors Received Sufficient Notice of the Hearing and Objection Deadline**
        **for Approval of the Disclosure Statement.**

22.    Under Bankruptcy Rule 3017(a), a hearing on the adequacy of a disclosure
statement generally requires twenty-eight (28) days' notice.[29]  Similarly, Bankruptcy Rule 2002(b)
provides that parties in interest should receive twenty-eight (28) days' notice of the objection
deadline and the hearing to consider approval of the disclosure statement.[30]  Courts in the Fifth
Circuit and elsewhere have adopted the general rule that due process requires "notice be
'reasonably calculated, under all the circumstances, to inform interested parties of the pendency
of a proceeding.'"[31]  When evaluating the notice and the sufficiency thereof, courts will consider
"[f]irst, whether the notice apprised the claimant of the pendency of the action, and second,

---

[28]    *Declaration of Heath C. Gray In Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 26]
(the "**First Day Declaration**").

[29]    *See* Fed. R. Bankr. P. 3017(a) ("the court shall hold a hearing on at least 28 days' notice to the debtor, creditors,
equity security holders and other parties in interest . . . to consider the disclosure statement and any objections or
modifications thereto").

[30]    *See* Fed. R. Bankr. P. 2002(b).

[31]    *In re Placid Oil Co.*, 753 F.3d 151, 154 (5th Cir. 2014) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339
U.S. 306, 314 (1950)).

whether it was sufficiently timely to permit the claimant to act."[32]  Whether a particular method of notice is reasonably calculated to inform interested parties is determined on a case-by-case basis.[33]

23.     As noted above, on January 8, 2024, the Court entered the Solicitation Procedures Order, which, among other things, scheduled the Combined Hearing, approved certain objection and reply deadlines, and approved the form of Combined Notice and manner of service thereof.[34] The Combined Notice informed recipients of, among other things: (a) the commencement of the Chapter 11 Cases, (b) the date and time set for the Combined Hearing, and (c) the Objection Deadline.  On January 11, 2024, the Combined Notice was served upon the Debtors' master service list.[35]  Accordingly, the Debtors submit that all parties in interest had notice at least forty days prior to the Combined Hearing and at least thirty-two days prior to the Objection Deadline, in compliance with both Bankruptcy Rule 3017(a) and Bankruptcy Rule 2002(b).

24.     Further, the Debtors caused the Publication Notice to be published in the national edition of *USA Today* on January 16, 2024, which, among other things, disclosed the date of the Combined Hearing and the Objection Deadline.[36]  Both the Combined Notice and Publication Notice included instructions regarding how to obtain the Plan and the Disclosure Statement free of charge through the Solicitation Agent's website.  Accordingly, the Debtors have satisfied Bankruptcy Rules 2002(b) and 3017(a).

---

[32]  *In re Tex. Tamale Co., Inc.*, 219 B.R. 732, 739-40 (Bankr. S.D. Tex. 1998) (applying two-part test); *Sequa Corp. v. Christopher (In re Christopher)*, 28 F.3d 512, 518 (5th Cir. 1994) (same).

[33]  *See In re Hunt*, 146 B.R. 178, 182 (Bankr. N.D. Tex. 1992) ("Whether a particular method of notice is reasonably calculated to reach interested parties depends upon the particular circumstances of each case.").

[34]  *See* Solicitation Procedures Order.

[35]  *See* First Certificate of Service, ¶ 4; Second Certificate of Service, ¶ 2.

[36]  *See* Affidavit of Publication.

**B.** **The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code and Should Be Approved.**

25.     The Debtors commenced the solicitation of votes on the Plan from Holders of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims prior to the Petition Date.  To determine whether a prepetition solicitation of votes to accept or reject a plan should be approved, the Court must determine whether the solicitation complied with Sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rules 3017(d), 3017(e), 3018(b), and 3018(c).  Similarly, Section 1125(b) of the Bankruptcy Code prohibits postpetition solicitation of a plan unless the plan (or summary thereof) and "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information" are transmitted to those persons whose votes are being solicited.[37]  For the reasons set forth herein, the Debtors satisfied the requirements of the Bankruptcy Code and the Bankruptcy Rules in connection with solicitation.

**1.** **The Disclosure Statement Demonstrates That the Debtors Complied With Applicable Nonbankruptcy Law With Respect to the Prepetition Solicitation.**

26.     Section 1126(b) of the Bankruptcy Code expressly permits a debtor to solicit votes from holders of claims and equity interests prepetition without a court-approved disclosure statement if the solicitation complies with applicable non-bankruptcy law—including generally applicable federal and state securities laws or regulations—or, if no such laws exist, the solicited holders receive "adequate information" within the meaning of Section 1125(a) of the Bankruptcy Code.[38]

---

[37]   11 U.S.C. § 1125(b).

[38]   *See* 11 U.S.C. § 1126(b) ("[A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if—(1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title."); *see also* 11 U.S.C. § 1125(g) ("[A]n acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with

27.     To the extent that the Debtors' prepetition solicitation was deemed to constitute an offer of new securities, such solicitation procedures are exempt from securities law registration requirements pursuant to Section 4(a)(2), Regulation D, and/or Regulation S of the Securities Act,[39] or any similar rules, regulations, or statutes, as applicable to any recipient deemed an offeree.  Specifically, Section 4(a)(2) and Regulation D of the Securities Act create an exemption from the registration requirements under the Securities Act for certain transactions not involving a "public offering," and Regulation S creates an exemption from the registration requirements under the Securities Act for offerings deemed to be executed outside of the United States.[40]

28.     The Debtors have complied with the requirements of Section 4(a)(2) of the Securities Act, Regulation D, and Regulation S thereunder, as applicable, with respect to the requirements for transactions exempt from the registration requirements under the Securities Act in order to address the scenario where the prepetition solicitation of votes would be deemed a private placement of securities.  Specifically, the prepetition solicitation was made to those Holders of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims who certified that they were one of the following: (a) a "qualified institutional buyer" (as such term is defined in Rule 144A of the Securities Act), (b) an "accredited investor" (as such term is defined in Rule 501(a) of Regulation D of the Securities Act), or (c) for Holders of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims located outside the United States, a person other than a "U.S. person" (as defined in Rule 902(k) of Regulation S of the Securities Act) and not participating on behalf

---

applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law.").

[39]   The Securities Act of 1933 (the "**Securities Act**").

[40]   *See* Securities Act, 15 U.S.C. § 77d(a)(2); 17 C.F.R. § 230.501 *et seq.*; 17 C.F.R. § 230.901 *et seq.*

of or on account of a U.S. person.[41]  Therefore, the prepetition solicitation meets the requirements

of applicable nonbankruptcy law and, thus, complies with Section 1126(b)(1) of the Bankruptcy

Code.  Moreover, no party in interest has objected to final approval of the Disclosure Statement,

much less on account of noncompliance with applicable nonbankruptcy law.

### 2.     The Disclosure Statement Contains Adequate Information.

29.     The prepetition solicitation also complies with Section 1126(b)(2) of the

Bankruptcy Code, which requires that the Debtors demonstrate compliance with Section 1125(a)

with respect to the prepetition solicitation.[42]  In addition, the Debtors must demonstrate compliance

with Section 1125(b) with respect to the postpetition solicitation, which requires that a disclosure

statement must be transmitted to holders of claims or interests whose votes are being solicited after

the commencement of the chapter 11 cases.[43]

30.     Section 1125(a) requires that a disclosure statement provide material information,

or "adequate information," that allows parties entitled to vote on a proposed plan to make an

informed decision about whether to vote to accept or reject the plan.[44]  "Adequate information" is

---

[41]   *See, e.g.*, Regulation D, 17 C.F.R. § 230.506 (deeming a transaction a non-public offering under Section 4(a)(2) of the Securities Act if the transaction only involves accredited investors, provided certain other conditions are satisfied); Regulation S, 17 C.F.R. § 230.903 (deeming a transaction occurring outside the United States, and, therefore, not subject to Section 5 of the Securities Act, if the transaction only involves purchasers who are not a U.S. person, provided certain conditions are satisfied).

[42]   11 U.S.C. § 1126(b)(2).

[43]   11 U.S.C. § 1125(b).

[44]   11 U.S.C. § 1125(a)(1); *see, e.g.*, *In re J.D. Mfg., Inc.*, No. 07-36751, 2008 WL 4533690, at *2 (Bankr. S.D. Tex. Oct. 2, 2008) ("Adequacy of information is a determination that is relative both to the entity (e.g. assets/business being reorganized or liquidated) and to the sophistication of the creditors to whom the disclosure statement is addressed."); *In re U.S. Brass Corp.*, 194 B.R. 420, 423 (Bankr. E.D. Tex. 1996) ("The purpose of the disclosure statement is . . . to provide enough information to interested persons so they may make an informed choice."); *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991) ("A court's legitimate concern under Section 1125 is assuring that hypothetical reasonable investors receive such information as will enable them to evaluate for *themselves* what impact the information might have on their claims and on the outcome of the case.") (emphasis in original).

a flexible standard based on the facts and circumstances of each case.[45]  Courts within the Fifth Circuit and elsewhere acknowledge that determining what constitutes "adequate information" for the purpose of satisfying Section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[46]

31.    Courts may consider various factors when evaluating the adequacy of the disclosures in a proposed disclosure statement, including: (a) the events that led to the filing of a bankruptcy petition, (b) the relationship of the debtor with its affiliates, (c) a description of the available assets and their value, (d) the anticipated future of the company, (e) claims asserted against the debtor, (f) the estimated return to creditors under a chapter 7 liquidation, (g) the chapter 11 plan or a summary thereof, (h) financial information relevant to a creditor's decision to accept or reject the chapter 11 plan, (i) information relevant to the risks posed to creditors under the plan, (j) the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers, and (k) the source of information stated in the disclosure statement.[47]

---

[45]   *See, e.g.*, 11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records"); *Mabey v. Southwestern Elec. Power Co.* (*In re Cajun Elec. Power Coop., Inc.*), 150 F.3d 503, 518 (5th Cir. 1998) ("The legislative history of § 1125 indicates that, in determining what constitutes 'adequate information' with respect to a particular disclosure statement . . . the kind and form of information are left essentially to the judicial discretion of the court and that the information required will necessarily be governed by the circumstances of the case.") (internal citations omitted); *Floyd v. Hefner*, No. H-03-5693, 2006 WL 2844245, at *30 (S.D. Tex. Sept. 29, 2006) (noting that what constitutes "adequate information" is a flexible standard); *In re Applegate Prop.*, 133 B.R. at 829 ("The issue of adequate information is usually decided on a case by case basis and is left largely to the discretion of the bankruptcy court.").

[46]   *See, e.g., In re Cajun Elec. Power Coop., Inc.*, 150 F.3d at 518 (holding that courts are vested with wide discretion to determine whether disclosure statement contains "adequate information" within meaning of Section 1125(a) of the Bankruptcy Code); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis.  This determination is largely within the discretion of the bankruptcy court.").

[47]   *See In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).  Disclosure regarding all topics is not necessary in every case.  *See, e.g.*, *In re U.S. Brass Corp.*, 194 B.R. at 425; *In re Phoenix Petroleum*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001).

32.     The Disclosure Statement is extensive and comprehensive.  It contains descriptions of, among other things: (a) the Plan; (b) an overview of the Debtors' business; (c) key events leading to the commencement of the Chapter 11 Cases; (d) anticipated events during the Chapter 11 Cases; (e) pending litigation; (f) financial information and financial projections that would be relevant to creditors' determinations of whether to accept or reject the Plan; (g) a liquidation analysis setting forth the estimated return that Holders of Claims and Equity Interests would receive in a hypothetical chapter 7 liquidation; (h) transfer restrictions and consequences under U.S. federal securities laws; (i) federal tax law consequences of the Plan; (j) certain FCC considerations under the Plan; (k) risk factors affecting the Plan; (l) voting procedures and requirements to vote; and (m) alternatives to confirmation and consummation of the Plan.  In addition, the Disclosure Statement and the Plan were subject to review and comment by the signatories to the Restructuring Support Agreement.[48]

33.     Accordingly, the Debtors submit that the Disclosure Statement contains adequate information within the meaning of Section 1125(a) of the Bankruptcy Code, in satisfaction of Sections 1125(b) and 1126(b)(2), and should therefore be approved.  Moreover, no party has objected to the adequacy of the Disclosure Statement.

### C.     The Debtors' Solicitation of Votes Complied With the Bankruptcy Code, the Bankruptcy Rules, and Solicitation Procedures Order.

34.     Prior to the Petition Date, on January 5, 2024, the Debtors distributed the Solicitation Packages to all Holders of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims.  Only Eligible Holders of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims were instructed to return their Ballot prior to entry of the Solicitation Procedures Order.

---

[48]   *See* Disclosure Statement, Art. III.D.

Subsequently, after the entry of the Solicitation Procedures Order, the Debtors began accepting votes from Non-Eligible Holders of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims.

35.     The solicitation was undertaken in accordance with Sections 1125 and 1126 of the Bankruptcy Code.[49]  In addition, Bankruptcy Rule 3017(d) enumerates those materials that must be provided to holders of claims and interests for the purpose of soliciting votes to accept or reject a plan of reorganization.[50]  As set forth in more detail below, the solicitation complied with the Bankruptcy Code and the Bankruptcy Rules.

### 1.      The Ballots Used to Solicit Holders of Claims Entitled to Vote on the Plan Complied With the Bankruptcy Rules.

36.     Bankruptcy Rule 3017(d) requires the Debtors to transmit a form of ballot, which substantially conforms to Official Form No. 314, only to "creditors and equity security holders entitled to vote on the plan."[51]  Bankruptcy Rule 3018(c) provides that, "[a]n acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent, and conform to the appropriate Official Form."[52]  As set forth in the First Certificate of Service, the applicable Ballots were transmitted to all Holders of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims.[53]  The forms of Ballots complied with the Bankruptcy Rules, are consistent with Official Form No. 314, and were

---

[49]   *See* 11 U.S.C. § 1125(b) (debtors may solicit votes following filing if the holders of claims or interested solicited are sent a summary of the plan and an approved disclosure statement); 11 U.S.C. § 1125(g) (debtors may commence solicitation prior to filing chapter 11 petitions); 11 U.S.C. § 1126(b)(2) (holders of claims or interests that accepted or rejected a plan before the commencement of a chapter 11 case are deemed to accept or reject the plan so long as the solicitation provided adequate information).

[50]   *See* Fed. R. Bankr. P. 3017(d).

[51]   *Id.*

[52]   Fed. R. Bankr. P. 3018(c).

[53]   *See* First Certificate of Service, ¶ 3.

approved by the Bankruptcy Court in the Solicitation Procedures Order.[54]  Further, there have been no objections to the sufficiency of the Ballots.  Based on the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy Rules 3017(d) and 3018(c).

**2.  The Voting Record Date Complied With Bankruptcy Rules and the Solicitation Procedures Order.**

37.    In a prepetition solicitation, the holders of record of the applicable claims against and interests in a debtor entitled to receive ballots and related solicitation materials are to be determined "on the date specified in the solicitation."[55]  For a postpetition solicitation, the holders of record of the applicable claims against and interests in a debtor entitled to receive ballots and related solicitation materials are to be "on the date the order approving the disclosure statement is entered or on another date fixed by the court. . . after notice and a hearing."[56]  The Solicitation Procedures Order, the Disclosure Statement, and the Ballots clearly identify December 28, 2023 as the Voting Record Date.  No party in interest has objected to the Voting Record Date.  Thus, the Debtors respectfully request that the Court approve December 28, 2023 as the Voting Record Date on a final basis, to the extent not previously approved on a final basis in the Solicitation Procedures Order.

**3.  The Debtors' Solicitation Period Complied With Bankruptcy Rule 3018 and the Solicitation Procedures Order.**

38.    The Debtors' solicitation period for Holders of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims complied with Bankruptcy Rule 3018.  First, as set forth above, the Plan and Disclosure Statement were transmitted to all Holders of Class 4 First Lien Claims and

---

[54]   *See* Solicitation Procedures Order, ¶ 13.

[55]   FED. R. BANKR. P. 3018(b).

[56]   *Id.*

Class 5 Second Lien Notes Claims in accordance with Bankruptcy Rule 3018(b).[57]  Second, the solicitation period—which lasted from January 5, 2024 through February 12, 2024 for Eligible Holders (approximately 38 days) and from January 11, 2024[58] through February 12, 2024 for Non-Eligible Holders (approximately 32 days)—complied with the deadlines set forth in the Solicitation Procedures Order and were adequate under the particular facts and circumstances of this case and applicable bankruptcy law.  Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 3018.[59]

### 4.   The Debtors' Vote Tabulation Was Appropriate and Complied with the Solicitation Procedures Order.

39.   The Debtors request that the Court find that the tabulation of votes was completed in a manner consistent with the Solicitation Procedures approved in the Solicitation Procedures Order and in accordance with applicable bankruptcy law.  As described in the Solicitation Procedures and the Kjontvedt Declaration, the Solicitation Agent used standard tabulation procedures in tabulating votes from Holders of Claims and Equity Interests.  Specifically, the Solicitation Agent reviewed and tabulated all valid Ballots received through the Voting Deadline, each in accordance with the court-approved Solicitation Procedures and the Disclosure Statement.[60]

---

[57]  *See* First Certificate of Service, ¶ 3.

[58]  On January 11, 2024, the Debtors completed service of the Combined Notice, which, among other things, notified Non-Eligible Holders of Class 4 First Lien Claims and Class 5 Second Lien Notes Claims of the entry of the Solicitation Procedures Order.  *See* Second Certificate of Service, ¶ 2.

[59]  Courts in this district and others have approved significantly shorter solicitation periods.  *See, e.g., In re Transcoastal Corp.*, No. 15-34956 (Bankr. N.D. Tex. Dec. 18, 2015) (approving solicitation procedures with voting period of two days); *In re Cross Canyon Energy Corp.*, No. 10-30747 (Bankr. S.D. Tex. Mar. 11, 2010) (approving solicitation procedures with voting period of one day where holders of claims and interests entitled to vote were familiar with the restructuring efforts and the plan); *In re Davis Petroleum Corp.*, No. 06-20152 (Bankr. S.D. Tex. Mar. 10, 2006) (approving solicitation procedures with voting period of five days).

[60]  *See* Kjontvedt Declaration.

### 5.   Waiver of Certain Solicitation Package Mailings Is Reasonable and Appropriate and Complied with the Solicitation Procedures Order.

40.    As further described in the Solicitation Procedures Motion, certain Holders of Claims and Equity Interests were not provided a Solicitation Package because such Holders are Unimpaired under, and conclusively presumed to accept, the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  In the Solicitation Procedures Order, the Court approved the Solicitation Procedures, which provided that the Debtors would not mail a copy of the Solicitation Package to Holders of Claims and Equity Interests presumed to accept the Plan.[61]  As set forth above, the Court-approved Combined Notice was sent to the Debtors' full creditor matrix and provided instructions for obtaining copies of the Disclosure Statement and Plan, which are available at no cost on the Solicitation Agent's website.  In addition, the Court-approved Notice of Non-Voting Status and Opt Out Opportunity was sent to all non-Affiliate Holders of Claims and Equity Interests in Non-Voting Classes in accordance with the Solicitation Procedures Order.[62]

### 6.   Solicitation of the Plan Complied With the Bankruptcy Code and Was in Good Faith.

41.    Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable, on account of such solicitation . . . for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan."[63]  Section 1125(e) of the Bankruptcy Code is understood to "provide[] a safe harbor for the disclosure and solicitation

---

[61]   *See* Solicitation Procedures Order, ¶ 10.

[62]   *See id.*

[63]   11 U.S.C. § 1125(e).

process of a bankruptcy."[64]   Courts in this District frequently enter confirmation orders with protections based on Section 1125(e) of the Bankruptcy Code.[65]

42.     As set forth in the First Day Declaration, the Gray Declaration, and the Disclosure Statement, the parties to the Restructuring Support Agreement at all times engaged in arm's-length, good-faith negotiations,[66] and all parties, including the Debtors, the Released Parties, and the Exculpated Parties took appropriate actions in connection with the solicitation of the Plan in compliance with Section 1125 of the Bankruptcy Code.   Therefore, the Debtors respectfully request that the Court grant these parties the protections provided under Section 1125(e) of the Bankruptcy Code.

## II.   THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE.

43.     To confirm the Plan, the Court must find that both the Plan and the Debtors are in compliance with each of the requirements of Section 1129(a) of the Bankruptcy Code.[67]   The

---

[64]   *In re Davis Offshore, L.P.*, 644 F.3d 259, 266 (5th Cir. 2011).

[65]   *See, e.g.*, *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) [Docket No. 1760] (approving the protection of the debtors, the directors, managers, and officers of any debtor entity, the parties to the restructuring support agreement, the Official Committee of Unsecured Creditors and its members, the DIP agent and DIP lenders, and certain settling parties, among others, pursuant to Section 1125(e) of the Bankruptcy Code); *In re Altera Infrastructure L.P.*, No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) [Docket No. 533] (approving protection of the debtors' and certain other plan proponents' affiliates, directors, officers, members, managers, employees, and advisors pursuant to Section 1125(e) of the Bankruptcy Code); *In re Sunguard AS New Holdings, LLC*, No. 22-90018 (DRJ) (Bankr. S.D. Tex. Oct. 17, 2022) [Docket No. 763] (approving of the debtors' and other plan proponents' affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys relating to the offer, issuance, sale, and purchase of securities offered and sold under the plan); *see also In re Fieldwood Energy LLC*, No. 20-33948 (MI), 2021 WL 2853151, at *10 (Bankr. S.D. Tex. June 25, 2021) ("Debtors and their directors, officers, employees, members, agents, advisors, and professionals have acted in 'good faith' within the meaning of section 1125(e) of the Bankruptcy Code . . . in connection with all their respective activities relating to the solicitation of acceptances or rejections of the Plan and their participation in the activities . . . and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in . . . the Plan.").

[66]   *See* First Day Declaration ¶¶ 55-60; *see also* Gray Declaration, ¶¶ 6, 16; Meltzer Declaration, ¶¶ 8, 12, 21.

[67]   *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993), *cert. denied*, 510 U.S. 992 (1993); *In re 203 N. LaSalle St. P'ship*, 126 F.3d 955, 960 (7th Cir. 1997) (proponent must show that plan satisfies thirteen requirements of Section 1129(a) *rev'd on other grounds*, 526 U.S. 434 (1999); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 648 (2d Cir. 1988); *In re Swiftco,*

proponent of a plan must demonstrate compliance with Section 1129 by a preponderance of the evidence.[68] For the reasons set forth below, the Plan and the Debtors meet the requirements of Section 1129(a) of the Bankruptcy Code.[69]

### A. The Plan Complies With All Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(1).

44. Section 1129(a)(1) of the Bankruptcy Code provides that a court may confirm a plan of reorganization only if "[t]he plan complies with the applicable provisions of [the Bankruptcy Code]."[70] As set forth herein, the Plan complies with the requirements of the Bankruptcy Code in terms of both (a) the classification of Claims and Equity Interests and (b) the content of the Plan.

### 1. The Classification of Claims and Equity Interests in the Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

45. Section 1122(a)[71] of the Bankruptcy Code states: "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if

---

*Inc.*, No. 85–07083–H1–5, 1988 WL 143714, at *5 (Bankr. S.D. Tex. Oct. 5, 1988). Sections 1129(a)(14) (payment of domestic support obligations) and (a)(15) (for cases in which debtors are individuals) are not applicable to the Debtors' cases.

[68] *In re Briscoe Enters.*, 994 F.2d at 1165 (recognizing that "preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.").

[69] In the event all requirements of Section 1129(a) are met other than every impaired class having accepted the Plan, the Court may confirm the Plan if the "cramdown" requirements under Section 1129(b) of the Bankruptcy Code are satisfied. 11 U.S.C. § 1129(b)(1). As discussed below, the Debtors satisfy the "cramdown" requirements because (a) Class 4 (First Lien Claims) and Class 5 (Second Lien Notes Claims) have voted to accept the Plan and (b) with respect to those Classes of Claims and Equity Interests deemed to reject the Plan—Class 7 (510(b) Claims), Class 8 (Intercompany Claims) solely to the extent Impaired, Class 9 (Intercompany Interests) solely to the extent Impaired, and Class 10 (Exiting Parent Equity Interests)—the Plan is fair and equitable and does not discriminate unfairly.

[70] 11 U.S.C. § 1129(a)(1). The legislative history of Section 1129(a)(1) explains that this provision encompasses the requirements of Sections 1122 and 1123 governing classification of claims and contents of the plan, respectively. *See* H.R. REP. No. 95-595, at 412 (1977); S. REP. No. 95-989, at 126 (1978).

[71] The Plan does not include a class for administrative convenience, so Section 1122(b) of the Bankruptcy Code does not apply in the Chapter 11 Cases.

such claim or interest is substantially similar to the other claims or interests of such class."[72]  The plan proponent has broad discretion in classifying claims under Section 1122, and, as implied by the statute, a plan may place substantially similar claims in different classes when a reasonable nondiscriminatory basis exists for such classification.[73]  In evaluating whether a plan complies with Section 1122, courts look to the kind, species, or character of each category of claims.  If a plan classifies substantially similar claims in different classes, there must exist a reasonable, non-discriminatory basis for such treatment, such as a business or economic justification for the separate classification or a legal distinction between the claims.[74]  Here, the Plan classifies substantially similar claims in the same class, satisfying Section 1122(a) of the Bankruptcy Code.

46.    Article III of the Plan classifies eight Classes of Claims against the Debtors and two Classes of Equity Interests in the Debtors, which are described in the Plan and Disclosure Statement.  Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Postpetition Securitization Program Claims, DIP Claims, Priority Tax Claims, and Statutory Fees are not classified and are separately treated.  The classes under the Plan are designated as follows: Other Priority Claims (Class 1), Other Secured Claims (Class 2), Secured Tax Claims (Class 3), First Lien Claims (Class 4), Second Lien Notes Claims (Class 5),

---

[72]  11 U.S.C. § 1122(a).

[73]  *In re Idearc, Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009); *see also In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991), *aff'd sub nom NLRB v. Greyhound Lines (In re Eagle Bus. Mfg.)*, 158 B.R. 421 (S.D. Tex. 1993); *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278 (5th Cir. 1991) ("A fair reading of both subsections [of Section 1122] suggests that ordinarily 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class").

[74]  *See In re Briscoe Enters.*, 994 F.2d at 1167 (Claims may be classified separately for good business reasons and a plan proponent cannot "classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."); *In re Mirant Corp.,* No. 03–46590DML11, 2007 WL 1258932 at *7 (Bankr. N.D. Tex. Apr. 27, 2007) ("Section 1122 of the Bankruptcy Code does not require that all substantially similar claims be placed in the same class. Decisions interpreting section 1122(a) generally uphold separate classification of different groups of unsecured claims when a reasonable basis exists for that classification.").

General Unsecured Claims (Class 6), 510(b) Claims (Class 7), Intercompany Claims (Class 8), Intercompany Interests (Class 9), and Existing Parent Equity Interests (Class 10).

47. The classification scheme set forth in the Plan complies with Section 1122(a) of the Bankruptcy Code because each Class contains only Claims or Equity Interests that are substantially similar to each other. Furthermore, the classification scheme created by the Plan is based on the similar nature of the Claims or Equity Interests contained in each Class and not upon an impermissible classification factor. Similar Claims have not been placed into different Classes in order to affect the outcome of the vote on the Plan. Rather, Other Priority Claims, Other Secured Claims, Secured Tax Claims, First Lien Claims, Second Lien Notes Claims, General Unsecured Claims, 510(b) Claims, and Intercompany Claims have been classified separately, respectively, because of the nature of such Claims and/or their unique proposed treatment under the Plan, as negotiated in connection with the Restructuring Support Agreement. Intercompany Interests and Existing Parent Equity Interests have been classified separately due to the distinct nature of such Equity Interests and their separate proposed treatment under the Plan. Because each Class consists of only similar Claims or Equity Interests, the Court should approve the classification scheme of the Plan as consistent with Section 1122(a) of the Bankruptcy Code.

> **2. The Plan Satisfies the Requirements of Section 1123(a) of the Bankruptcy Code.**

48. The Plan complies with all subsections of Section 1123(a) of the Bankruptcy Code, which sets forth seven requirements that every chapter 11 plan must satisfy.[75]

49. <u>Designation of Classes of Claims and Equity Interests – 11 U.S.C. § 1123(a)(1)</u>. Section 1123(a)(1) of the Bankruptcy Code requires a plan to designate classes of interests and

---

[75] 11 U.S.C. § 1123(a). Section 1123(a)(8) does not apply in the Chapter 11 Cases because the Debtors are not individuals.

claims, other than the types of claims specified in Section 507(a)(2) (administrative expense claims), Section 507(a)(3) (claims arising in the "gap" period in an involuntary case),[76] and Section 507(a)(8) (priority tax claims).[77]   As described above, Article III of the Plan designates Classes of Claims and Equity Interests in compliance with Section 1123(a)(1).

50.    Specification of Unimpaired Classes – 11 U.S.C. § 1123(a)(2).   Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan."[78]   Article III of the Plan provides that Claims in Classes 1, 2, 3, and 6 are Unimpaired under, and conclusively presumed to accept, the Plan.   Similarly, Article III of the Plan provides that Claims and Equity Interests in Classes 8 and 9 are either Unimpaired or Impaired and not expected to receive any recovery on account of their Claims or Equity Interests, and thus are either presumed to accept or deemed to reject the Plan, as applicable.

51.    Specification of Treatment of Impaired Classes – 11 U.S.C. § 1123(a)(3).   Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan."[79]   As provided in Article III of the Plan, Claims and Equity Interests in Classes 4, 5, 7, and 10 are designated as Impaired under the Plan.   Specifically, Article III of the Plan specifies the treatment afforded to the Impaired Class of Claims (Class 4 First Lien Claims, Class 5 Second Lien Notes Claims, and 510(b) Claims) and the Impaired Class of Equity Interests (Class 10 Existing Parent Equity Interests).   In addition, the Plan specifies the treatment afforded to Claims and Equity Interests in Classes 8 and 9, which are either Unimpaired

---

[76]   The Debtors commenced a voluntary chapter 11 case; therefore, there are no "gap" period claims of the kind specified in Section 507(a)(3) of the Bankruptcy Code.

[77]   11 U.S.C. § 1123(a)(1).

[78]   *Id.* at § 1123(a)(2).

[79]   *Id.* at § 1123(a)(3).

or Impaired and not expected to receive any recovery on account of their Claims or Equity Interests, as applicable.

52.     <u>Same Treatment of Claims or Equity Interests Within Each Class – 11 U.S.C. § 1123(a)(4)</u>.  Section 1123(a)(4) of the Bankruptcy Code requires that the treatment of each claim or equity interest in each particular class be the same as the treatment of all other claims or equity interests in such class unless the holder of a particular claim or equity interest agrees to less favorable treatment.[80]  The Plan complies with Section 1123(a)(4) by ensuring that the treatment of each Claim or Equity Interest in each particular Class is the same as the treatment of all other Claims or Equity Interests in such Class unless the Holder of a particular Claim or Equity Interest has agreed to less favorable treatment with respect to such Claim or Equity Interest.

53.     <u>Adequate Means for Implementation of Plan – 11 U.S.C. § 1123(a)(5)</u>.  Section 1123(a)(5) of the Bankruptcy Code requires that a plan "provide adequate means for the plan's implementation," and gives several examples of what may constitute "adequate means."[81]  In

---

[80]   11 U.S.C. § 1123(a)(4).

[81]   *See id.* at § 1123(a)(5).  Section 1123(a)(5) requires a plan to provide for "adequate means" for the plan's implementation, "such as—

  (A) retention by the debtor of all or any part of the property of the estate;

  (B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;

  (C) merger or consolidation of the debtor with one or more persons;

  (D) sale of all or any part of property of the estate … among those having an interest in such property of the estate;

  (E) satisfaction or modification of any lien;

  (F) cancellation or modification of any indenture or similar instrument;

  (G) curing or waiving of any default;

  (H) extension of a maturity date or a change in an interest rate or other term of outstanding securities;

  (I) amendment of the debtor's charter; or

  (J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose."

accordance with Section 1123(a)(5) of the Bankruptcy Code, the Plan, including Article V of the Plan, provides adequate means for its implementation, including, among other things: (a) the continued corporate existence of the Debtors and the vesting of assets in the Reorganized Debtors under Articles V.B and V.C of the Plan; (b) the adoption of the New Governance Documents that will govern the Reorganized Debtors and the appointment of the initial board of directors of the Reorganized Debtors, as provided in Articles V.L and V.N of the Plan; (c) the issuance of the Plan Securities for distribution in accordance with the terms of the Plan, as detailed in Article V.F and V.H; (d) the entry by the Reorganized Debtors into the Exit Term Loan Facility Credit Documents, as detailed in Article V.D of the Plan; (e) the entry by the Reorganized Debtors into the Exit Securitization Program Documents, as detailed in Article V.E of the Plan; (f) the cancellation of all notes, stock, instruments, certificates, credit agreements and other agreements and documents evidencing or relating to the First Lien Claims, the Second Lien Notes Claims, any Impaired Claim and/or the Existing Parent Equity Interests to the extent provided in the Plan, *provided* that the First Lien Credit Documents and the Second Lien Notes Documents shall continue in effect for the limited purpose of allowing Holders of Claims thereunder to receive, and allowing and preserving the rights of the First Lien Agent and the Second Lien Indenture Trustee or other applicable Distribution Agent thereunder to make (or cause to be made), distributions under the Plan, as detailed in Article V.O of the Plan; (g) the release and discharge of all Liens, except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, as detailed in Article V.K of the Plan; (h) the preservation of certain causes of action by the Reorganized Debtors pursuant to Article V.Q of the Plan; (i) the various discharges, releases, injunctions, indemnifications and

exculpations provided in Article X of the Plan; (j) the process for implementation of the Management Incentive Plan, as described in Article V.I; and (k) the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases to which any Debtor is a party, as detailed in Article VI of the Plan.  Accordingly, the Plan provides adequate means for its implementation in a manner consistent with Section 1123(a)(5) of the Bankruptcy Code.

54.     <u>Prohibition on the Issuance of Nonvoting Equity Securities – 11 U.S.C. § 1123(a)(6)</u>.  Under Section 1123(a)(6) of the Bankruptcy Code, a plan must "provide for the inclusion in the charter of the debtor, if the debtor is a corporation, . . . of a provision prohibiting the issuance of nonvoting equity securities . . . ." 11 U.S.C. § 1123(a)(6).  Article V.L of the Plan provides that the New Governance Documents of the Debtors shall prohibit the issuance of non-voting equity securities.  Accordingly, the Plan complies with Section 1123(a)(6) of the Bankruptcy Code to the extent applicable.

55.     <u>Selection of Directors and Officers — 11 U.S.C. § 1123(a)(7)</u>.  Section 1123(a)(7) of the Bankruptcy Code provides that a plan shall "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."[82]

56.     In accordance with Section 1123(a)(7) of the Bankruptcy Code, the provisions of the Plan and the Reorganized Debtors' formation documents, bylaws and similar constituent documents, the manner of selection of officers and directors or managers, as appliable, of the Reorganized Debtors is consistent with the interests of creditors and equity security holders and with public policy.  Each of the insiders is compensated with an annual salary and the opportunity

---

[82]   *Id.* at § 1123(a)(7).

to earn additional awards through various incentive plans, as described in the Wages Motion and the Plan. [83]   In addition, as described in the Plan, the Reorganized Debtors will adopt the Management Incentive Plan after the Effective Date.   Accordingly, the Plan satisfies the requirements of Section 1123(a)(7) of the Bankruptcy Code.

> ### 3.   The Plan Complies With the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

57.   Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.[84]  Among other things, Section 1123(b) of the Bankruptcy Code provides that a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[85]

58.   The Plan is consistent with Section 1123(b) of the Bankruptcy Code.  Specifically, under Article III of the Plan, Classes 1, 2, 3, and 6 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of, or otherwise provides treatment in accordance with Section 1124 to, the Holders of Claims within such Classes.[86]  On the other hand, Classes 4, 5, 7 and 10 are Impaired because the Plan modifies the rights of the Holders of Claims

---

[83]   The "**Wages Motion**" means *Debtors' Emergency Motion for Entry of an Order (I) (A) Authorizing Payment of Certain Prepetition Workforce Obligations, Including Compensation, Expense Reimbursements, Benefits, and Related Obligations, (B) Confirming Right to Continue Workforce Programs on Postpetition Basis, (C) Authorizing Payment of Withholding and Payroll-Related Taxes, (D) Confirming the Debtors' Authority to Transmit Payroll Deductions, (E) Authorizing Payment of Prepetition Claims Owing to Administrators of Workforce Programs, and (II) Granting Related Relief* [Docket No. 22].

[84]   *See* 11 U.S.C. § 1123(b).

[85]   *See id.* at § 1123(b)(1)–(3), (6).

[86]   *See* Plan, Art. III.

or Equity Interests within such Classes as contemplated by Section 1123(b)(1) of the Bankruptcy Code.[87]   Additionally, Classes 8 and 9 are either Unimpaired or Impaired because the Plan provides that, at the option of the Debtors (with the consent of the Required Consenting First Lien Lenders and the reasonable consent of the Required Consenting Second Lien Noteholders), the legal, equitable, and contractual rights of such Claims and Equity Interests will either be unaltered or otherwise receive treatment in accordance with Section 1123(b) of the Bankruptcy Code, or be canceled and released in accordance with Section 1123(b) of the Bankruptcy Code.[88]

59.     Further, as permitted by Section 1123(b)(2) of the Bankruptcy Code, for the reasons set forth below, Article VI of the Plan provides for the assumption, subject to certain exceptions set forth in Article VI of the Plan, of all of the Debtors' executory contracts and unexpired leases pursuant to Section 365 of the Bankruptcy Code.[89]   Finally, for the reasons set forth below, the release, exculpation, and injunction provisions contained in Article X of the Plan are consistent with Section 1123(b) of the Bankruptcy Code.

    **4.**    **The Assumption or Rejection of Executory Contracts and Unexpired Leases Under the Plan Are Appropriate Pursuant to Section 365 and Section 1123(b)(2) of the Bankruptcy Code.**

60.     As set forth in Section 1123(b)(2) of the Bankruptcy Code, a plan may provide for the assumption, rejection or assignment of any executory contract or unexpired lease not previously rejected.[90]   Pursuant to Article VI of the Plan, and except as otherwise provided therein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan and the Plan Supplement, as of the Effective Date, each Debtor shall be

---

[87]   *See id.*

[88]   *See id.*

[89]   *See* Plan, Art. VI.

[90]   11 U.S.C. § 1123(b)(2).

deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party, unless such contract or lease: (a) was assumed or rejected by the Debtors by prior order of the Bankruptcy Court, (b) is the subject of a motion to reject filed by the Debtors pending on the Effective Date, (c) is identified as rejected Executory Contracts and Unexpired Leases by the Debtors on the Schedule of Rejected Executory Contracts and Unexpired Leases, which may be amended by the Debtors up to and through the Effective Date to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court a subsequent Plan Supplement and serving it on the affected non-Debtor contract parties, or (d) is rejected or terminated pursuant to the terms of the Plan.

61.     Subject to the payment of any Cure Claim, assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting assignment, the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before or on the date that the Debtors assume such Executory Contract or Unexpired Lease.  The Plan provides that entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

62.     Section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease."[91]   Courts routinely approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound

---

[91]   11 U.S.C. § 365(a).

business judgment.[92]  Indeed, courts recognize that to impose more exacting scrutiny than the business judgment standard would slow a debtor's reorganization, thereby increasing its cost and undermining the "Bankruptcy Code's provision for private control" of the estate's administration.[93]

63.     The assumption by the Debtors of their executory and postpetition contracts and unexpired leases in accordance with and subject to the terms and conditions of the Plan is both beneficial and necessary to the Debtors' and Reorganized Debtors' business operations upon and subsequent to emergence from chapter 11.[94]  The assumption of each of the executory and postpetition contracts and unexpired leases proposed to be assumed pursuant to Section 365 of the Bankruptcy Code and the Plan is a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors, their Estates and their creditors.[95]  Based upon, among other things, the Reorganized Debtors' anticipated financial wherewithal after the Effective Date, each Reorganized Debtor that is assuming an executory contract or unexpired lease pursuant to the Plan will be fully capable of performing under the terms and conditions of the respective contract or lease to be assumed or assumed and assigned on and after the Effective Date.[96]

---

[92]  *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) (recognizing business judgment standard); *NLRB v. Bildisco & Bildisco (In re Bildisco)*, 465 U.S. 513, 523 (1984) (same); *In re Eagle Bus. Mfg.*, 134 B.R. at 597 (confirming plan in which decisions regarding assumption or rejection of executory contracts and unexpired leases were based on sound business judgment and in best interests of the estate); *see also In re Idearc, Inc.*, 423 B.R. at 162 (citing *Lubrizol Enters., Inc. v. Richmond Metal Finishers (In re Richmond Metal Finishers, Inc.*), 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986) (for the proposition that courts will approve a debtor's assumption or rejection of an executory contract or unexpired lease unless evidence is presented that the debtor's decision to assume or reject was "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice")).

[93]  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

[94]  *See* Gray Declaration, ¶ 11.

[95]  *See id.*

[96]  *See id.*

64.     Finally, the assumption by the Debtors of (a) the Indemnification Provisions pursuant to Article VI.E of the Plan, (b) the Specified Employee Plans pursuant to Article VI.F of the Plan, (c) all the D&O Liability Insurance Policies pursuant to Article VI.D of the Plan, and (d) the Insurance Contracts pursuant to Article VI.G of the Plan is of fundamental importance to the Debtors' reorganization process, a sound exercise of the Debtors' business judgment, and in the best interest of the Debtors and their Estates.[97]

### 5.     Assumption of the Restructuring Support Agreement Is Appropriate.

65.     The Plan provides for the assumption of the Restructuring Support Agreement and for the payment of certain fees in consideration for the substantial commitments made thereunder.[98]  Specifically, pursuant to the Restructuring Support Agreement, the Debtors have agreed to pay the reasonable and documented fees and out-of-pocket expenses (including travel costs and expenses) of certain advisors to the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group (collectively, the "**Plan Supporters' Fees and Expenses**") in consideration for the various contributions and, in certain instances, material concessions made by the Ad Hoc Groups and Consenting Lenders under the Plan.[99]

66.     The Debtors' assumption of the Restructuring Support Agreement is integral to the Debtors' ability to effectuate the Restructuring Transactions contemplated by the Plan and to maximize value for all stakeholders.  The Plan Supporters' Fees and Expenses (i) were the subject of arm's-length and good faith negotiations between the Debtors and the Ad Hoc Groups and (ii) are integral components of the Restructuring Support Agreement and the Plan.[100]  The Ad Hoc

---

[97]   *See* Gray Declaration, ¶ 13.

[98]   *See* Plan, Art. V-R.

[99]   *See* Disclosure Statement, Ex. B.

[100]  *See* Evarts Declaration, ¶ 16-17.

Groups have spent substantial time and expense negotiating the Restructuring Transactions with the Debtors.  Moreover, the Consenting Lenders have agreed to make substantial contributions under the Plan, including, among other things, (a) compromising Claims and accepting Impaired recoveries, (b) participating in raising new money debt, including the DIP Facility and the Exit Term Loan Facility, and (c) negotiating and supporting the Restructuring Transactions that keep the Debtors' business intact and provide that General Unsecured Claims will be paid in full or otherwise Unimpaired.

### 6.    The Plan Complies With Section 1123(d) of the Bankruptcy Code.

67.    Section 365(b)(1) and Section 1123(b)(2) of the Bankruptcy Code provide that a debtor may not assume an executory contract or unexpired lease unless, among other things, it cures any defaults at the time of assumption.[101]  Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[102]

68.    The Plan complies with Section 1123(d) of the Bankruptcy Code.  Article VI.B of the Plan and the Proposed Confirmation Order provide for the satisfaction of any monetary amounts by which each Executory Contract and Unexpired Lease to be assumed is in default by payment of the default amount in Cash on the Effective Date on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree in accordance with Section 365(b)(1) of the Bankruptcy Code.

---

[101]  11 U.S.C. § 365(b)(1); 11 U.S.C. § 1123(b)(2).

[102]  11 U.S.C. § 1123(d).

### 7.   The Plan's Release, Exculpation, and Injunction Provisions Comply With the Bankruptcy Code.

69.     The Plan includes certain releases of the Debtors and third parties, an exculpation provision, and an injunction provision.  These provisions comply with the Bankruptcy Code and applicable law because, among other things, they are fair and equitable, are given for valuable consideration, are the product of extensive good faith, arm's-length negotiations, were a material inducement for parties to enter into the Restructuring Support Agreement, and are in the best interests of the Debtors and the Chapter 11 Cases.[103]  In addition, the Third Party Release contained in the Plan is consensual and consistent with Fifth Circuit precedent.  None of the release, exculpation, or injunction provisions are inconsistent with the Bankruptcy Code and, thus, the requirements of Section 1123(b) of the Bankruptcy Code are satisfied.

### a.   The Debtor Releases Comply With the Bankruptcy Code and Are Appropriate.

70.     Article X.B of the Plan provides for the Debtors to release the Released Parties, as contemplated by Section 1123(b)(3)(A) of the Bankruptcy Code.  Section 1123(b)(3)(A) provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[104]  Accordingly, pursuant to Section 1123(b)(3)(A), the Debtors may release estate causes of action as consideration for concessions made by its various stakeholders pursuant to the Plan.[105]  In considering the appropriateness of such releases, courts in the Fifth Circuit generally consider whether the release is (a) "fair and equitable" and (b) "in the

---

[103]  *See* Gray Declaration, ¶ 16; *see also* Meltzer Declaration, ¶¶ 12-24.

[104]  11 U.S.C. § 1123(b)(3)(A).

[105]  *See*, *e.g.*, *In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan"); *see also In re Heritage Org.*, *L.L.C.,* 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 737-39 (Bankr. N.D. Tex. 2006); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).

best interests of the estate."[106]  While courts sometimes conflate the two prongs of the foregoing analysis, the "fair and equitable" prong is generally interpreted, consistent with that term's usage in Section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy Code's absolute priority rule.[107]  Courts generally determine whether a release is "in the best interests of the estate" by reference to the following factors:

(a)   the probability of success of litigation;

(b)   the complexity and likely duration of the litigation, any attendant expense, inconvenience, or delay, and possible problems collecting a judgment;

(c)   the interest of creditors with proper deference to their reasonable views; and

(d)   the extent to which the settlement is truly the product of arm's-length negotiations.[108]

Ultimately, courts afford a debtor some discretion in determining for itself the appropriateness of granting plan releases of estate causes of action.[109]

71.    Article X.B of the Plan provides for a release by the Debtor Releasing Parties of any and all Causes of Action, including any derivative claims, that the Debtors could assert against the Released Parties[110] (the "**Debtor Release**").  The Debtor Release easily meets the controlling standard.  The Plan, including the Debtor Release, complies with the Bankruptcy Code's absolute

---

[106] *In re Mirant Corp.*, 348 B.R. at 738; *see also In re Heritage Org.*, 375 B.R. at 259.

[107] *In re Mirant Corp.*, 348 B.R. at 738.

[108] *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (citation omitted); *In re Mirant Corp.*, 348 B.R. at 739-40 (citing *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 355-56 (5th Cir. 1997)).

[109] *See In re Gen. Homes*, 134 B.R. at 861 ("The court concludes that such a release is within the discretion of the Debtor").

[110] "**Released Party**" means each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Lenders; (d) the First Lien Agent; (e) the Second Lien Indenture Trustee; (f) the DIP Agent; (g) the DIP Lenders; (h) the DIP Backstop Parties; (i) the Securitization Program Parties; (j) the Exit Backstop Parties; and (k) each Related Party of each Entity in clauses (a) through (j); *provided*, that any Entity that would otherwise be a "Released Party" that votes to reject this Plan, objects to this Plan, or objects to or opts out of the Third Party Release contained herein, shall not be a "Released Party."

priority rule because (a) Classes 1, 2, 3 and 6 are Unimpaired, (b) Classes 4 and 5 have voted to accept the Plan, (c) the Holders of Claims and Equity Interests in Classes 8 and 9 are Affiliates and/or party to the Restructuring Support Agreement, pursuant to which they agreed to support the Plan, and (d) with respect to Holders of Claims and Equity Interests in Classes 7 and 10, no Holder of a Claim or Equity Interest junior to Holders in Classes 7 and 10 will receive or retain on account of such Claims or Equity Interests any property under the Plan.[111]  Therefore, the releases are "fair and equitable" to all Classes.[112]

72.    In addition to being fair and equitable, the Debtor Release is in the best interest of the Estates.[113]  Based on their review, the Debtors are not aware of any claims being released that might reasonably be expected to yield value for their Estates.  Moreover, each Released Party has played an integral role in the Chapter 11 Cases, made substantial concessions that underpin the consensual resolution of the Chapter 11 Cases that will allow the Debtors to expeditiously exit bankruptcy with a de-leveraged capital structure, and/or may be unwilling to support the Plan without the Debtor Release.[114]  In addition, the Plan, including the Debtor Release, was negotiated by sophisticated entities that were represented by able counsel and financial advisors. [115]

---

[111] Claims in Class 7 (510(b) Claims) are subordinated under Section 510(b) of the Bankruptcy Code "to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock."  *See* 11 U.S.C. § 510(b).

[112] *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) ("[T]he absolute priority rule provides that a *dissenting class* of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.") (internal citation omitted) (emphasis added); *see also In re Mirant Corp.*, 348 B.R. at 738 ("Because 'fair and equitable' translates to the absolute priority rule, in order for a settlement to meet that test it must be consistent with the requirement that *dissenting classes* of creditors must be fully satisfied before any junior creditor receives anything on account of its claim") (emphasis added).

[113] *See* Gray Declaration, ¶ 17.

[114] *See id.*; *see also Matter of Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995) ("While the desires of the creditors are not binding, a court 'should carefully consider the wishes of the majority of the creditors.'") (citing *In re Transcon. Energy Corp.*, 764 F.2d 1296 (9th Cir. 1985)).

[115] *See* Gray Declaration, ¶ 16.

Accordingly, the Debtor Release is fair, equitable, and in the best interests of the Estates, is justified under the controlling Fifth Circuit standard, and should be approved.

> **b.  The Consensual Third-Party Releases Comply With the Bankruptcy Code and Are Appropriate.**

73.    The third-party release provision contained in Article X.B of the Plan provides that each Non-Debtor Releasing Party, including (a) the Consenting Lenders; (b) the First Lien Agent; (c) the Second Lien Indenture Trustee; (d) the DIP Agent; (e) the DIP Lenders; (f) the DIP Backstop Parties; (g) the Exit Backstop Parties; (h) the Securitization Program Parties; (i) the Distribution Agents; (j) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third Party Release as provided on its respective ballot; (k) each Holder of a Claim or Equity Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third Party Release as provided on its respective Release Opt Out Form; and (l) each Related Party of each Entity in clauses (a) through (k), is deemed to release each of the Released Parties and their respective assets and properties (the "**Third Party Release**"), as more fully set forth in the Plan.  Third party releases are justified and in conformity with Fifth Circuit precedent when the release is *consensual*.[116]  Indeed, as noted by a bankruptcy court in this Circuit, "most courts allow consensual nondebtor releases to be included in a plan."[117]  Here, the solicitation process gave, and the Plan expressly allows for, the ability of affected parties in interest to object to or opt out

---

[116] *See, e.g.*, *In re CJ Holding Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit does not preclude bankruptcy courts from approving a 'consensual non-debtor release.'  Bankruptcy courts within the Fifth Circuit commonly exercise jurisdiction to approve nonparty releases based on agreed plans."); *See also In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701-02 (Bankr. W.D. Tex.  2011) ("the Fifth Circuit does allow permanent injunctions *so long as there is consent*") (emphasis in original).  The Debtors acknowledge the line of decisions from the United States Court of Appeals for the Fifth Circuit that limit or prohibit third party releases.  However, as set forth in such decisions, such limitation applies to *nonconsensual* third party releases.  *See Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de C.V. (In re Vitro S.A.B. de C.V.)*, 701 F.3d 1031, 1059 (5th Cir. 2012); *Bank of New York Trust Co. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009); *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760-61 (5th Cir. 1995).

[117] *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007).

of the Third Party Release.  Accordingly, the Third Party Release is appropriate under Fifth Circuit precedent as consensual third-party releases.

74.    While the Fifth Circuit has not directly defined what constitutes a consensual third party release, this Court has held that a claimant who received notice of the debtor's chapter 11 filing and the proposed plan, which included a third-party release, but failed to object to the plan, was deemed to have consented to the third-party release.[118]  The Fifth Circuit has also shed light on the issue through a series of decisions addressing the *res judicata* effect of a confirmed chapter 11 plan that contains a third party release provision.[119]  For example, in *Republic Supply*, the Fifth Circuit found that the Bankruptcy Code does not preclude a third party release provision where "it has been accepted and confirmed as an integral part of a plan of reorganization,"[120] and ultimately held that such provision was binding and enforceable.[121]  The Fifth Circuit addressed the same issue on three occasions thereafter, analyzing the specificity of the third party release to determine its *res judicata* effect.[122]  *Republic Supply* and its Fifth Circuit progeny ultimately stand for the proposition that "[c]onsensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate" the Bankruptcy Code.[123]  This rule is consistent with the theory that "[t]he validity of a consensual release is primarily a

---

[118] *See, e.g.*, *In re CJ Holding*, 597 B.R. at 609 (holding that a claimant who failed to object to confirmation of the plan consented to the plan and the third-party releases contained therein).

[119] *See Hernandez v. Larry Miller Roofing, Inc.*, 628 Fed. App'x 281, 286-88 (5th Cir. 2016); *FOM Puerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*, 255 Fed. App'x 909, 911-12 (5th Cir. 2007); *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 919 (5th Cir. 2000); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987).

[120] *Republic Supply*, 815 F.2d at 1050.

[121] *Id.* at 1053.

[122] *See generally Hernandez*, 628 Fed. App'x. 281 (comparing the specificity of the third-party release provisions at issue in *Republic Supply*, *Applewood*, and *Dr. Barnes Eyecenter*).

[123] *In re Wool Growers*, 371 B.R. at 776 (citing *Republic Supply*, 815 F.2d at 1050; *FOM Puerto Rico*, 255 Fed. App'x at 911-12).

question of contract law because such releases are no different from any other settlement or contract."[124]

75.     Bankruptcy courts in the Fifth Circuit have applied this standard in recent chapter 11 bankruptcies when approving third party releases.  In doing so, these courts have focused on *process*—i.e., whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look it over [and] the disclosure is adequate so that they can actually understanding [*sic*] what they're being asked to do and the options that they're being given."[125]

76.     The Third Party Release meets the *Republic Supply* standard.  First, the Third Party Release is consensual.  As set forth above, parties in interest were provided fair and extensive notice of the Chapter 11 Cases, the Plan (including the Third Party Release), and the deadline to object to confirmation of the Plan and related releases.  Further, all Holders of Claims in Voting Classes were entitled to vote on the Plan and provided with an opportunity to opt out of the Third Party Release on their respective Ballots, and all Non-Voting Holders were provided with an opportunity to opt out of the Third Party Release on the Release Opt Out Form included with the Notice of Non-Voting Status and Opt Out Opportunity.  Any Holders in Voting Classes or Non-Voting Classes that timely exercised a valid opt out will not be included in the Third Party Release.

---

[124] *Id.* at 775 (*citations omitted*).

[125] Conf. Hr'g Tr. at 47, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. April 21, 2016) [Docket No. 730] (approving third-party releases as consensual, over objection of the U.S. Trustee, in light of sufficient notice and opportunity to object); *see also In re GenOn Energy, Inc.*, No. 17-33695 (DRJ), 2019 WL 13192461 (Bankr. S.D. Tex. Aug. 14, 2019) (approving third-party releases as consensual over objections from parties in interest, including U.S. Trustee).  Further, the Procedures for Complex Cases in the Southern District of Texas (the "**Complex Case Procedures**"), in an effort to ensure proper notice and an opportunity to object, provide: "If a proposed plan seeks consensual pre- or post-petition releases with respect to claims that creditors may hold against non-debtor parties, then a ballot must be sent to creditors entitled to vote on the proposed plan and notices must be sent to non-voting creditors and parties-in-interest.  The ballot and the notice must inform the creditors of such releases and provide a box to check to indicate assent or opposition to such consensual releases together with a method for returning the ballot or notice."  Complex Case Procedures, ¶ 40.  The Debtors compliance with paragraph 40 of the Complex Case Procedures further evidences that parties received the requisite notice and were provided adequate disclosure.

77.     Second, the language in the Third Party Release is sufficiently specific so as to put the Releasing Parties on notice of the Released Claims.   Indeed, similar language has been approved by this Court.[126]

78.     Third, the Third Party Release is integral to the Plan and a condition to the global settlement embodied therein.   As described above and in the Gray Declaration, the provisions of the Plan and Restructuring Support Agreement, including the Third Party Release, were vigorously negotiated among the Debtors and their key stakeholders prior to the Petition Date, and such parties may be unwilling to support the Plan without the Third Party Release.[127]   Indeed, the Restructuring Term Sheet attached to the Restructuring Support Agreement, which set forth the global settlement embodied in the Plan, required that the parties would incorporate release provisions into the Plan.[128]

79.     Fourth, the Third Party Release is to be provided in exchange for significant consideration.   The Debtors' creditors benefit from the Restructuring Transactions contemplated by Restructuring Support Agreement and the Plan—including the distributions under the Plan and the elimination of approximately $1.6 billion of prepetition funded debt—which will allow the Debtors to emerge as reorganized entities to the benefit of the Debtors' employees, vendors, and commercial counterparties.   That accomplishment is a direct result of the significant contributions of and, in some cases, material concessions made by the Released Parties.   Such substantial contributions include, among other things, (a) compromising Claims and accepting Impaired

---

[126] This Court has approved substantially similar third-party releases.  *See In re Ill. Power Generating Co.*, No. 16-36326 (Bankr. S.D. Tex. Jan. 25, 2017) (confirmation order); *Sundance Energy Inc.*, No. 21-30882 (Bankr. S.D. Tex. April 19, 2021) (confirmation order); *Monitronics Int'l, Inc.*, No. 23-90332 (Bankr. S.D. Tex. June 26, 2023) (confirmation order).

[127] *See* Gray Declaration, ¶¶ 15-16.

[128] *See* Disclosure Statement, Ex. B.

recoveries, (b) participating in raising and backstopping new money debt, (c) permitting the use of encumbered assets and cash collateral during the Chapter 11 Cases, (d) negotiating and supporting the Plan, and (e) in the case of the Debtors' directors, officers, and employees, their immense efforts on behalf of the Debtors both prior to and throughout the Chapter 11 Cases.[129]

80.    The Ad Hoc Groups engaged with the Debtors in extensive negotiations in good faith and spent many months working with the Debtors to develop and implement a value-maximizing restructuring, culminating with the upcoming hearing on confirmation of the Plan.[130] Under the Restructuring Support Agreement, the DIP Lenders agreed to provide the Debtors with liquidity to fund the Chapter 11 Cases through a $32 million new money DIP Facility backstopped by certain members of the Ad Hoc First Lien Group.[131]  In addition, the DIP Lenders will have the option to convert their DIP Loans into First-Out Exit Term Loans with a maturity date that is four years following the Effective Date, which, together with the DIP Facility, are essential components of the Debtors' restructuring.[132]  In short, the contributions and efforts of the Released Parties in formulating the Plan have allowed the Debtors to achieve a value-maximizing outcome and strongly support approval of the Third Party Release.

81.    Finally, courts have held that creditors who fail to return their ballot, or are not entitled to vote because they are unimpaired, have demonstrated their consent to third party releases contained in a plan, and can thus be bound by such releases.[133]  Here, the Plan goes further

---

[129]  *See* Gray Declaration, ¶ 17.

[130]  *See id.* at ¶ 6.

[131]  *See id.* at ¶ 22.

[132]  *See* Evarts Declaration, ¶ 13.

[133]  In *In re Indianapolis Downs, LLC*, the court confirmed a plan that provided that creditors were deemed to have consented to the plan's third party release provisions where: (a) the creditor voted to reject or accept the plan and failed to "opt-out"; (b) the creditor failed to return his/her ballot; or (c) the creditor's claims were unimpaired, and therefore, were not entitled to vote.  *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013); *see*

by providing (i) Holders of Claims and Equity Interests in Voting Classes with the opportunity to opt out of the Third Party Release by indicating their election to opt out on their Ballot and (ii) Holders of Claims and Equity Interests in Non-Voting Classes with the opportunity to opt out of the Third Party Release by indicating their election to opt out on the Release Opt Out Form. Thus, only Holders of Claims and Equity Interests who do not opt out of the Third Party Release will be deemed to have released the Released Parties pursuant to the Plan.

### c.   The Exculpation Provision Complies With the Bankruptcy Code and is Appropriate.

82.     Article X.E of the Plan provides that each Exculpated Party—*i.e.*, the Debtors— shall be released and exculpated from any Exculpated Claim,[134] obligation, Cause of Action or liability for any Exculpated Claim, except for fraud, gross negligence, willful misconduct or criminal conduct (the "**Exculpation Provision**").  The Exculpation Provision limits the liability of Exculpated Parties to a standard of care of fraud, gross negligence, willful misconduct or criminal conduct in hypothetical future litigation against an Exculpated Party for acts arising out of the Debtors' restructuring.[135]  A bankruptcy court may approve an exculpation provision in a

---

*also In re Conseco Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) (finding a release provision binding unimpaired creditors who abstained from voting on the plan and did not otherwise opt out to be consensual).

[134] "**Exculpated Claim**" means any Claim arising from and after the Petition Date and prior to the Effective Date related to any act or omission in connection with, relating to or arising out of the Debtors' in- or out-of-court restructuring efforts, the Debtors' Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing of the Restructuring Support Agreement, the Disclosure Statement or the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement or the Plan (including related to the DIP Facility, the Postpetition Securitization Program, the Exit Term Loan Facility, the Exit Securitization Program, and the Plan Securities), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Plan Securities or the distribution of property under the Plan or any other agreement; provided that Exculpated Claims shall not include: (i) any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, criminal conduct or fraud, and/or (ii) the rights of any Entity to enforce the Plan and the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court.  Plan, Art. I-D.

[135] *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000).

chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[136]  As such, an exculpation provision represents a legal conclusion resulting from certain findings a bankruptcy court must reach in confirming a plan.[137]  Once the court makes its good faith finding, it is appropriate to set the standard of care of the fiduciaries involved in the formulation of that chapter 11 plan.[138]  Exculpation provisions appropriately prevent future collateral attacks against the Debtors.  Accordingly, the Exculpation Provision in the Plan is appropriate because it provides protection to the Debtors, who served as fiduciaries during the restructuring process.

83.     The Exculpation Provision is an integral component of the global settlement embodied in the Plan and is the product of good faith, arm's-length negotiations.[139]  The Exculpation Provision is narrowly tailored to the Debtors, excludes acts of fraud, willful misconduct, gross negligence, and criminal conduct, and relates only to acts or omissions in connection with or arising out of the administration of the Chapter 11 Cases.  Accordingly, the Debtors respectfully submit that the Exculpation Provision should be approved.

### d.     The Injunction Provision Complies With the Bankruptcy Code and is Appropriate.

84.     The injunction provision set forth in Article X.F of the Plan (the "**Injunction Provision**") implements the Plan's discharge, release, and exculpation provisions, in part, by permanently enjoining all Persons from commencing or maintaining any action against the Debtors or the Reorganized Debtors on account of or in connection with or with respect to any Claims or

---

[136] *See* 11 U.S.C. § 1129(a)(3).

[137] *See* 11 U.S.C. § 157(b)(2)(L); *see also* 11 U.S.C. § 1129(a)(3).

[138] *In re PWS Holding*, 228 F.3d at 246 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity" for actions within the scope of their duties).

[139] *See* Gray Declaration, ¶¶ 15-16; *see also* Meltzer Declaration, ¶ 21.

Equity Interests discharged, released, exculpated, or settled under the Plan. Thus, the Injunction Provision is a key provision of the Plan. Accordingly, to the extent the Court finds that the Plan's exculpation and release provisions are appropriate, the Injunction Provision should be approved.[140]

85.     In addition, the Plan provides for a "gatekeeper" provision to implement the Plan's exculpation and release provisions. Specifically, Article X.F of the Plan provides that in order for any Person or Entity to commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of Claims or Causes of Action subject to the Debtor Release, the Third Party Release, or Exculpation, the Court must (a) first determine, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (b) specifically authorize such Person or Entity to bring such Claim or Cause of Action against any of the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties (the "**Gatekeeping Provision**"). The Gatekeeping Provision is consistent with the one authorized in *In re Highland Capital* and recent confirmations in this district.[141] In addition, the Gatekeeping Provision is limited to parties which have performed valuable services in connection with the Debtors' restructuring, including negotiating and supporting the Restructuring Support Agreement, the

---

[140] *See*, *e.g.*, *In re Camp Arrowhead*, 451 B.R. at 701-02 ("[T]he Fifth Circuit does allow permanent injunctions *so long as there is consent*. Without an objection, this court was entitled to rely on . . . silence to infer consent at the confirmation hearing.") (citing *In re Pacific Lumber*, 584 F.3d at 253; *In re Pilgrim's Pride Corp*, No. 08–45664–DML–11, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan. 14, 2010)).

[141] *See*, *e.g.*, *NexPoint Advisors, L.P., et al. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419, 437–38 (5th Cir. 2022); *see also Order Approving the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization of Pipeline Health System, LLC and Its Debtor Affiliates (Technical Modifications)*, ¶¶ 44–45, *In re Pipeline Health Sys., LLC*, No. 22-90291 (MI) (Bankr. S.D. Tex. Jan. 13, 2023) [Docket No. 1041]; *Findings of Fact, Conclusions of Law, and Order Confirming Joint Chapter 11 Plan of Talen Energy Supply, LLC and its Affiliated Debtors*, ¶ 37, *In re Talen Energy Supply, LLC, et al.*, Case No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 15, 2022) [Docket No. 1760]; *Order Approving the Debtors' Disclosure Statement and Confirming the Joint Chapter 11 Plan of Reorganization of Altera Infrastructure L.P. and its Debtor Affiliates*, ¶ 43, *In re Altera Infrastructure L.P.*, Case No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) [Docket No. 533].

Plan, the DIP Facility, the Exit Securitization Program, and the Exit Term Loan Facility, among other aspects of the Restructuring Transactions.  The value-maximizing outcome set forth in the Plan is a direct result of the efforts of the Debtors, the Reorganized Debtors, and the Released Parties.  Accordingly, the Gatekeeper Provision is appropriate and should be approved.

### B.  The Debtors Have Complied With the Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(2).

86.     Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a plan comply "with the applicable provisions of this title."[142]  Whereas Section 1129(a)(1) of the Bankruptcy Code focuses on the form and content of a plan itself, Section 1129(a)(2) is concerned with the applicable activities of a plan proponent under the Bankruptcy Code.[143]  In determining whether a plan proponent has complied with this section, courts focus on whether the proponent has adhered to the disclosure and solicitation requirements of Sections 1125 and 1126 of the Bankruptcy Code.[144]

87.     As set forth above and as evidenced by the Kjontvedt Declaration and the Certificates of Service, the Debtors have complied with all solicitation and disclosure requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order governing notice, disclosure, and solicitation in connection with the Plan and the Disclosure Statement.  In addition, the Debtors and their professionals acted in good faith in all respects in

---

[142]  11 U.S.C. § 1129(a)(2).

[143]  *See* 7 Collier on Bankruptcy ¶ 1129.02[2] (Richard Levin & Henry J. Sommer eds., 16th ed.).

[144]  The legislative history to Section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under Sections 1125 and 1126.  H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").

connection with the solicitation of votes on the Plan and the tabulation of such votes.  Accordingly, the requirements of Section 1129(a)(2) of the Bankruptcy Code have been satisfied.[145]

### C.     The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law – 11 U.S.C. § 1129(a)(3).

88.     Section 1129(a)(3) of the Bankruptcy Code provides that the Court shall confirm a plan of reorganization only if the plan has been "proposed in good faith and not by any means forbidden by law."[146]  Section 1129(a)(3) does not define good faith, but it is generally held that a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.[147]  "The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a [c]hapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."[148]  The plan proponent must also show that the plan has not been proposed by any means forbidden by law and that the plan has a reasonable likelihood of success.[149]

---

[145] *See In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 769 (Bankr. S.D.N.Y. 1992) (holding Section 1129(a)(2) satisfied where debtors complied with all provisions of Bankruptcy Code and Bankruptcy Rules governing notice, disclosure and solicitation relating to Plan).

[146] 11 U.S.C. § 1129(a)(3).

[147] *See Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997).

[148] *In re Cajun Elec. Power Coop.*, 150 F.3d at 519 (quoting *In re T-H New Orleans*, 116 F.3d at 802; *see also Brite v. Sun Country Dev. (In re Sun Country Dev.)*, 764 F.2d 406, 408 (5th Cir. 1985); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) ("The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code'" (citations omitted)).

[149] *See In re T-H New Orleans*, 116 F.3d at 802 (finding that a court may only confirm a plan for reorganization if the plan has been proposed in good faith and not by any means forbidden by law and that where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of [S]ection 1129(a)(3) is satisfied); *see also In re Food City, Inc.*, 110 B.R. 808, 810 (Bankr. W.D. Tex. 1990) (explaining that the term "law" as used in this section, includes state law, and applies not to the substantive provision of a plan itself but rather to the means employed in proposing a plan).

89.     The objectives and purposes of the Bankruptcy Code, and chapter 11 reorganization in particular, have been described by the United States Supreme Court as follows: "to revive the debtors' businesses and thereby preserve jobs and protect investors" and to "maximiz[e] the value of the bankruptcy estate;"[150] "to permit successful rehabilitation of debtors;"[151] and "to provide jobs, to satisfy creditors' claims, and to produce a return for [debtors'] owners."[152]  These opinions recognize the primary legislative goal of rehabilitating viable businesses.[153]

90.     The Plan accomplishes this goal in the Chapter 11 Cases by providing the means by which the Reorganized Debtors may continue to operate as viable entities.  The Debtors filed the Chapter 11 Cases to preserve the going concern value of their business and to maximize the value of their Estates.  The Plan is the culmination of the Debtors' efforts and the product of extensive negotiations between and among the Debtors and the Ad Hoc Groups, and it provides a mechanism for preserving the going-concern value of the Debtors through emergence from chapter 11.  In addition, the Plan provides for the continued employment of the Debtors' employees and a full recovery to general unsecured creditors.

91.     As will be further demonstrated at the Combined Hearing, the Debtors satisfy the good faith requirement of Section 1129(a)(3) of the Bankruptcy Code.  The Debtors proposed the Plan with the legitimate and honest purpose of reorganizing a company burdened by an unsustainable debt load.  The terms of the Plan were negotiated in good faith with the Ad Hoc Groups and their respective advisors and achieve an outcome that is fundamentally fair to all

---

[150] *Toibb v. Radloff*, 501 U.S. 157, 163 (1991).

[151] *In re Bildisco*, 465 U.S. at 527.

[152] *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203 (1983).

[153] *See In re Bildisco*, 465 U.S. at 528.

stakeholders.  Indeed, the broad-based and near-unanimous support behind the Plan speaks to the good faith of the parties involved and the fairness of the Plan.

> **D.   The Plan Provides That Payments Made by the Debtors for Services or Costs and Expenses Are Subject to Approval – 11 U.S.C. § 1129(a)(4).**

92.      Section 1129(a)(4) of the Bankruptcy Code provides that the Court shall confirm a plan only if "[a]ny payment made or to be made by the proponent, [or] by the debtor, . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."[154]   In other words, the debtor must disclose to the court all professional fees and expenses, and such professional fees and expenses must be subject to court approval.[155]

93.      In accordance with Section 1129(a)(4) of the Bankruptcy Code, no payment for services or costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incidental to the Chapter 11 Cases, including Claims for professional fees, has been or will be made by any Debtor other than payments that have been authorized by order of the Bankruptcy Court.  Article II.A of the Plan provides for the payment of various Administrative Claims, including Professional Fee Claims, which are subject to Court approval and the standards of the Bankruptcy Code.  Accordingly, the provisions in the Plan comply with Section 1129(a)(4) of the Bankruptcy Code.

---

[154]  11 U.S.C. § 1129(a)(4).

[155]  *See In re Cajun Elec. Power Coop.*, 150 F.3d at 514-15 (concluding that Section 1129(a)(4) is designed to assure payments for professional services are subject to the bankruptcy court's approval and determination of reasonableness); *see also In re McCommas LFG Processing Partners, LP*, Nos. 07–32222–HDH–11, 07–32219–DHD–11, 2007 Bankr. LEXIS 4053, at *45 (Bankr. N.D. Tex. Nov. 29, 2007).

E.      **The Debtors Have Disclosed All Necessary Information Regarding the Debtors' Directors and Officers and Insiders – 11 U.S.C. § 1129(a)(5).**

94.     Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor.[156] Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by Section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[157] In addition, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[158] Section 1129(a)(5)(A)(ii) directs the Court to ensure that the post-confirmation governance of the Reorganized Debtors is in "good hands," which courts have interpreted to mean: (a) that management has experience in the reorganized debtor's business and industry;[159] (b) that management has experience in financial and management matters;[160] (c) that the debtor and creditors believe control of the entity by the proposed individuals will be beneficial;[161] and (d) that the post-confirmation governance does not "perpetuate[] incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor."[162] The "public

---

[156] *See* 11 U.S.C. § 1129(a)(5)(A)(i).

[157] *See id.* at § 1129(a)(5)(B).

[158] *See id.* at § 1129(a)(5)(A)(ii).

[159] *See In re Rusty Jones, Inc.*, 110 B.R. 362, 372, 375 (Bankr. N.D. Ill. 1990) (stating that 1129(a)(5) was not satisfied where management had no experience in the debtor's line of business); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149-50 (Bankr. S.D.N.Y. 1984) (continuation of debtors' president and founder, who had many years of experience in the debtors' businesses, satisfied Section 1129(a)(5)).

[160] *See In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992); *In re Sherwood Square Assoc.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989).

[161] *See In re Landing Assocs.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors"); *see also In re Apex Oil Co.*, 118 B.R. 683, 704-05 (Bankr. E.D. Mo. 1990).

[162] *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).

policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[163]

95.     The Debtors have satisfied Section 1129(a)(5) of the Bankruptcy Code.   In instances where specific individuals are not yet known, the Debtors have disclosed the process by which the applicable directors will be selected.[164]   The Debtors believe control of the Reorganized Debtors by the proposed individuals or individuals to be appointed in accordance with the Plan and New Governance Documents will be consistent with public policy.   In addition, the Debtors have proposed that the existing officers of the Debtors remain in their current capacities as officers of the Reorganized Debtors and serve pursuant to the New Governance Documents and such officers' respective employment agreements.[165]   The Debtors' existing officers have at all times proceeded in good faith and with diligence and care in connection with the Chapter 11 Cases. Accordingly, it is reasonable to continue such officers' employment post-emergence.   Moreover, the proposed managers and officers of the Reorganized Debtors have significant knowledge and business and industry experience and will give the Reorganized Debtors continuity in running their business.   Therefore, the requirements under Section 1129(a)(5) of the Bankruptcy Code are satisfied.

F.     **The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission – 11 U.S.C. § 1129(a)(6).**

96.     Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by a reorganized debtor in the operation of its business approve any rate change provided for in the plan.   The Plan does not provide for any

---

[163] 7 Collier on Bankruptcy ¶ 1129.02[5][b] (Richard Levin & Henry J. Sommer eds., 16th ed.).

[164] *See* Disclosure Statement, Ex. B.

[165] *See* Disclosure Statement, Ex. B; *see also* Plan, Art. V-I.F.

rate changes over which a governmental regulatory commission has jurisdiction.  As a result, the requirements of Section 1129(a)(6) of the Bankruptcy Code have been satisfied.

### G.    The Plan is in the Best Interests of Creditors – 11 U.S.C. § 1129(a)(7).

97.    Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and equity holders.  This "best interests" test focuses on individual dissenting creditors, rather than classes of claims.[166]  The best interests test requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.[167]

98.    As Section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to non-accepting holders of impaired claims or equity interests.[168]  If a class of claims or equity interests unanimously approves the plan, the best interests test is deemed satisfied for all members of that class.[169]  Under the Plan, Claims in Classes 4 and 5 are Impaired and allowed to vote on the Plan.  The Plan was accepted by (a) 100% in amount of the Class 4 First Lien Claims that voted and 100% in number of Holders of Class 4 First Lien Claims that voted and (b) 100% in amount of the Class 5 Second Lien Notes Claims that voted and 100% in number of Holders of Class 5 Second Lien Notes Claims that voted.[170]  As such, the Liquidation Analysis establishes (as described therein) that the best interests test is satisfied as to each Classes 4 and 5.

---

[166] *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

[167] 11 U.S.C. § 1129(a)(7).

[168] *See id.*

[169] *In re Drexel Burnham Lambert*, 138 B.R. at 761; *see also In re Star Ambulance Serv., LLC*, 540 B.R. 251, 264 (Bankr. S.D. Tex. 2015).

[170] *See* Kjontvedt Declaration.

99.     In addition, based on the liquidation analysis performed by FTI Consulting, Inc. ("**FTI**"), financial advisor to the Debtors, and annexed to the Disclosure Statement as <u>Exhibit D</u> (the "**Liquidation Analysis**"), including the methodology used and estimations and assumptions made therein, it is clear that the best interests test is satisfied as to all Impaired Classes of Claims and Equity Interests, including those in Classes 4, 5, 7, 8, 9 and 10.   Specifically, a chapter 7 liquidation of the Debtors' Estates would result in a substantial loss of value otherwise available to Holders of Claims in Classes 4 and 5 when compared to the proposed distributions under the Plan.[171]   In addition, Claims and Equity Interests in Classes 7, 8, 9 and 10 would not receive or retain more value if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.   Thus, the Plan satisfies the best interests test.

> **H.     The Plan Has Been Accepted by Each Impaired Voting Class – 11 U.S.C. § 1129(a)(8).**

100.     Subject to the exceptions identified in Section 1129(b) of the Bankruptcy Code, Section 1129(a)(8) requires that each class of claims and interests either accept or be unimpaired under the plan of reorganization.   A class of claims or interests that is not impaired under a plan is "conclusively presumed" to have accepted the plan and need not be further examined under Section 1129(a)(8).[172]   As relevant here, a class of claims accepts a plan if the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in the number of claims in the class vote to accept the plan, counting only those claims whose holders actually vote to accept or reject the plan.[173]

---

[171]  *See* Disclosure Statement, Ex. D.

[172]  *See* 11 U.S.C. § 1126(f).

[173]  11 U.S.C. § 1126(c).

101.     As set forth in Article III of the Plan, Classes 1, 2, 3, and 6 are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  The Impaired Classes of Claims and Equity Interests entitled to vote to accept or reject the Plan—Class 4 (First Lien Claims) and Class 5 (Second Lien Notes Claims)— have voted overwhelmingly to accept the Plan pursuant to Section 1126(c) of the Bankruptcy Code.[174]  However, Classes 7 and 10 are Impaired and deemed to reject the Plan, and Classes 8 and 9 are either Unimpaired and presumed to accept the Plan or Impaired and deemed to reject the Plan.  Thus, the Plan does not satisfy Section 1129(a)(8) of the Bankruptcy Code with respect to Classes 7 and 10, and Classes 8 and 9 to the extent they are Impaired.  Notwithstanding, the Plan is confirmable because, as discussed below, the Plan satisfies Section 1129(b) of the Bankruptcy Code with respect to such Classes.

**I.      The Plan Provides for Payment in Full of All Allowed Priority Claims – 11 U.S.C. § 1129(a)(9).**

102.     The Plan satisfies the requirements of Section 1129(a)(9) of the Bankruptcy Code, which requires that persons holding priority claims under the Bankruptcy Code receive specified

---

[174] *See* Kjontvedt Declaration.

cash payments.[175]  The treatment of Administrative Claims (other than DIP Claims) (Article II.A),

Postpetition Securitization Program Claims (Article II.B), DIP Claims (Article II.C), Priority Tax

Claims (Article II.D), and Statutory Fees (Article II.E) under the Plan is, in each case, consistent

with Section 1129(a)(9) of the Bankruptcy Code.

**J.       At Least One Impaired Class Has Accepted the Plan – 11 U.S.C. § 1129(a)(10).**

103.     In general, Section 1129(a)(10) requires that to the extent there is a class of

impaired claims under the Plan that at least one impaired class of claims must accept the plan,

excluding the votes of any insiders.[176]  As shown in the Kjontvedt Declaration, Class 4 and Class 5

voted unanimously to accept the Plan.[177]  As such, at least one impaired class of claims has voted

in sufficient number and amount to accept the Plan, without regard to the votes of insiders.

Accordingly, the Plan satisfies Section 1129(a)(10) of the Bankruptcy Code.

**K.       The Plan is Feasible – 11 U.S.C. § 1129(a)(11).**

104.     Pursuant to Section 1129(a)(11) of the Bankruptcy Code, a plan of reorganization

may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation,

---

[175] 11 U.S.C. § 1129(a)(9).  Under Section 1129(a)(9), unless otherwise agreed, a plan must provide that:

(A)   the holder of a claim entitled to priority under section 507(a)(2) or 507(a)(3) will receive cash for the allowed amount of the claims on the effective date of the plan;

(B)   the holder of a claim entitled to priority under section 507(a)(1), (4), (5), (6), or (7) will receive either deferred cash payments for the allowed amount or cash for the allowed amount for the claim on the effective date of the plan;

(C)   the holder of a tax claim entitled to priority under section 507(a)(8) will receive regular installment payments in cash (i) of the total value, as of the effective date of the plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order of relief under section 301, 302, or 303; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

(D)   the holder of a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, will receive cash payments on account of that claim in the same manner and over the same period, as prescribed in subparagraph (C).

[176] 11 U.S.C. § 1129(a)(10).

[177] *See* Kjontvedt Declaration.

or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[178]  As described below, the Plan is feasible under Section 1129(a)(11) of the Bankruptcy Code.

105.    To establish that a plan is feasible, "the [bankruptcy] court need not require a guarantee of success . . . [o]nly a reasonable assurance of commercial viability is required."[179]  Indeed, "[a]ll the bankruptcy court must find is that the plan offer[s] 'a reasonable probability of success.'"[180]  While the debtor bears the burden of proving plan feasibility, the applicable standard is by a preponderance of the evidence, which means presenting proof that a given fact is "more likely than not."[181]  The courts have fashioned a series of factors that may be considered in the determination of whether a debtor's plan is feasible.  These factors, while varying from case to case, traditionally include: (a) the adequacy of the debtor's capital structure, (b) the earning power of its business, (c) economic conditions, (d) the abilities of the debtor's management, (e) the probability of the continuation of the same management, and (f) other related matters affecting successful performance under the provisions of the plan.[182]  As demonstrated below, consideration of these factors supports a finding that the Plan is feasible.

---

[178]  11 U.S.C. § 1129(a)(11).

[179]  *In re Briscoe Enters.*, 994 F.2d at 1165-66 (quoting *In re Lakeside Global II*, 116 B.R. at 507).

[180]  *In re T-H New Orleans,* 116 F.3d at 801 (quoting *In re Landing Assocs.*, 157 B.R. at 820).

[181]  *In re Briscoe Enters.*, 994 F.2d at 1164; *see also In re T-H New Orleans*, 116 F.3d at 801.  Further, a number of courts have held that this standard constitutes a "relatively low threshold of proof."  *In re Mayer Pollock Steel Corp.*, 174 B.R. 414, 423 (Bankr. E.D. Pa. 1994) (stating that the debtors "have established that they meet the requisite low threshold of support for the Plan as a viable undertaking.").

[182]  *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226-27 (Bankr. D.N.J. 2000) (citing *In re Temple Zion*, 125 B.R. 910, 915 (Bankr. E.D. Pa. 1991)); *In re Toy & Sports Warehouse*, 37 B.R. at 151 (citing *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr. D.N.J. 1980)); *see also In re T-H New Orleans*, 116 F.3d at 801 (discussing the factors that the bankruptcy court examined in its decision that the debtor's plan was feasible).

106.    Here, the Financial Projections attached to the Disclosure Statement as <u>Exhibit E</u> and the Gray Declaration demonstrate that the Plan is feasible.  These Financial Projections demonstrate that the Debtors will have sufficient earnings to meet their obligations under the Plan.[183]  Although the Debtors' business operates in a competitive industry and market, and although it is impossible to predict with certainty the precise future profitability of the Debtors' business or industries and markets in which the Debtors operate, confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, the Reorganized Debtors, or any successors to the Reorganized Debtors under the Plan.[184] The proposed Plan, negotiated in good faith between the Debtors and their major creditor constituencies, has more than a reasonable likelihood of success because the transactions contemplated under the Plan will enable the Debtors to continue their current operations while generating positive free cash flow and will eliminate approximately $1.6 billion of the Debtors' prepetition funded debt obligations.[185]

107.    In formulating the Plan, the Debtors and their financial advisors sought to ensure that the Plan would provide sufficient free cash flow to allow the Debtors to continue to operate their business successfully after emergence and to satisfy all of their obligations under the Plan. By substantially reducing the Debtors' prepetition debt and negotiating the Debtors' emergence capital structure, the Reorganized Debtors will be better positioned to service ongoing debt obligations and generate cash flow to reinvest in their business.  Accordingly, the Plan provides for a workable reorganization, with more than a reasonable likelihood of success, and, therefore, satisfies Section 1129(a)(11) of the Bankruptcy Code.

---

[183]  Disclosure Statement, Ex. E; *see also* Gray Declaration, ¶¶ 33-34.

[184]  *See* Gray Declaration, ¶¶ 33-34.

[185]  *See id.*, ¶ 7.

**L.      All Statutory Fees Have Been or Will Be Paid – 11 U.S.C. § 1129(a)(12).**

108.      Section 1129(a)(12) of the Bankruptcy Code provides that a court may confirm a plan of reorganization only if "[a]ll fees payable under Section 1930 of Title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."[186]  Article II.E provides for the payment by each of the Debtors of all fees payable pursuant to Section 1930(a) of the Judicial Code for each quarter (including any fraction thereof) until the earliest to occur of (a) the final decree closing such Debtors' Chapter 11 Case, (b) an order dismissing such Debtor's Chapter 11 Case or (c) an order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. Thus, the Plan meets the requirements of Section 1129(a)(12) of the Bankruptcy Code.

**M.      Plan Does Not Modify Any Retiree Benefit Obligations – 11 U.S.C. § 1129(a)(13).**

109.      Section 1129(a)(13) of the Bankruptcy Code requires that a plan of reorganization provide for the continued payment of certain retiree benefits "for the duration of the period the debtor has obligated itself to provide such benefits."[187]  The Plan does not propose to modify any retiree benefits and Article VI.F provides that the Specified Employee Plans, including any retiree benefit obligations, shall be assumed.  As a result, Section 1114's requirement that the Debtors "shall timely pay and shall not modify any retiree benefits" is satisfied and, therefore, Section 1129(a)(13) of the Bankruptcy Code is satisfied.

**N.      Sections 1129(a)(14)-(a)(16) of the Bankruptcy Code Are Inapplicable.**

110.      Based on the facts of the Chapter 11 Cases, Sections 1129(a)(14) through (16) of the Bankruptcy Code are not applicable.

---

[186]  11 U.S.C. § 1129(a)(12).

[187]  *Id*. at § 1129(a)(13); *see also* 11 U.S.C. § 1114(e).

O.      **Section 1129(b): Confirmation of the Plan Over Nonacceptance of Impaired Classes.**

111.    Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances where the plan is not accepted by all impaired classes of claims and equity interests.  This mechanism is known colloquially as "cram down."  Section 1129(b) provides in pertinent part:

> [I]f all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).

112.    Thus, under Section 1129(b) of the Bankruptcy Code, the Court may "cram down" a plan over rejection by impaired classes of claims or equity interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such classes.[188]

113.    Class 7 (510(b) Claims), Class 8 (Intercompany Claims), Class 9 (Intercompany Interests), and Class 10 (Existing Parent Equity Interests), to the extent Impaired under the Plan, have been deemed to reject the Plan.  The Plan may nonetheless be confirmed over the rejection by such Classes pursuant to Section 1129(b) of the Bankruptcy Code because the Plan does not discriminate unfairly and is fair and equitable with respect to the non-accepting Impaired Classes.

### 1.      The Plan Does Not Discriminate Unfairly.

114.    Section 1129(b)(1) does not prohibit discrimination between classes.  Rather, it prohibits discrimination that is unfair.  Under Section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable

---

[188] *See* 11 U.S.C. § 1129(b)(1).

basis for the disparate treatment.[189]  As between two classes of claims or two classes of equity interests, there is no unfair discrimination if (a) the classes are comprised of dissimilar claims or interests,[190] or (b) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment.[191]

115.    The Plan does not discriminate unfairly with respect to Classes 7, 8, 9 and 10. Specifically, the Plan does not discriminate unfairly against Class 7 (510 (b) Claims) because, unlike Class 6 (General Unsecured Claims) or Class 8 (Intercompany Claims), such Claims are subordinated pursuant to Section 510(b) of the Bankruptcy Code.[192]  Similarly, the Plan does not discriminate unfairly against Class 10 (Exiting Parent Equity Interests) because Holders in Class 10 hold common stock in the Parent, while the only other Class of Equity Interests—Class 9 (Intercompany Interests)—are held by Affiliates and consist of Equity Interests in Debtor entities other than the Parent.  Thus, Classes 9 and 10 are comprised of entirely dissimilar Equity Interests. Finally, the Plan does not discriminate unfairly against Claims and Equity Interests in Classes 8 and 9, to the extent such Claims and Equity Interests are Impaired and deemed to reject the Plan, because such Holders are Affiliates and/or party to the Restructuring Support Agreement, pursuant to which they agreed to support the Plan.

---

[189]  *See In re WorldCom Inc*., No. 02-13533 (AJG), 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct 31, 2003) (citing *In re Buttonwood Partners, Ltd*., 111 B.R 57, 63 (Bankr. S.D.N.Y. 1990); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1986), *aff'd sub nom*, *Kane v. Johns-Manville Corp*., 843 F.2d 636 (2d Cir. 1988)).

[190]  *See, e.g., In re Johns-Manville Corp*., 68 B.R. at 636.

[191]  *See, e.g*., *In re Drexel Burnham Lambert*, 138 B.R. at 715 (separate classification and treatment was rational where members of each class "possess[ed] different legal rights").

[192]  As noted above, Claims in Class 7 (510(b) Claims) are subordinated under Section 510(b) of the Bankruptcy Code "to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock."  *See* 11 U.S.C. § 510(b).

## 2.      The Plan Is Fair and Equitable.

116.     Section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides that a plan is fair and equitable with respect to a class of impaired unsecured claims if under the plan no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest.[193]  Section 1129(b)(2)(C)(ii) of the Bankruptcy Code provides that a plan is fair and equitable with respect to a class of impaired interests if under the plan no holder of any junior interest will receive or retain property under the plan on account of such junior interest.[194]

117.     The Plan complies with the Bankruptcy Code's absolute priority rule with respect to non-accepting Impaired Classes because (a) the Holders of Claims and Equity Interests in Classes 8 and 9 are Affiliates and party to the Restructuring Support Agreement, pursuant to which they agreed to support the Plan, and (b) with respect to Holders of Claims and Equity Interests in Classes 7 and 10, no Holder of a Claim or Equity Interest junior to Holders in Classes 7 and 10 will receive or retain on account of such Claims or Equity Interests any property under the Plan, as applicable.  Accordingly, the Plan is fair and equitable and, therefore, consistent with the requirements of Section 1129(b) of the Bankruptcy Code.

### P.      The Plan Is Not an Attempt to Avoid Tax Obligations – 11 U.S.C. § 1129(d).

118.     Section 1129(d) of the Bankruptcy Code provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of Section 5 of the Securities Act.  The Plan meets these requirements because the principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act, and there has been no filing by any governmental agency asserting such a purpose.

---

[193]  *See* 11 U.S.C. § 1129(b)(2)(B)(ii).

[194]  *See id.* at § 1129(b)(2)(C)(ii).

### III.    WAIVER OF STAY OF EFFECTIVENESS IS APPROPRIATE

119.    The Debtors respectfully request that the Court direct that the Proposed Confirmation Order be effective immediately upon its entry, notwithstanding the 14-day stay imposed under Bankruptcy Rules 3020(e) and 6004(h).  Good cause exists for waiving the 14-day stay.  Such a waiver would benefit the Debtors and their Estates by allowing the Debtors to implement the Plan by promptly seeking necessary regulatory approvals to emerge from chapter 11 as soon as possible.  In addition, effectiveness of the Plan will cut off the accrual of additional administrative expenses by the Debtors in the form of certain professional fees, preserving additional value for the Debtors' Estates and all parties in interest.  Accordingly, a waiver of the 14-day stay is in the best interests of the Estates and will not prejudice any parties in interest.

### <u>CONCLUSION</u>

120.    For all of the reasons set forth herein and in the Gray Declaration, the Evarts Declaration, the Meltzer Declaration, the Kjontvedt Declaration, the Liquidation Analysis, and the Financial Projections, and as will be further shown at the Combined Hearing, the Debtors respectfully request that the Court approve the Disclosure Statement and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Proposed Confirmation Order, and granting such other and further relief as is just and proper.

Dated: February 16, 2024

Respectfully submitted,

*/s/John F. Higgins*
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
**PORTER HEDGES LLP**
1000 Main St., 36th Floor
Houston, Texas 77002
Tel:    713-226-6000
Email:  jhiggins@porterhedges.com
            sjohnson@porterhedges.com
            myoung-john@porterhedges.com

– and –

George A. Davis (NY Bar No. 2401214)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Tel:    212-906-1200
Email:  george.davis@lw.com

– and –

Caroline Reckler (IL Bar No. 6275746)
Joseph C. Celentino (NY Bar No. 5508809)[195]
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Tel:    312-876-7700
Email:  caroline.reckler@lw.com
            joe.celentino@lw.com

– and –

Jeffrey T. Mispagel (NY Bar No. 4842779)
Deniz A. Irgi (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Tel:    213-485-1234
Email:  jeffrey.mispagel@lw.com
            deniz.irgi@lw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

---

[195] Not admitted to practice in Illinois.  Admitted to practice in New York.